**Mark E. Haddad, SBN 205945**
mhaddad@sidley.com
**SIDLEY AUSTIN LLP**
**555 West Fifth Street, Suite 4000**
**Los Angeles, California 90013**
**Telephone: +1 213 896-6000**
**Facsimile: +1 213 896-6600**

FILED
CLERK, U.S. DISTRICT COURT

MAR - 3 2016

CENTRAL DISTRICT OF CALIFORNIA
EASTERN ~ BY DEPUTY

**Eamon P. Joyce (*pro hac vice* motion forthcoming)**
ejoyce@sidley.com
**Nicholas M. McLean (*pro hac vice* motion forthcoming)**
**SIDLEY AUSTIN LLP**
**787 Seventh Avenue**
**New York, New York 10019**
**Telephone: +1 212 839-5300**
**Facsimile: +1 212 839-5599**

**Attorneys for *Amicus Curiae* ACT | The App Association**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF AN APPLE IPHONE SEIZED DURING THE EXECUTION OF A SEARCH WARRANT ON A BLACK LEXUS IS300, CALIFORNIA LICENSE PLATE 35KGD203 | ) Case No. 5:16-CM-00010 SP ) ) **BRIEF OF *AMICUS CURIAE* ACT |** ) **THE APP ASSOCIATION IN** ) **SUPPORT OF APPLE INC.'S** ) **MOTION TO VACATE ORDER** ) **COMPELLING ASSISTANCE** ) ) ) ) Date: March 22, 2016 ) Time: 1:00 p.m. ) Place: Courtroom 3 or 4 ) Judge: The Hon. Sheri Pym ) ) ) ) ) ) |

ORIGINAL

LODGED

2016 MAR -2  PM 3: CLERK U.S. DISTRICT COURT CENTRAL DIST. OF CALIF. RIVERSIDE

# **TABLE OF CONTENTS**

Page

BACKGROUND ....................................................................................................... 1

ARGUMENT ........................................................................................................... 5

I.      THE BURDEN THE GOVERNMENT SEEKS TO IMPOSE IS
        UNPRECEDENTED. ..................................................................................... 6

      A.      The All Writs Act Does Not Support The Type Of Burdensome
                Assistance Compelled Here. ................................................................ 8

      B.      The Government Misapprehends The Extraordinary Burdens,
                Particularly On Small Companies, That Compelled Assistance Of
                This Type Imposes. ............................................................................. 12

      C.      These Burdens Cannot Be Cabined To This Particular Case.................. 15

II.     If the Government Wants These New Tools, It Should Seek New
        Legislation, Not Use the All Writs Act ...................................................... 16

CONCLUSION ....................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Brower v. Cty. of Inyo*, 489 U.S. 593 (1989) ...................................................16

*Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122 (9th Cir. 2003) ......................18

*In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to the Gov't*, 620 F.3d 304 (3d Cir. 2010) ..............................13, 14

*In re Cty. of Orange*, 784 F.3d 520 (9th Cir. 2015) .........................................11

*In re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by this Court*, No. 1:15-MC-1902(JO), 2015 WL 5920207 (E.D.N.Y. Oct. 9, 2015) .............................................................................23

*In re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by this Court*, No. 15-MC-1902(JO), --- F. Supp. 3d ---, 2016 WL 783565 (E.D.N.Y. Feb. 29, 2016) ...........................................................passim

*In re U.S. for an Order Authorizing Roving Interception of Oral Commc'ns*, 349 F.3d 1132 (9th Cir. 2003) .................................................................15

*Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401 (2015) ......................................25

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) .......................................18

*Pennsylvania Bureau of Correction v. U.S. Marshals Serv.*, 474 U.S. 34 (1985) .......22

*Plum Creek Lumber Co. v. Hutton*, 608 F.2d 1283 (9th Cir. 1979) ....................12, 23

*Riley v. California*, 134 S. Ct. 2473 (2014) .................................................3

*U.S. Telecom Ass'n v. F.C.C.*, 227 F.3d 450 (D.C. Cir. 2000) ................................14

*United States v. New York Tel. Co.*, 434 U.S. 159 (1977) ..............................passim

*Whitman v. Am. Trucking Assns.*, 531 U.S. 457 (2001) .......................................23

**Statutes**

18 U.S.C. §§ 2701–2711 ....................................................................14

28 U.S.C. § 1651 ...........................................................................11

**Other Authorities**

ACT, *State of the App Economy* (4th ed. 2016), http://actonline.org/wp-content/uploads/2016_State_of_App_Economy.pdf...........................................2, 10

Julia Angwin, *What's Really at Stake in the Apple Encryption Debate*, ProPublica (Feb. 24, 2016), https://www.propublica.org/article/whats-really-at-stake-in-the-apple-encryption-debate ..................................................................................20

Apple, *Unauthorized Modification of iOS Can Cause Security Vulnerabilities, Instability, Shortened Battery Life, and Other Issues* (Sept. 22, 2015), https://support.apple.com/en-us/HT201954 ...........................................................16

Catherine Barrett, *Healthcare Providers May Violate HIPAA by Using Mobile Devices to Communicate with Patients*, 8 ABA Health *e*Source, no. 2 (Oct. 2011), http://www.americanbar.org/newsletter/publications/aba_health_esource_home/aba_health_law_esource_1110_barrett.html ....................................................................3

Brad Chacos, *Here's How to Best Secure Your Data Now That the NSA Can Crack Almost Any Encryption*, PC World (Sept. 6, 2013), http://www.pcworld.com/article/2048248/heres-how-to-best-secure-your-data-now-that-the-nsa-can-crack-almost-any-encryption.html ..............................................6

Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547 (1999)................................................................................................................16

*The Encryption Tightrope: Balancing Americans' Security and Privacy*, H. Comm. on the Judiciary, 114th Cong. (2016), http://judiciary.house.gov/index.cfm/2016/3/the-encryption-tightrope-balancing-americans-security-and-privacy ..............................24

Ernst & Young, *Bring Your Own Device: Security and Risk Considerations for Your Mobile Device Program*, Insights on Governance, Risk & Compliance (Sept. 2013), http://www.ey.com/Publication/vwLUAssets/EY_-_Bring_your_own_device:_mobile_security_and_risk/$FILE/Bring_your_own_device.pdf ...............................................................................................................4

Federal Communications Commission, *Cyber Security Planning Guide*, https://transition.fcc.gov/cyber/cyberplanner.pdf....................................................2, 4

Federal Trade Commission, *What's the Deal?  An FTC Study on Mobile Shopping Apps* (2014), https://www.ftc.gov/system/files/documents/reports/whats-deal-federal-trade-commission-study-mobile-shopping-apps-august-2014/140801mobileshoppingapps.pdf ...............................................................7, 19

Jim Finkle, *Solid Support for Apple in iPhone Encryption Fight: Poll*, Reuters (Feb. 24, 2016), http://www.reuters.com/article/us-apple-encryption-poll-idUSKCN0VX159.....................................................................................................24

Tomio Geron, *Something Ventured: Uncle Sam Is Staking Start-Ups*, VentureWire (Mar. 12, 2008)..........................................................................................................7

Heidi Hoopes, *Apps to Easily Encrypt Your Text Messaging and Mobile Calls*, Gizmag (Sept. 27, 2014), http://www.gizmag.com/secure-text-messaging-phone-clients-comparison-ios-and-android/34000 ..............................................................6

Orin S. Kerr, *Foreword: Accounting for Technological Change*, 36 Harv. J.L. & Pub. Pol'y 403 (2013)......................................................................................................3

Ivana Kottasova, *Zuckerberg Goes Shopping: Facebook's Top 10 Purchases*, CNN (Mar. 26, 2014), http://www.cnn.com/2014/03/26/business/facebook-acquisitions/index.html ....................................................................................18

N. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* (1937) ....................................................................................16

Michael Mandel, *App Economy Jobs in the United States (Part 1)*, Progressive Pol'y Inst. (Jan. 6, 2016), http://www.progressivepolicy.org/slider/app-economy-jobs-part-1 ....................................................................................1

Michael Mandel, *Where the Jobs Are: The App Economy* (2012), http://www.technet.org/wp-content/uploads/2012/02/TechNet-App-Economy-Jobs-Study.pdf ....................................................................................1

Alyssa Newcomb, *New York DA Says He Can't Access 175 iPhones From Criminal Cases Due to Encryption*, ABC News (Feb. 18, 2016), http://abcnews.go.com/Technology/york-da-access-175-iphones-criminal-cases-due/story?id=37029693 ....................................................................................21

Jessica Rich, Director, Bureau of Consumer Protection, Federal Trade Commission, *Beyond Cookies: Privacy Lessons for Online Advertising*, AdExchanger Industry Preview 2015 (Jan. 21, 2015), https://www.ftc.gov/system/files/documents/public_statements/620061/150121beyondcookies.pdf ....................................................................................5

Paul Ruggiero & Jon Foote, United States Computer Emergency Readiness Team, *Cyber Threats to Mobile Phones* (2011), https://www.us-cert.gov/sites/default/files/publications/cyber_threats-to_mobile_phones.pdf ...........5

Scott J. Savage & Donald M. Waldman, *The Value of Online Privacy* (Univ. of Colo. at Boulder, Working Paper No. 13-02, 2013), http://ssrn.com/abstract=2341311 .....7

U.S. Gov't Accountability Office, GAO-12-757, *Information Security: Better Implementation of Controls for Mobile Devices Should Be Encouraged*, at "Highlights" page (2012), http://www.gao.gov/assets/650/648519.pdf ....................4

Cyrus R. Vance Jr., *No Smartphone Lies Beyond the Reach of a Judicial Search Warrant*, N.Y. Times (Feb. 18, 2016), http://www.nytimes.com/roomfordebate/2016/02/18/crimes-iphones-and-encryption/no-smartphone-lies-beyond-the-reach-of-a-judicial-search-warrant ......21

iv

1   Rather than restating the arguments Apple Inc. ("Apple") has made in its Mo-
2   tion to Vacate the Order Compelling Apple Inc. to Assist Agents in Search, and Op-
3   position to the Government's Motion to Compel Assistance (filed Feb. 25, 2016)
4   [ECF Docket Entry 16] (hereinafter "Apple's Mot."), *amicus curiae* ACT | The App
5   Association ("ACT") writes narrowly to emphasize the enormous burdens that the
6   Government's position would impose on software developers, and to discuss the po-
7   tential damage such a position threatens to inflict on a significant and growing sector
8   of the U.S. economy.

**BACKGROUND**

10   Just one tool to protect privacy and security is directly implicated in this case,
11   but what the Government seeks to do would send rippling effects through the entire
12   digital economy, particularly for those who develop software for the mobile economy.
13   This case involves the Government's ability to dictate to any company that it has to
14   write code for any purpose that potentially would facilitate a law enforcement inves-
15   tigation.  That, as we explain below, would impose an untenable burden on the App
16   Economy, which now is a vital sector of the nation's overall economy and continues
17   to unleash an extraordinary wave of innovation and expansion.  In 2012, "[t]he App
18   Economy [was] responsible for roughly 466,000 jobs in the United States, up from
19   zero in 2007."  Michael Mandel, *Where the Jobs Are: The App Economy* 1 (2012).[1]
20   Today, that number is closer to 1.7 million.  *See* Michael Mandel, *App Economy Jobs*
21   *in the United States (Part 1)*, Progressive Pol'y Inst. (Jan. 6, 2016).  This $120 billion
22   industry is led by U.S. companies, the vast majority of which are startups or small
23   businesses.  *See* ACT, *State of the App Economy* 4 (4th ed. 2016).
24   As the App Economy has grown, so have the demands and expectations of
25   consumers and businesses for privacy and security in connection with their transac-

---

[1] For ease of reading, *amicus curiae* omits URL citations from the body of this brief. The URLs at which to access the cited authorities appear in the Table of Authorities.

1

tions and communications. In a dynamic economy in which consumer trust is essential (and easily lost), businesses are increasingly bundling encryption and other forms of data protection with their products. Privacy and security, therefore, are industry best practices and essential competitive advantages. Any electronic platform that allows two-way communication must think about privacy and security, and any platform that seeks to allow anonymity (for any purpose) must do the same. Thus, against this backdrop, companies have adopted a variety of digital security initiatives to protect data. Encryption, at the fore here, has become an integral part of the U.S. economy: It provides the transaction security that allows companies to sell globally and provides security for much of the nation's commerce, and ensures that our most sensitive data stays private—protecting patient health information, financial data, and every American who shops online. *See, e.g.*, Federal Communications Commission ("FCC"), *Cyber Security Planning Guide*, at PDS-4 ("The two primary safeguards for data are passwords and encryption."). But there are many other means for securing digital information in addition to encryption and the specific processes implicated by the Government's request for assistance here. Software companies design programs that, *inter alia*, limit access to data stored or collected by software, or that purge data automatically after a set period (perhaps most famous is Snapchat, whereby photos and messages are automatically deleted shortly after receipt).

Such privacy and security protections are vital to the mobile economy. As the United States Supreme Court has recognized, "modern cell phones . . . are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley v. California*, 134 S. Ct. 2473, 2484 (2014). "Today, . . . it is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate." *Id.* at 2490. "Mobile application software on a cell phone, or 'apps,' offer a range of tools for managing detailed information about all aspects of a person's life."

2

1    *Id.* Platform designers, telecom providers, and third-party software developers,

2    working together, have created the App Economy in less than a decade, and "[t]he

3    mantra of the smart phone era is that 'there's an app for that,' indicating that there is

4    a program to fulfill every need." Orin S. Kerr, *Foreword: Accounting for Technolog-*

5    *ical Change*, 36 Harv. J.L. & Pub. Pol'y 403, 405 (2013).

6       With mobile platforms and communications now ubiquitous, risks that private

7    data will be breached have multiplied. To start, "[m]obile devices are particularly

8    vulnerable to loss and theft because of their small size and portability. The most

9    common form of security breach is the theft of mobile devices." Catherine Barrett,

10    *Healthcare Providers May Violate HIPAA by Using Mobile Devices to Communicate*

11    *with Patients*, 8 ABA Health *e*Source, no. 2 (Oct. 2011). "Millions of cell phones

12    and smartphones are lost or stolen every year[,]" and "approximately 22% of the total

13    number of mobile devices produced will be lost or stolen during their lifetime, and

14    over 50% of these will never be recovered." Ernst & Young, *Bring Your Own De-*

15    *vice: Security and Risk Considerations for Your Mobile Device Program*, Insights on

16    Governance, Risk & Compliance 4 (Sept. 2013). And while the security of the de-

17    vices themselves is critical, best practices also require a variety of additional protec-

18    tions be implemented with respect to the device's operating system, applications, and

19    other content on the device itself. These protections are critical whether the device is

20    locked or unlocked, because the data stored on mobile devices is regularly targeted

21    by social engineering attacks, malware, and other web and network-based attacks.

22    FCC, *Cyber Security Planning Guide*, at MD–1. As the Government Accountability

23    Office told Congress several years ago, "[t]hreats to the security of mobile devices

24    and the information they store and process have been increasing significantly." U.S.

25    Gov't Accountability Office ("GAO"), GAO-12-757, *Information Security: Better*

26    *Implementation of Controls for Mobile Devices Should Be Encouraged*, at "High-

27    lights" page (2012). Between July 2011 and May 2012 alone, the number of malware

28    attacks on mobile devices jumped *185%. Id.*; *see id.* at 11–14 ("Attacks on Mobile

1    Devices Are Increasing"); *see also* Paul Ruggiero & Jon Foote, United States Com-

2    puter Emergency Readiness Team, *Cyber Threats to Mobile Phones* (2011).

3          In light of these risks, the public is demanding stronger and stronger privacy

4    and security protections. *See, e.g.*, Jessica Rich, Director, Bureau of Consumer Pro-

5    tection, Federal Trade Commission ("FTC"), *Beyond Cookies: Privacy Lessons for*

6    *Online Advertising*, AdExchanger Industry Preview 2015 (Jan. 21, 2015) ("consumer

7    awareness and demand for privacy continues to grow" and there is "even consumer

8    reluctance to engage fully in the marketplace as a result" of these concerns). In re-

9    sponse, companies have taken a variety of measures to protect privacy and security.

10   Software companies have been at the forefront, developing security tools that are sold

11   directly to consumers or other businesses. *See, e.g.*, Heidi Hoopes, *Apps to Easily*

12   *Encrypt Your Text Messaging and Mobile Calls*, Gizmag (Sept. 27, 2014); Brad

13   Chacos, *Here's How to Best Secure Your Data Now That the NSA Can Crack Almost*

14   *Any Encryption*, PC World (Sept. 6, 2013).

15         The current federal regulatory framework not just tolerates but actively en-

16   courages that approach. *See In re Order Requiring Apple, Inc. to Assist in the Execu-*

17   *tion of a Search Warrant Issued by this Court*, No. 15-mc-1902, --- F. Supp. 3d ---,

18   2016 WL 783565, at *19 n.29 (E.D.N.Y. Feb. 29, 2016) ("Not only has Apple done

19   nothing wrong in marketing devices with such strong data security features, it has ex-

20   ercised a freedom that Congress explicitly deemed appropriate in balancing the needs

21   of law enforcement against the interests of private industry."). The FTC, for example,

22   has repeatedly urged app developers to take privacy and security seriously. *See, e.g.*,

23   FTC, *What's the Deal? An FTC Study on Mobile Shopping Apps* 6 n.16 (2014)

24   (hereinafter "FTC Study") ("reiterat[ing] [the FTC's] call for [app] companies to

25   practice 'Privacy by Design' and to offer consumers simplified choices over how

26   their data is handled") (citing additional FTC guidance). Companies do so, and regu-

27

28

4

1  larly compete over the efficacy of the technologies they have developed.[2]  Their in-

2  novations in this space benefit not just the public but also the federal government.

3  *See, e.g.*, Tomio Geron, *Something Ventured: Uncle Sam Is Staking Start-Ups*,

4  VentureWire (Mar. 12, 2008) (discussing the federal government's funding of, and

5  purchases from, IronKey, which develops encryption and other data security prod-

6  ucts).  As discussed below, the Government's demands in this case would severely

7  compromise the ability of software companies to meet the public's demands, as well

8  as the demands of other federal government agencies, for secure data storage and

9  communications.

10                               **ARGUMENT**

11        The Government's demands would impose an unprecedented and extraordi-

12  nary burden on numerous industry participants.  If changes to the policy framework

13  governing the mobile economy's vital technologies need to be made, such changes

14  should come from Congress—not by way of an ad hoc process based on a misappli-

15  cation of a 227-year-old law.  As Magistrate Judge Orenstein of the U.S. District

16  Court for the Eastern District of New York held earlier this week in rejecting a simi-

17  lar attempt by the Government to use the All Writs Act, "the relief the government

18  seeks is unavailable because Congress has considered legislation that would achieve

19  the same result but has not adopted it."  *In re Order Requiring Apple, Inc. to Assist in*

20  *the Execution of a Search Warrant Issued by this Court*, 2016 WL 783565, at *1; *see*

21  *id.* at *17 (recognizing that the type of Government application for assistance here

22  "fails to satisfy the [All Writs Act's] statutory requirements").  Moreover, in the

23  _____

24  [2] This is to be expected because of how consumers value privacy and security.  *See*
    Scott J. Savage & Donald M. Waldman, *The Value of Online Privacy* (Univ. of Colo.

25  at Boulder, Working Paper No. 13-02, 2013) (determining that "privacy permissions
    are . . . important characteristics a consumer considers when purchasing a smartphone

26  app" and that "[t]he representative consumer is willing to make a one-time payment of
    $2.28 to conceal their online browser history, $4.05 to conceal their list of contacts,

27  $1.19 to conceal their location, $1.75 to conceal their phone's identification number,
    and $3.58 to conceal the contents of their text messages").

28

1   course of rejecting the Government's request there, the court recognized that the re-

2   quest was *less* burdensome than the one pending before this Court.  *See id.* at *1 n.3

3   (the request there involved Apple's iOS7, not "later versions" of Apple's operating

4   system, which present "important differences . . . in terms of the difficulty of bypass-

5   ing passcode security"); *id.* at *10 n.14 ("more intrusive relief . . . is precisely what

6   the government seeks in the *California* action," *i.e.*, the case pending here); *id.* at *22

7   ("[T]he government continues to seek orders compelling Apple's assistance in by-

8   passing the passcode security of more recent models and operating systems, notwith-

9   standing the fact that such requests are more burdensome than the one pending

10  here.").

## I.   THE BURDEN THE GOVERNMENT SEEKS TO IMPOSE IS UN-PRECEDENTED.

11  
12          The "assistance" that the Government has compelled through the All Writs Act

13  here is unprecedented and extraordinary.  By the Government's account, the All

14  Writs Act empowers the federal government to compel companies to write software

15  to assist law enforcement, simply because those companies "write[ ] software code as

16  part of [their] regular business."  Gov't's *Ex Parte* Application for Order Compelling

17  Apple Inc. to Assist Agents at 15 (C.D. Cal. Feb. 16, 2016) [ECF Docket Entry 18]

18  (hereinafter "*Ex Parte* Application"); *id.* ("the order in this case requires Apple to

19  provide modified software").  The Government contends that this power over a third

20  party, which has not engaged in any wrongful conduct, is incident to a "warrant au-

21  thorizing the search" of property used by an accused criminal and the property own-

22  er's "consent."  *Id.* at 1.  The notion that the All Writs Act permits this remedy—

23  which more closely resembles a mandatory injunction imposed against a defendant

24  found liable for causing significant harm or the type of structural relief found in a

25  consent decree—is incredible.  *See In re Order Requiring Apple, Inc. to Assist in the*

26  *Execution of a Search Warrant Issued by this Court*, 2016 WL 783565, at *20–24

27  (rejecting the Government's request for All Writs Act relief, and explaining that the

28

1   assistance the Government attempted to compel has no parallel in and "is irreconcila-

2   ble with," *id.* at \*23, the line of cases upon which the Government also relies here).

3          Moreover, nothing in the Government's argument limits this construction of

4   the All Writs Act to the device and operating system at issue here; to a particular type

5   of privacy measure used to protect the device, its operating system, its applications or

6   its data; to the type of software company (multi-national with extraordinary re-

7   sources) whose assistance is being conscripted; or to the type of crime (terrorism and

8   mass murder) that gave rise to the search warrant with which the third party is now

9   compelled to assist.  Nor are any of the Government's arguments logically capable of

10  doing so.  *See generally id.* at \*23–24.  The interpretation of the All Writs Act that

11  would allow the Government to compel Apple to write software to avoid the security

12  measures currently in place on the locked phone in question would similarly allow

13  the Government to compel any software company of any size to rewrite, alter, or de-

14  stroy their software programs if that would assist the Government in an investigation.

15  *See id.* at \*13 ("[T]he implications of the government's position are so far-reaching—

16  both in terms of what it would allow today and what it implies about Congressional

17  intent in 1789—as to produce impermissibly absurd results.") (citation omitted); *id.*

18  at \*24 ("Nothing in the government's arguments suggests *any principled limit* on

19  how far a court may go in requiring a person or company to violate the most deeply-

20  rooted values to provide assistance to the government the court deems necessary.")

21  (emphasis added).

22          Because the number of players in the computer technology industry (and, more

23  specifically, the mobile economy, *see State of the App Economy*, *supra*, at 2–4, 8–10)

24  is large and increasing, and because many of those industry participants use proprie-

25  tary methods both to protect data privacy *and* "write[ ] software code," *Ex Parte* Ap-

26  plication at 15, the Government's ability to commandeer a third party to alter an op-

27  erating system or to write new software in the interest of law enforcement objectives

28  has enormous repercussions.  The form of "assistance" the Government has con-

scripted Apple to provide here would require massive expenditures of time and re-
sources from *any* industry player, and it would be exceptionally onerous for the small
companies that constitute the majority of ACT's members and that are the heart of
the mobile economy.  The extent, if any, to which the thousands of participants in the
App Economy should be enlisted to aid the Government in criminal investigations in
such a manner was not resolved by Congress in 1789 when it passed the All Writs
Act, and the courts should allow Congress to address the issue now rather than fash-
ioning what would be in effect a common law solution to a significant matter of pub-
lic policy.  *In re Order Requiring Apple, Inc. to Assist in the Execution of a Search
Warrant Issued by this Court*, 2016 WL 783565, at *27 ("It would betray our consti-
tutional heritage and our people's claim to democratic governance for a judge to pre-
tend that our Founders already had that debate [relevant to such motions to compel
assistance], and ended it, in 1789.").

### A.    The All Writs Act Does Not Support The Type Of Burdensome Assistance Compelled Here.

"The All Writs Act provides that federal courts 'may issue all writs necessary
or appropriate in aid of their respective jurisdictions and agreeable to the usages and
principles of law.'"  *In re Cty. of Orange*, 784 F.3d 520, 526 (9th Cir. 2015) (quoting
28 U.S.C. § 1651).  The scope of the Act may "extend[ ], under appropriate circum-
stances, to persons who [are] not parties to the original action" and potentially "en-
compasses even those who have not taken any affirmative action to hinder justice."
*United States v. New York Tel. Co.*, 434 U.S. 159, 174 (1977) (citation omitted).  As
summarized by the Ninth Circuit, "[i]n *New York Telephone*, the Supreme Court held
that the All Writs Act empowered the district court to order a third party telephone
company to provide facilities it regularly used for its own purposes to assist the FBI
to conduct a search."  *Plum Creek Lumber Co. v. Hutton*, 608 F.2d 1283, 1289 (9th
Cir. 1979).  Such an order, according to the Supreme Court, was "authorized by the
All Writs Act and was consistent with the intent of Congress."  *New York Tel. Co.*,

434 U.S. at 172. The Supreme Court, however, made clear that "the power of federal courts to impose duties upon third parties is not without limits[,]" and that "unreasonable burdens may not be imposed." *Id.*

The All Writs Act, "read with the *New York Telephone* gloss, permits the district court, in aid of a valid warrant, to order a third party to provide *nonburdensome* technical assistance to law enforcement officers." *Plum Creek*, 608 F.2d at 1289 (emphasis added). In that way, the All Writs Act can serve as an interstitial, gap-filling tool. But it is also important to bear in mind what the All Writs Act does *not do*. The statute "does not give the district court a roving commission to order a party subject to an investigation to accept additional risks at the bidding of . . . inspectors." *Id.* "It does not authorize a court to order a party to bear risks not otherwise demanded by law, or to aid the government in conducting a more efficient investigation, when other forms are available." *Id.* at 1289–90. It does not constitute "a grant of plenary power to the federal courts." *Id.* at 1289; *see In re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by this Court*, 2016 WL 783565, at *17–18, *20–24 (discussing *New York Telephone*).

The Government's position here flaunts those principles. *See In re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by this Court*, 2016 WL 783565, at *1, *5–17. The Government seeks a power that extends far beyond any previously recognized under the All Writs Act. Notably, the Government cannot point to a *single* case under the All Writs Act (or otherwise), in which a court compelled a third party to build software, let alone to restructure a business, in order to assist in a criminal investigation. *See, e.g., Ex Parte* Application at 14–16. There is a good reason for this: Such a power is utterly unprecedented, and it is all the more extraordinary here where the Government invokes this power against a third party—a third party who, moreover, has acted *within* the carefully-constructed priva-

cy frameworks established by Congress.[3]

"The growth of electronic communications has stimulated Congress to enact statutes that provide both access to information heretofore unavailable for law enforcement purposes and, at the same time, protect users of such communication services from intrusion that Congress deems unwarranted." *In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to the Gov't*, 620 F.3d 304, 306 (3d Cir. 2010); *see generally In re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by this Court*, 2016 WL 783565, at *5–7, *8–17 (discussing existing legislation and legislation Congress has chosen not to enact); Apple's Mot. at 8–10, 16–18 (discussing statutes relevant here).[4]  This framework struck an important balance:  For example, "[f]inding that 'new and emerging telecommunications technologies pose problems for law enforcement,'" Congress sought "to preserve the government's ability, pursuant to court order or other lawful authorization, to intercept communications involving advanced technologies . . . while protecting the privacy of communications and *without impeding the introduction of new technologies, features, and services*[.]"  *U.S. Telecom Ass'n v. F.C.C.*, 227 F.3d 450, 454 (D.C. Cir. 2000) (emphasis added) (citation omit-

---

[3] Notwithstanding the Government's statement that "providers of electronic communications services and remote computing services are sometimes required to write code in order to gather information in response to subpoenas or other process[,]" *Ex Parte* Application at 15, the Government cannot point to a single instance where the *All Writs Act* has imposed the requirement.  That Congress may have *legislated* such requirements in other contexts does not strengthen the Government's case here, *see generally In re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by this Court*, 2016 WL 783565, at *9–12; it instead shows why the Government's position must be rejected.

[4] As the Third Circuit has summarized, "[t]he Stored Communications Act . . . , was enacted in 1986 as Title II of the Electronic Communications Privacy Act of 1986 . . . , Pub.L. No. 99-508, 100 Stat. 1848 (1986) (codified as amended at 18 U.S.C. §§ 2701–2711 (2010)), which amended the Omnibus Crime Control and Safe Streets Act of 1968, . . . Pub.L. No. 90-351, 82 Stat. 197 (1968).  In 1994, Congress enacted the Communications Assistance for Law Enforcement Act [CALEA], Pub.L. No. 103-414, 108 Stat. 4279, 4292 (1994) (codified in relevant part at 18 U.S.C. § 2703 (2010)), in part to amend the [Stored Communications Act]."  *In re Application*, 620 F.3d at 306 (footnote omitted).

10

1  ted).

2       But the Government now seeks to do an end-run around the existing frame-

3  work—and stands to demolish the significant reliance interests associated with it—

4  and, instead, arrogate to itself new powers that impose extraordinary burdens.  "The

5  obligation of private citizens to assist law enforcement, even if they are compensated

6  for the immediate costs of doing so, has not extended to circumstances in which there

7  is a complete disruption of a service they offer to a customer as part of their busi-

8  ness[.]"  *In re U.S. for an Order Authorizing Roving Interception of Oral Commc'ns*,

9  349 F.3d 1132, 1145 (9th Cir. 2003).  App developers have taken privacy and securi-

10  ty seriously, and built entire business models based on delivering information securi-

11  ty to their customers.  Now, the Government (by which we mean specifically the law

12  enforcement arm of the Executive, not the federal government more broadly) wants

13  to weaken data protection.  And weaker data protection is bad for business, bad for

14  innovation, and ultimately bad for consumers.  (By contrast, it would be a boon to

15  hackers, cyberterrorists and unfriendly or rogue governments.)  Moreover, when

16  companies have been told by legislators, policy-setting agencies and consumers that

17  they should aspire to create the strongest protections possible, and then certain actors

18  in the Executive Branch seek to undo those protections after the fact—without prior

19  notice, let alone comment and debate—it imposes unanticipated harms on developers

20  while disrupting the marketplace, discouraging innovation, and failing to account for

21  the full range of relevant economic and consumer interests.  *In re Order Requiring*

22  *Apple, Inc. to Assist in the Execution of a Search Warrant Issued by this Court*, 2016

23  WL 783565, at *26–27.

24       Indeed, the Government's distortion and misapplication of *New York Tele-*

25  *phone* makes Justice Stevens's dissent in that case appear prophetic.  *See New York*

26  *Tel. Co.*, 434 U.S. at 178–91 (Stevens, J., dissenting in part).  The dissent suggested

27  that while the relatively mild burden imposed in *New York Telephone* might not be

28  "particularly offensive," the order at issue in that case nevertheless was "deeply trou-

bling as a portent of . . . powers that future courts may find lurking in the arcane language of . . . the All Writs Act." *Id.* Justice Stevens might well have been speaking of the Government's position in this case.[5]

### B. The Government Misapprehends The Extraordinary Burdens, Particularly On Small Companies, That Compelled Assistance Of This Type Imposes.

The Government's arguments against the existence of an unreasonable burden not only are unsupported by any case law, but they also misconstrue the burdens at issue. At bottom, the Government's position rests on fallacies. *See Ex Parte Application* at 15. That one can build software that fulfills a particular function in the first instance does not mean that one can undo it without creating significant harms. The risks associated with such revisions are especially severe where, as here, the modifications need to occur at the operating system level of the code, because the operating system affects all applications that run on and data stored on the device and therefore can create cascading problems throughout. *See, e.g.*, Apple, *Unauthorized Modification of iOS Can Cause Security Vulnerabilities, Instability, Shortened Battery Life, and Other Issues* (Sept. 22, 2015). Indeed, the Government's position borders on the absurd in the context of software development. Not only are the burdens imposed extraordinary (*i.e.*, diverting resources from company's actual business to being a tool

---

[5] As Justice Stevens observed, the type of power the Government seeks here *might* find a certain historical parallel in the common law "writ of assistance." *New York Tel. Co.*, 434 U.S. at 180. "The writ of assistance . . . took its name from its command that all peace officers and any other persons who were present 'be assisting' in the performance of the search." Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 561 n.18 (1999). Such writs "commanded 'all officers and subjects of the Crown to assist in their execution,' and were not returnable after execution, but rather served as continuous authority during the lifetime of the reigning sovereign." *New York Tel. Co.*, 434 U.S. at 180 n.3 (quoting N. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* 53–54 (1937)). But "[t]he use of that writ by the judges appointed by King George III was one British practice that the Revolution was specifically intended to terminate." *Id.* at 190; *see Brower v. Cty. of Inyo*, 489 U.S. 593, 596 (1989) (identifying "writs of assistance" as "the principal grievance against which the Fourth Amendment was directed").

12

1  of government),[6] but the goals the Government seeks to achieve are far from assured.

2  As any computer user knows, many software patches, which are far more basic than

3  what the Government seeks to compel here, fail to fix problems, make other things

4  worse, or simply necessitate more patches.

5        Additionally, although Apple faces extraordinary burdens here, *see* Declaration

6  of Erik Neuenschwander in Support of Apple's Mot. (Feb. 25, 2016), the burdens

7  likely would be far weightier for a smaller or startup software company conscripted

8  to develop software to assist a Government investigation.  Put simply, the small busi-

9  nesses who comprise the majority of ACT's 5,000-plus members do not have the per-

10  sonnel or the resources to effectuate the type of new software development that the

11  Government compelled here.  *See id.* ¶¶ 3, 21–22 (testifying that "between six and

12  ten Apple engineers and employees" would be required).  The logic set forth by the

13  Government in obtaining relief under the All Writs Act, however, lacks any princi-

14  pled stopping point:  *Any* app developer might generate and apply privacy and securi-

15  ty protections that neither the developer nor the Government could crack.[7]

16        Moreover, the burdens associated with the sort of assistance compelled here go

17  well beyond writing software.  For one thing, not only must a company *write* the new

18  software, its personnel—once conscripted as quasi-forensic scientists developing and

19  testing methods to support a prosecution—likely will be haled into courts around the

20  country to *testify* about it as well.  *See generally Melendez-Diaz v. Massachusetts*,

21  557 U.S. 305, 310 (2009) (forensic reports available for use at trial are "testimonial

22

23  [6] *See In re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by this Court*, 2016 WL 783565, at *20 (rejecting Government's argument that

24  assistance it sought to compel would not impose unreasonable burdens, stating "[t]he salient points that the Court highlighted as the basis for finding a lack of unreasonable

25  burdens in *N.Y. Tel. Co.* are virtually all absent here," notwithstanding as noted *supra* at 6, the burdens there were less than in this case).

26  [7] The app industry has been marked by some of the most innovative content being de-

27  veloped by small startups, which has directly led to larger industry players purchasing those small companies or their technologies.  *See, e.g.*, Ivana Kottasova, *Zuckerberg Goes Shopping: Facebook's Top 10 Purchases*, CNN (Mar. 26, 2014).

28

statements" and a certifying analyst is a "'witness[ ]' for purposes of the Sixth Amendment").

Irrespective of whether the conscripted employees trigger a defendant's Confrontation Clause protections, a necessary incident to the compelled assistance is that a company's proprietary software used to incriminate the criminal defendant will become discoverable by the criminal defendant and by his or her experts. As a result, those experts may attempt to attack the reliability of the recovered data and the methods used to obtain it. This, in turn, likely will be subject to further court proceedings as the experts' data-recovery methodology is questioned and passed on by the trial court in its gate-keeping role. Even assuming that the "strong presumption in favor of access to court records," *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003), is overcome and that robust protective orders remain in place throughout this process, some disclosure of the software company's proprietary methods would be inherent to this process. Consistent with this, companies, consumers and the United States Government itself reasonably should fear that, once the privacy protections are compromised for one purpose, they will more readily be compromised by hackers, criminals, and foreign governments from which they have attempted to shield such information.

Although one cannot predict with absolute certainty the full range of second-order effects resulting from the Government's use of the All Writs Act in this manner, there is no question that even the mere prospect of these extraordinary burdens will chill innovation and deter companies and individuals from entering this important space.[8] Technology development will be compromised, perhaps radically so, in an

---

[8] Moreover, the Government's position may have adverse consequences even with respect to those actors that choose to remain in the privacy and security marketplace. Specifically, because the magnitude of the burdens imposed often will vary in proportion to the security of the measures in place, *see In re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by this Court*, 2016 WL 783565, at *22, the Government's proposed use of the All Writs Act would perversely incentivize use of measures that provide *less* privacy and security protections for businesses

*(Footnote continued)*

14

area of exceptional importance to consumers and the broader economy—despite that
the federal government's other arms, as noted, have encouraged and in some cases
required companies to focus on and strengthen data privacy and security.  The un-
precedented order the Government seeks is not authorized by the All Writs Act; it
would impose an extraordinary and unreasonable burden both on Apple and on thou-
sands of other entities across the App Economy.

### C.     These Burdens Cannot Be Cabined To This Particular Case.

Finally, it is important to understand how broadly applicable the powers sought
by the Government would be, in practice.  Notwithstanding the Government's at-
tempts to emphasize the specific facts of this case, *see Ex Parte* Application at 1–4,
16–17, there is nothing in the Government's argument that provides a principled
stopping point that would limit the assistance sought to cases such as this one.  *In re
Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by
this Court*, 2016 WL 783565, at *13, *22–24.  The Government's argument regard-
ing the lawfulness of this Court's order does not, for example, carefully weigh the
specifics of its interest in investigating and combating terrorism against the specifics
of the burden imposed.[9]  Rather, it focuses only on the supposed lack of a burden on
Apple, which is based on reasoning that, as explained, would apply to any company
that writes software.  The Government does this, presumably, because it does not ac-
tually *want* an order that would apply "'Just this once.'"  Apple's Mot. at 3.

For example, as recently disclosed in the Eastern District of New York case
discussed throughout this brief, the federal government has sought similar orders in-

---

and consumers.  This would undermine the government's broader aims of fostering
increased security.  *See, e.g.*, FTC Study, *supra* at 4.

[9] The Government's presumption is that where a company's technology is implicated
in a government investigation, *see Ex Parte* Application at 13–14, and where a com-
pany's technology provides some barrier to fully effectuating a warrant, *id.* at 16–
17—conditions that often will be met where data privacy is at issue—a company can
be compelled to write software relevant to the same technological subject matter, *id.* at
14–16.

1   volving twelve other devices manufactured by Apple alone.  *See In re Order Requir-*
2   *ing Apple, Inc. to Assist in the Execution of a Search Warrant Issued by the Court*,
3   2016 WL 783565, at \*22; *see also* Julia Angwin, *What's Really at Stake in the Apple*
4   *Encryption Debate*, ProPublica (Feb. 24, 2016).  Moreover, as Manhattan District At-
5   torney Cyrus Vance has stated, this issue implicates not just federal investigations,
6   but "virtually all criminal investigations, the overwhelming majority of which are
7   handled by state and local law enforcement."  Cyrus R. Vance Jr., *No Smartphone*
8   *Lies Beyond the Reach of a Judicial Search Warrant*, N.Y. Times (Feb. 18, 2016).
9   Vance's office alone "has 175 iPhones it can't open."  Alyssa Newcomb, *New York*
10  *DA Says He Can't Access 175 iPhones From Criminal Cases Due to Encryption*,
11  ABC News (Feb. 18, 2016).

12      The Government's position converts every criminal investigation into an op-
13  portunity to enlist the aid of software companies.  But the All Writs Act is a gap-
14  filling tool, not a license for the federal courts to regulate a critical function of a rap-
15  idly growing $120 billion industry through the common law.  The kinds of trade-offs
16  between national security and data security that the Government asks this Court to
17  make require the gathering of information and the reconciliation of competing na-
18  tional policy goals that Congress should address.  *In re Order Requiring Apple, Inc.*
19  *to Assist in the Execution of a Search Warrant Issued by the Court*, 2016 WL
20  783565, at \*8–17, \*26–27.

21  **II.   IF THE GOVERNMENT WANTS THESE NEW TOOLS, IT SHOULD**
22  **SEEK NEW LEGISLATION, NOT USE THE ALL WRITS ACT**

23      There is no doubt that tensions and competing interests exist between law en-
24  forcement's interests and the broader interest of ensuring data privacy.  *In re Order*
25  *Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by the*
26  *Court*, 2016 WL 783565, at \*26.  To address the sensitive balancing of these consid-
27  erations, however, the answer is not to contort the All Writs Act and *New York Tele-*
28  *phone* beyond recognition.  If a change needs to be made to the manner in which the

16

interests at issue here are weighed, it should be made by Congress. "The All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute. Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling." *Pennsylvania Bureau of Correction v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985). The Act, in other words, is a narrow tool designed to fill in statutory gaps. Although it "empowers federal courts to fashion extraordinary remedies when the need arises, it does not authorize them to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate." *Id.; see In re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by this Court*, 2016 WL 783565, at *5–17; Apple's Mot. at 14–19.

"The All Writs Act is not a grant of plenary power to the federal courts," nor is it a font of "wide-ranging inherent powers" pursuant to which a court may "impose a duty on a private party when Congress has failed to impose one." *Plum Creek*, 608 F.2d at 1289–90. "To so rule would be to usurp the legislative function and to improperly extend the limited federal court jurisdiction." *Id.*

The Government invites this Court to conclude that it somehow would be "consistent with the intent of Congress," *New York Tel. Co.*, 434 U.S. at 172, for the All Writs Act to give courts and prosecutors the power to effect cataclysmic change across a $120 billion industry, disrupting many settled expectations and threatening critical consumer privacy interests in the process. But Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Assns.*, 531 U.S. 457, 468 (2001). Still less should such a change be based on the mere *possibility* that Congress may have "failed to consider" the type of compelled action sought here. *In re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by this Court*, No. 1:15-mc-1902, 2015 WL 5920207, at *1 (E.D.N.Y. Oct. 9, 2015). This is particularly so when Congress has legislated within

17

this very field and chose not to go further. *See* discussion *supra* at I.A; *In re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by this Court*, 2016 WL 783565, at *19 n.29 ("CALEA provides that law enforcement agencies cannot do precisely what the government suggests here: dictate to a private company in the business of manufacturing smartphones the extent to which it may install data security features on such devices."); *id.* at *10 n.13; Apple's Mot. at 8–10, 16–18.

   If it wished to do so, Congress could legislate against the forms of information security that the Government is seeking to bypass. *See, e.g., In re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by this Court*, 2016 WL 783565, at *12.[10] The issue clearly has not escaped Congress's attention. Just yesterday—on March 1, 2016—the House Judiciary Committee held a hearing entitled *The Encryption Tightrope: Balancing Americans' Security and Privacy.* H. Comm. on the Judiciary, 114th Cong. (2016). Here, the "tightrope" should be Congress's to walk, not this Court's. If the Government needs new law-enforcement tools, and if those needs outweigh Americans' vital privacy and security interests, then that decision should be debated and properly addressed to Congress, not to this Court: "Congress has the prerogative to determine the exact right response—choosing the policy fix, among many conceivable ones, that will optimally serve the public interest." *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2414 (2015). With new legislation, companies could assess the risks and burdens *ex ante*, and they could ensure that their voices are heard, and that *all* the relevant factors are considered. *In re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued*

---

[10] Of course, it is not clear whether such an action would have the support of the American people. *See, e.g.,* Jim Finkle, *Solid Support for Apple in iPhone Encryption Fight: Poll,* Reuters (Feb. 24, 2016) ("Forty-six percent of respondents said they agreed with Apple's position, 35 percent said they disagreed and 20 percent said they did not know, according to poll results released on Wednesday. Other questions in the poll showed that a majority of Americans do not want the government to have access to their phone and Internet communications, even if it is done in the name of stopping terror attacks.").

*by the Court*, 2016 WL 783565, at \*26–27.  The All Writs Act should not be used to effect dramatic change that fails to account for the full range of relevant interests, disrupts settled expectations, and imposes considerable harms on one of the country's most important economic engines.

## CONCLUSION

For the foregoing reasons, *amicus curiae* ACT urges the Court to grant Apple's Motion to Vacate the Order Compelling Apple Inc. to Assist Agents in Search.

Dated:  March 2, 2016                SIDLEY AUSTIN LLP


By: _Mark E. Haddad_
Mark E. Haddad
Eamon P. Joyce
Nicholas M. McLean
Attorneys for *Amicus Curiae* ACT | The
App Association