1  Michael M. Maddigan (Bar No. 163450)
   HOGAN LOVELLS US LLP
2  1999 Avenue of the Stars, Suite 1400
   Los Angeles, California 90067
3  Telephone:   (310) 785-4600
   Facsimile:   (310) 785-4601
4  michael.maddigan@hoganlovells.com

5  Neal Kumar Katyal (*pro hac vice* application forthcoming)
   HOGAN LOVELLS US LLP
6  555 Thirteenth Street, N.W.
   Washington, D.C. 20004
7  Telephone:   (202) 637-5600
   Facsimile:   (202) 637-5910
8  neal.katyal@hoganlovells.com

9  Attorneys for *Amici Curiae*

10
11              UNITED STATES DISTRICT COURT
12              CENTRAL DISTRICT OF CALIFORNIA
13                    EASTERN DIVISION
14
15  IN THE MATTER OF THE SEARCH          ED No. CM 16-10 (SP)
    OF AN APPLE IPHONE SEIZED
16  DURING THE EXECUTION OF A            **BRIEF OF AMICI CURIAE**
    SEARCH WARRANT ON A BLACK            **AMAZON.COM, BOX, CISCO**
    LEXUS IS300, CALIFORNIA              **SYSTEMS, DROPBOX,**
17  LICENSE PLATE 35KGD20                **EVERNOTE, FACEBOOK,**
                                         **GOOGLE, MICROSOFT,**
18                                       **MOZILLA, NEST, PINTEREST,**
                                         **SLACK, SNAPCHAT, WHATSAPP,**
19                                       **AND YAHOO IN SUPPORT OF**
                                         **APPLE, INC.**
20
21                                       **Hearing**:
22                                       Date:      March 22, 2016
                                         Time:      1:00 p.m.
23                                       Place:     Courtroom 3 or 4
                                         Judge:     Hon. Sheri Pym
24
25
26
27
28

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
LOS ANGELES

FILED
CLERK, U.S. DISTRICT COURT
MAR - 4 2016
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION   BY DEPUTY

LODGED
2016 MAR -3 PM 3: 21
CLERK US DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

BY FAX

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES...........................................................................ii

STATEMENT OF INTEREST ....................................................................... 1

ARGUMENT................................................................................................. 5

I.    THE GOVERNMENT'S INTERPRETATION OF THE
ALL WRITS ACT IS UNPRECEDENTED AND
UNNECESSARY ............................................................................... 5

    A.    The All Writs Act Is A Limited, "Residual" Source Of
Federal Court Authority........................................................... 5

    B.    The Government Seeks A Dramatic Extension Of
*New York Telephone* To Cover Ever-Evolving
Technologies............................................................................. 6

    C.    The Government's Interpretation Of The All Writs
Act Ignores Congress's Comprehensive Regulation Of
Investigative Methods............................................................. 10

II.    THE LAW DOES NOT ALLOW FEDERAL AGENTS TO
CONSCRIPT COMPANIES INTO DEFEATING THEIR
OWN SECURITY SAFEGUARDS AND PRODUCT
DESIGNS ......................................................................................... 15

    A.    The Government Seeks Here Far More Than The
Nonburdensome Technical Assistance Allowed By
The All Writs Act .................................................................. 15

    B.    The Government's Position, If It Prevails, Will
Undermine The Security Of Americans' Most
Sensitive Data ....................................................................... 18

III.    THE CANON OF CONSTITUTIONAL AVOIDANCE
COUNSELS AGAINST THE GOVERNMENT'S
EXPANSIVE INTERPRETATION OF THE ALL WRITS
ACT ................................................................................................. 21

CONCLUSION........................................................................................... 24

# TABLE OF AUTHORITIES

Page

CASES:

*Adams v. United States ex rel. McCann,*
   317 U.S. 269 (1942) ...................................................................................... 5

*Bernstein v. Dep't of Justice,*
   176 F.3d 1132 (9th Cir. 1999)..................................................................... 22

*Brown v. Entertainment Merchants Ass'n,*
   131 S. Ct. 2729 (2011) ................................................................................ 22

*Diamond v. Chakrabarty,*
   447 U.S. 303 (1980) .................................................................................... 12

*FTC v. Wyndham Worldwide Corp.,*
   799 F.3d 236 (3d Cir. 2015)........................................................................ 18

*Harris v. Nelson,*
   394 U.S. 286 (1969) ...................................................................................... 5

*In re Application of U.S. for an Order Authorizing an In-Progress*
   *Trace of Wire Commc'ns Over Tel. Facilities,*
   616 F.2d 1122 (9th Cir. 1980)................................................................. 7, 15

*In re Application of U.S. for an Order Directing a Provider of*
   *Commc'n Serv. to Provide Technical Assistance to Agents of the*
   *U.S. Drug Enforcement Administration,*
   No. 15-1242, 2015 WL 5233551 (D.P.R. Aug. 27, 2015)................................. 15

*In re Application of U.S. for an Order Directing X to Provide Access*
   *to Videotapes,*
   No. 03-89, 2003 WL 22053105 (D. Md. Aug. 22, 2003) ............................. 8, 16

*In re Order Requiring Apple, Inc. to Assist in the Execution of a*
   *Search Warrant Issued by This Court,*
   No. 15-MC-1902 (E.D.N.Y. Feb. 29, 2016) ................................................*passim*

*INS v. St. Cyr,*
   533 U.S. 289 (2001) .................................................................................... 21

*Junger v. Daley,*
    209 F.3d 481 (6th Cir. 2000) ........................................................................ 22

*NAACP v. Button,*
    371 U.S. 415 (1963) ...................................................................................... 24

*NLRB v. Catholic Bishop of Chicago,*
    440 U.S. 490 (1979) ...................................................................................... 24

*Pennsylvania Bureau of Corr. v. United States Marshals Serv.,*
    474 U.S. 34 (1985) ..................................................................... 5, 6, 10, 12

*Plum Creek Lumber Co. v. Hutton,*
    608 F.2d 1283 (9th Cir. 1979) ............................................................. *passim*

*Riley v. California,*
    134 S. Ct. 2473 (2014) ............................................................................. 8, 9

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
    487 U.S. 781 (1988) ...................................................................................... 23

*Sorrell v. IMS Health Inc.,*
    131 S. Ct. 2653 (2011) .................................................................................. 22

*United States v. Hall,*
    583 F. Supp. 717 (E.D. Va. 1984) ........................................................ 8, 16

*United States v. Jones,*
    132 S. Ct. 945 (2012) ...................................................................................... 9

*United States v. New York Tel. Co.,*
    434 U.S. 159 (1977) ............................................................................. *passim*

*United States v. X,*
    601 F. Supp. 1039 (D. Md. 1984) ................................................................. 8

*Universal City Studios, Inc. v. Corley,*
    273 F.3d 429 (2d Cir. 2001) ........................................................................ 22

STATUTES:

18 U.S.C. §§ 2511-2522 .................................................................................. 10

18 U.S.C. §§ 2701-2712 .................................................................................... 4

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
LOS ANGELES

- iii -

BRIEF OF AMICI CURIAE

18 U.S.C. § 2703 ............................................................................................ 11

28 U.S.C. § 1651 ....................................................................................... *passim*

47 U.S.C. §§ 1001-1010 ............................................................................... 11

47 U.S.C. § 1002(b)(2) ................................................................................. 11

47 U.S.C. § 1002(b)(3) ................................................................................. 11

50 U.S.C. § 1805 .......................................................................................... 10

50 U.S.C. § 1874 .......................................................................................... 14

USA Freedom Act of 2015, Pub. L. No. 114-23, 129 Stat. 268 (2015) ................... 10

**CONSTITUTIONAL PROVISIONS:**

U.S. Const. amend. I ................................................................. 21, 22, 23, 24

U.S. Const. amend. IV .................................................................................. 8, 9

**OTHER AUTHORITIES:**

Harold Abelson et al., *Keys Under Doormats: Mandating Insecurity by*
    *Requiring Government Access to All Data And Communications*
    (Jul. 6, 2015) ......................................................................................... 20

Devlin Barrett et al., *Apple and Others Encrypt Phones, Fueling*
    *Government Standoff*, The Wall St. J., Nov. 18, 2014 ...................... 18

Katie Benner & Matt Apuzzo, *Narrow Focus May Aid F.B.I. in Apple*
    *Case*, N.Y. Times, Feb. 22, 2016 ....................................................... 13

Cory Bennett & Katie Bo Williams, *Week Ahead: Encryption Fight*
    *Heats Up*, The Hill, Feb. 22, 2016 ..................................................... 12

Box, *Privacy Policy*, http://goo.gl/QQr1u1 ............................................. 14

James B. Comey, Dir., FBI, *Joint Statement with Deputy Attorney*
    *General Sally Quillian Yates Before the Senate Judiciary*
    *Committee* (July 8, 2015) ..................................................................... 19

The Chertoff Group, *The Ground Truth About Encryption and the*
    *Consequences of Extraordinary Access*, http://goo.gl/Z9xPpj ........... 20

Dropbox, *2015 Transparency Report*, https://goo.gl/HhEUQm ................................ 5

Dropbox, *Privacy Policy*, http://goo.gl/QQr1u1 ...................................................... 14

Evernote, *Privacy Policy*, https://goo.gl/yKbzbq ...................................................... 14

Evernote, *Transparency Report for 2015*, https://goo.gl/MIpwJW ........................... 4

Facebook, *Data Policy*, http://goo.gl/VxoRFQ ........................................................ 14

Facebook, *Information for Law Enforcement*, https://goo.gl/SdfH4r ........................ 4

Facebook, *United States Law Enforcement Requests for Data*,
    https://goo.gl/YwTyOQ ...................................................................................... 4

Google, *Privacy & Terms*, https://goo.gl/NICNc ..................................................... 13

Google, *Transparency Report*, https://goo.gl/RkS5f8 ................................................ 4

Julia Harte & Julia Edwards, *Apple Lawyer, FBI Director Face Off in
    Congress on iPhone Encryption*, REUTERS, Mar. 2, 2016 .................................. 13

Amy Hess, Exec. Assistant Dir., Science & Technology Branch, FBI,
    *Statement Before the House Oversight and Government Reform
    Committee, Subcommittee on Information Technology* (Apr. 29,
    2015) ...................................................................................................................... 19

Erin Kelly, *Bill Would Stop Feds from Mandating 'Backdoor' to Data*,
    USA Today, Apr. 2, 2015 ..................................................................................... 20

Mike Masnick, Techdirt, *FBI Claims It Has No Record of Why It
    Deleted Its Recommendation to Encrypt Phones* (Feb. 29, 2016) ...................... 19

Microsoft, *Law Enforcement Requests Report*, https://goo.gl/3KHQUB ................. 4

Microsoft, *Privacy Statement*, http://goo.gl/mGf4qs ............................................... 14

Mozilla, *Privacy Policy*, http://goo.gl/LX4rRi ......................................................... 14

Ellen Nakashima, *Google, Facebook and Other Powerful Tech Firms
    Filing Briefs to Support Apple*, Wash. Post, Feb. 28, 2016 ............................... 20

Office of the Nat'l Counterintelligence Exec., *Foreign Spies Stealing
    US Economic Secrets in Cyberspace* (Oct. 2011) ............................................. 18

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
LOS ANGELES

- v -

**BRIEF OF AMICI CURIAE**

Nicole Perlroth & David E. Sanger, *Obama Won't Seek Access to Encrypted User Data*, N.Y. Times, Oct. 10, 2015 ............................................. 11

Pinterest, *Quarterly Transparency Report Archive*, https://goo.gl/S89TmN ......................................................................... 4

President's Review Group on Intelligence & Communications Technologies, *Liberty and Security in a Changing World* (Dec. 12, 2013) .................................................................................... 20

David Rowan, *WhatsApp: The Inside Story*, Wired UK, Feb. 19, 2014 ................. 17

Charlie Savage, *U.S. Tries to Make It Easier to Wiretap the Internet*, N.Y. Times, Sept. 27, 2010 ..................................................................... 11

Charlie Savage, *U.S. Weighs Wide Overhaul of Wiretap Laws*, N.Y. Times, May 7, 2013 ............................................................................. 11

Snapchat, *Law Enforcement Guide*, https://goo.gl/H2jSGQ ..................................... 4

Snapchat, *Privacy Policy*, http://goo.gl/EvfTe2 .............................................. 13

Snapchat, *Transparency Report*, https://goo.gl/pZbxnC ..................................... 4

Snapchat, *When are Snaps and Chats Deleted?*, https://goo.gl/adHPnO ............... 17

Dustin Volz et al., *Key U.S. Lawmaker Suggests Openness to Encryption Legislation after Apple Order*, Reuters, Feb. 18, 2016 ................... 12

Dustin Volz, *U.S. Lawmakers Seek to Bar States from Mandating Encryption Weaknesses*, Reuters, Feb. 10, 2016................................................ 12

The White House, *Administration Strategy on Mitigating the Theft of U.S. Trade Secrets* (Feb. 2013) ......................................................... 18

The White House, Office of the Press Sec'y, *Fact Sheet: Cybersecurity National Action Plan* (Feb. 9, 2016) ...................................................... 19

WhatsApp, *Privacy Notice*, http://goo.gl/0GQ7LI.................................................... 14

Yahoo, *Government Data Requests*, https://goo.gl/dnwcFv ..................................... 4

Yahoo, *Privacy Center*, http://goo.gl/Ng6xjn ......................................................... 14

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
LOS ANGELES

BRIEF OF AMICI CURIAE

### STATEMENT OF INTEREST

Amazon.com, Box, Cisco Systems, Dropbox, Evernote, Facebook, Google, Microsoft, Mozilla, Nest, Pinterest, Slack, Snapchat, WhatsApp, and Yahoo respectfully submit this brief as *amici curiae* in support of Apple, Inc.

**Amazon.com** is one of the world's largest and best known online retailers and cloud service providers. Amazon seeks to be the Earth's most customer-centric company, where customers can discover anything they might want to buy online at the lowest possible prices. Amazon's cloud computing business, Amazon Web Services, is trusted by more than a million active customers around the world— including the fastest growing startups, largest enterprises, and leading government agencies—to power their IT infrastructure, make them more agile, and lower costs.

**Box** is a cloud-based enterprise content management platform that makes it easier for people to securely collaborate and get work done faster. Today, more than 41 million users and 54,000 businesses—including 55% of the Fortune 500— trust Box to manage content in the cloud.

**Cisco Systems** is the worldwide leader in providing infrastructure for the internet. It also offers various services, managed from data centers operated by Cisco, which allow its customers to use, among other things, remote data centers, wireless internet services, internet security services and collaboration tools, which drive efficiency in their business.

**Dropbox** provides file storage, synchronization, and collaboration services. With over 400 million users and 150,000 businesses on Dropbox Business, people around the world use Dropbox to work the way they want, on any device, wherever they go. Dropbox's products are built on trust; when people put their files in Dropbox, they can trust they're secure and their data is their own.

**Evernote** provides a platform that allows individuals and teams to bring their life's work together in one digital workspace. More than 150 million people and

- 1 -

**BRIEF OF AMICI CURIAE**

over 20,000 businesses trust Evernote to help them collect their best ideas, write meaningful words, and move important projects forward.

**Facebook** is one of the world's leading providers of online networking services. Facebook provides a free Internet-based social media service that enables more than 1.5 billion people to connect with their friends and family, to discover what is going on in the world around them, and to share and publish the opinions, ideas, photos, and activities that matter to them and the people they care about.

**Google** is a diversified technology company whose mission is to organize the world's information and make it universally accessible and useful. Google offers a variety of web-based products and services—including Search, Gmail, Maps, YouTube, and Blogger—that are used by people throughout the United States and around the world.

**Microsoft** is a leader in the technology industry. Since its founding in 1975, it has developed a wide range of software, services, and hardware products, including the flagship Windows operating system, the Office suite of productivity applications, the Surface tablet computer, and the Xbox gaming system.

**Mozilla** is a global, mission-driven organization that works with a worldwide community to create open source products like its web browser Firefox. Its mission is guided by the Mozilla Manifesto, a set of principles that recognizes, among other things, that individuals' security and privacy on the Internet are fundamental and must not be treated as optional. In furtherance of that, Mozilla has also adopted data-privacy principles that emphasize transparency, user control, limited data collection, and multi-layered security control and practices.

**Nest** builds hardware, software, and services for the connected home. The Nest Learning Thermostat, Nest Protect smoke and carbon monoxide alarm, and Nest Cam security camera can all be controlled from customers' phones. Nest algorithms use data about a customer's preferences to adapt and optimize device behavior.

**Pinterest** is an online catalog of ideas.  Every month, over 100 million people around the world use Pinterest to find and save ideas for cooking, parenting, style, and more.

**Slack** is a messaging platform for teams.  It brings together all team communications and organizes them into one place; uses real-time messaging to improve productivity and reduce internal e-mail; and eliminates inefficiencies by providing easy-to-use archiving and search.

**Snapchat** is a camera application that empowers users to tell their stories and talk with their friends.

**WhatsApp**, a subsidiary of Facebook, is a fast, simple, and reliable mobile messaging application available on a variety of mobile platforms.  Over a billion users rely on WhatsApp to easily and securely exchange messages, calls, photos, and videos with friends, family, and others.

**Yahoo** is a guide focused on informing, connecting, and entertaining its more than one billion users around the world.  Yahoo's wholly-owned subsidiary, Tumblr, Inc.—with an audience of over 500 million people per month—provides a platform for users to connect, to explore new ideas and creative expressions, and form communities.  Yahoo's commitment to security compels it to both thoughtfully respond to requests from law enforcement and build products that make a more secure user experience and overall digital ecosystem, including ongoing work on an intuitive end-to-end encryption solution for Yahoo Mail users.

*Amici* often compete vigorously with Apple—and with each other.  But *amici* here speak with one voice because of the singular importance of this case to them and their customers who trust *amici* to safeguard their data and most sensitive communications from attackers.  *Amici* share the government's and the public's grief and outrage at the heinous act of terrorism that took place in San Bernardino, California, in December 2015, and they fully support the lawful investigation of that crime.  But *amici* are also united in their view that the government's order to

1  Apple exceeds the bounds of existing law and, when applied more broadly, will

2  harm Americans' security in the long run.

3       To be clear:  *Amici* feel no sympathy for terrorists.  Technology companies

4  like *amici* have obligations under the Stored Communications Act, 18 U.S.C.

5  §§ 2701-2712, and other laws to produce customer data to law enforcement with

6  proper legal process, and *amici* take their obligations seriously.  Many *amici* have

7  full-time teams of employees—with someone on duty or on call around-the-clock—

8  dedicated to responding to law enforcement requests for customer data.  Indeed, in

9  just the first six months of 2015, *amici* collectively responded to tens of thousands

10  of U.S. government data requests in criminal cases.[1]  Many *amici* also publish law-

11  enforcement guidelines that explain their products, what customer data can be

12  requested through legal process, and how to best serve process on the company.[2]

13  *Amici*, in short, have no interest in shielding those who break the law.  But *amici*

14  reject the government's unsupported assertion that the law allows it to commandeer

15  a company's own engineers to undermine their products' data security features.

16       The Court should vacate its order compelling Apple to engineer security

17  flaws into its own software and deny the government's motion to compel.

18

19

20

21

22

---

[1]       *See* Dropbox, *2015 Transparency Report*, https://goo.gl/HhEUQm; Evernote,
*Transparency Report for 2015*, https://goo.gl/MIpwJW; Facebook, *United States
Law Enforcement Requests for Data*, https://goo.gl/YwTyOQ; Google,
*Transparency Report*, https://goo.gl/RkS5f8; Microsoft, *Law Enforcement Requests
Report*, https://goo.gl/3KHQUB; Pinterest, *Quarterly Transparency Report
Archive*, https://goo.gl/S89TmN; Snapchat, *Transparency Report*,
https://goo.gl/pZbxnC; Yahoo, *Government Data Requests*, https://goo.gl/dnwcFv.

[2]       *See, e.g.*, Facebook, *Information for Law Enforcement Authorities*,
https://goo.gl/SdfH4r; Snapchat, *Law Enforcement Guide*, https://goo.gl/H2jSGQ.

# ARGUMENT

## I. THE GOVERNMENT'S INTERPRETATION OF THE ALL WRITS ACT IS UNPRECEDENTED AND UNNECESSARY.

### A. The All Writs Act Is A Limited, "Residual" Source Of Federal Court Authority.

The All Writs Act, 28 U.S.C. § 1651, was originally enacted as part of the Judiciary Act of 1789, ch. 20, 1 Stat. 73. That was fifty years before the telegraph was invented and almost a century before Alexander Graham Bell made the first telephone call. Amended just twice, in non-substantive ways, the All Writs Act currently provides: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

As its terms indicate, the All Writs Act was not designed to confer sweeping new powers. Rather, it gave federal courts a "residual source of authority to issue writs that are not otherwise covered by statute." *Pennsylvania Bureau of Corr. v. United States Marshals Serv.*, 474 U.S. 34, 43 (1985). The first Congress recognized that "historic aids" might be necessary for federal courts to exercise and protect their newfound jurisdiction. *Adams v. United States ex rel. McCann*, 317 U.S. 269, 273 (1942). The Act supplies those aids, but they are not unfettered; they must be employed according to established "usages and principles of law." *See Harris v. Nelson*, 394 U.S. 286, 300 (1969) (explaining that "the purpose and function of the All Writs Act [is] to supply the courts with the instruments needed to perform their duty, . . . provided only that such instruments are 'agreeable' to the usages and principles of law").

Now, 200 years later, the government endeavors to reinterpret the All Writs Act as an open-ended source of new powers. It asks this Court to endorse an unprecedented expansion of the Act that would allow law enforcement to force private technology companies to circumvent security features that protect their

BRIEF OF AMICI CURIAE

1   customers' most sensitive information from hackers and criminals.  Such

2   conscription looks nothing like the "historic aids" that the 1789 Judiciary Act

3   contemplated.  Moreover, where the new authority the government seeks would not

4   "fill[] the interstices of federal judicial power," *Pennsylvania Bureau of Corr.*, 474

5   U.S. at 41, but would confer on the judiciary a power that the legislature has

6   withheld, it contradicts "the usages and principles of law."  For that very reason,

7   another court recently rejected an even less sweeping request under the All Writs

8   Act.  *See* Mem. & Order, *In re Order Requiring Apple, Inc. to Assist in the*

9   *Execution of a Search Warrant Issued by This Court*, No. 15-MC-1902 (slip op.)

10   (E.D.N.Y. Feb. 29, 2016).  The court held that the "usages and principles" clause

11   prohibits the government from using the All Writs Act "to achieve a legislative goal

12   that Congress has considered and rejected."  *Id.* at 26; *see infra* Part I.C.  As a

13   textual matter, then, the circumscribed authority provided in the All Writs Act

14   cannot—and does not—support the government's broad reinterpretation.

15

16   **B.    The Government Seeks A Dramatic Extension Of *New York* *Telephone* To Cover Ever-Evolving Technologies.**

17   Nor has the government justified its boundless reading of the statute under

18   Supreme Court precedent.  In keeping with its "residual" status, the All Writs Act

19   has not been extensively analyzed by courts.  In this case, both Apple and the

20   government draw heavily from the Supreme Court's 1977 decision in *United States*

21   *v. New York Telephone Co.*, 434 U.S. 159.  They have extracted three (or so) factors

22   from *New York Telephone* to guide their analysis.  *See* Dkt. No. 1, at 10 (Feb. 19,

23   2016) (Mot. to Compel); Dkt. No. 16, at 20 (Feb. 25, 2016) (Mot. to Vacate).  But

24   the emphasis on a rigid multifactor test obscures the bigger point.  Those factors

25   were not ends unto themselves; they were markers to gauge whether the

26   government had pushed a "residual" power too far.

27   In the decision on appeal in *New York Telephone*, the court of appeals was

28   concerned that an order to the telephone company would "pose a severe threat to

the autonomy of third parties who for whatever reason prefer not to render such assistance." 434 U.S. at 171.  The Supreme Court concluded that the lower court had no reason to worry, because "the power of federal courts to impose duties upon third parties is not without limits." *Id.* at 172.  In particular, orders requested under the All Writs Act cannot impose an "unreasonable burden[]." *Id.*  The key question in *New York Telephone* was whether a specific order was "appropriate" and not "unreasonable." *Id.* at 172, 174.  And that question could not be divorced from the context in which it arose:  *New York Telephone* involved the installation of a pen register, "a mechanical device that records the numbers dialed on a telephone." *Id.* at 161 n.1.  The Supreme Court thought it "clear that Congress did not view pen registers as posing a threat to privacy of the same dimension as the interception of oral communications," which was governed by statutory procedures. *Id.* at 168.  It was equally clear to the Supreme Court that "the use of pen registers [wa]s by no means offensive" to the public utility subject to the order. *Id.* at 174.

It is dangerous to extend that limited endorsement of judicial power over third parties to situations the Supreme Court never could have envisioned—and all the more troubling where the Court itself declined to opine on "the diverse contexts in which [third party duties] may arise." *Id.* at 176 n.24.  As the Ninth Circuit has explained, *New York Telephone*'s only "gloss" on the All Writs Act was its conclusion that a third party could be ordered "to provide nonburdensome technical assistance to law enforcement officers." *Plum Creek Lumber Co. v. Hutton*, 608 F.2d 1283, 1289 (9th Cir. 1979).  But the Supreme Court stopped there.  It did not give courts "plenary power" or "a roving commission" to order third parties to assist law enforcement wherever law enforcement deems it expedient. *Id.*  Other applications of the Act have thus hewed carefully to the "nonburdensome technical assistance" required in *New York Telephone*. *See, e.g., In re Application of United States for an Order Authorizing an In-Progress Trace of Wire Commc'ns Over Tel. Facilities*, 616 F.2d 1122, 1129, 1132 (9th Cir. 1980) (*Wire Commc'ns*) (ordering

BRIEF OF AMICI CURIAE

1   telephone company to install devices "virtually identical" to a pen register, which

2   required no "active monitoring by company personnel"); *United States v. X*, 601 F.

3   Supp. 1039, 1043 (D. Md. 1984) (ordering telephone company to provide existing

4   toll records for two subscribers); *United States v. Hall*, 583 F. Supp. 717, 722 (E.D.

5   Va. 1984) (ordering bank to produce existing credit card records for a particular

6   account); *In re Application of United States for an Order Directing X to Provide*

7   *Access to Videotapes*, No. 03-89, 2003 WL 22053105, at *3 (D. Md. Aug. 22,

8   2003) (*Videotapes*) (ordering apartment complex "to provide access to surveillance

9   tapes already in existence").

10         The request here is far different.  This Court should therefore exercise

11   caution in how it applies a decision from an era in which concepts like "cell

12   phones" and "the Internet" were unheard of.  Extending *New York Telephone*'s

13   holding as the government requests here would unmoor it from its motivating

14   rationale.  And the Supreme Court has cautioned lower courts against woodenly

15   applying prior decisions without assessing intervening technological change, in the

16   comparable context of the Fourth Amendment.[3]

17         In *Riley v. California*, 134 S. Ct. 2473 (2014), the Supreme Court explained

18   that cell phones had altered the reasonableness of a full search incident to arrest.

19   The Court observed that modern cell phones "are based on technology nearly

20   inconceivable just a few decades ago," when the only relevant search-incident-to-

21   arrest precedents had been decided.  *Id.* at 2484.  In part because of the quantitative

22   and qualitative differences in available information, it concluded that the reasoning

23   in those precedents did not have "much force with respect to digital content on cell

24   phones."  *Id.*  Americans live their lives on their phones now.  They store their

25   _____

26   [3]     Although this case does not formally involve the Fourth Amendment
     (because the government has a warrant), the principles that inform the Fourth
27   Amendment analysis are instructive here.  Both doctrines, after all, assess the
     reasonableness of government intrusions onto private property, and Congress
28   passed the Fourth Amendment and the 1789 Judiciary Act just four days apart.

1  emails, their conversations, their appointments, their photos, sometimes even their

2  medical information, all in a device they carry in their pockets.  Cell phones are the

3  way we organize and remember the things that are important to us; they are, in a

4  very real way, an extension of our memories.  And as a result, to access someone's

5  cell phone is to access their innermost thoughts and their most private affairs.

6  Those concerns are why the Supreme Court in *Riley* found the difference between

7  searches of cell phones and other searches incident to arrest so stark that "any

8  extension of [the Court's prior] reasoning to digital data has to rest on its own

9  bottom." *Id.* at 2489.

10      A majority of the Supreme Court in *United States v. Jones*, 132 S. Ct. 945

11  (2012), made a similar point.  Writing for four Justices, Justice Alito remarked that

12  "technology can change" an individual's expectations of privacy and thus alter the

13  calculus that courts must perform.  *Id.* at 962 (Alito, J., concurring in the judgment).

14  And Justice Sotomayor, writing for herself, emphasized that technology can disrupt

15  the calculus so much that "it may be necessary to reconsider" basic Fourth

16  Amendment premises.  *Id.* at 957 (Sotomayor, J., concurring).  Again, the critical

17  lesson was that, when transplanting dated precedents into modern technological

18  scenarios, courts should never lose sight of the overarching reasonableness inquiry

19  that underlies all government access to private information.

20      The same concerns apply here. Whatever principles this Court extracts from

21  the 1977 *New York Telephone* decision about the 1789 All Writs Act, one thing is

22  clear:  Applying the All Writs Act here would extend the Act in unprecedented

23  ways, not routinely apply it.  The stakes are much higher now—the security

24  interests greater, the government's request broader, the companies' objections

25  sharper, the technological and social problems thornier—than when the Supreme

26  Court assessed the installation of a pen register.  As the Supreme Court has

27  cautioned, any extension of the All Writs Act to such complex modern scenarios

28  must "rest on its own bottom." *Riley*, 134 S. Ct. at 2489.  The government's

1   proposed extension, which would move beyond companies' existing products to

2   subvert security features millions of Americans rely on to keep their digital

3   information secure, *see infra* Part II, fails that test. A 200-year-old source of

4   residual power that must be exercised consistently with "the usages and principles

5   of law," 28 U.S.C. § 1651(a), cannot be transformed into a perpetual invitation to

6   reshape private parties' behavior in policy-laden ways.

7

8        **C.    The Government's Interpretation Of The All Writs Act Ignores
               Congress's Comprehensive Regulation Of Investigative Methods.**

9            It is well established that the All Writs Act is unavailable "[w]here a statute

10   specifically addresses the particular issue at hand." *Pennsylvania Bureau of Corr.*,

11   474 U.S. at 43; *see* Mot. to Vacate 15-19. That doctrinal preference for legislative

12   action is also good policy: In light of rapidly evolving technology and its

13   tremendous social benefits, Congress is better suited to confront the issues here.

14   And indeed, Congress has already grappled with these issues on many occasions—

15   leading to a comprehensive legislative scheme for regulating investigative methods.

16   "The absence from that comprehensive scheme of any requirement that Apple

17   provide the assistance sought here implies a legislative decision to prohibit the

18   imposition of such a duty." *In re Order*, No. 15-MC-1902, at 20.

19            In 1968, when Congress turned its attention to surveillance techniques, it

20   initially focused on law enforcement methods. It enacted the Wiretap Act, which

21   lays out specific procedures by which law enforcement can request, and courts can

22   supervise, the interception of communications (originally wire and oral, and later

23   electronic as well). *See* 18 U.S.C. §§ 2511-2522. In the Foreign Intelligence

24   Surveillance Act of 1978 (FISA), Congress then prescribed specific procedures for

25   the surveillance of foreign intelligence information, and required that certain

26   persons furnish technical assistance to law enforcement. *See* 50 U.S.C. § 1805. It

27   continues to update and amend FISA, including just last year in the USA Freedom

28   Act of 2015. *See* Pub. L. No. 114-23, 129 Stat. 268. In 1986, in the Stored

1   Communications Act, Congress also outlined the conditions under which law

2   enforcement can compel an internet service provider to disclose certain subscriber

3   content.  *See* 18 U.S.C. § 2703.

4          Particularly relevant here, Congress next decided to regulate

5   telecommunications carriers and manufacturers of telecommunications equipment.

6   In 1994, it enacted the Communications Assistance for Law Enforcement Act,

7   commonly known as CALEA, to enhance law enforcement's ability to conduct

8   surveillance.  CALEA requires telecommunications carriers and manufacturers to

9   design their services and equipment in a manner that ensures law enforcement can

10  execute court-ordered wiretaps.  *See* 47 U.S.C. §§ 1001-1010.  It specifically

11  exempts information service providers from that command.  *Id.* § 1002(b)(2).

12  Moreover, it specifies that in most instances telecommunications carriers "shall not

13  be responsible for decrypting, or ensuring the government's ability to decrypt,"

14  communications.  *Id.* § 1002(b)(3).

15         Since CALEA was enacted, there have been a number of proposals to extend

16  it to electronic communication service providers like Apple.  Yet Congress has

17  never seen fit to give law enforcement the power it now seeks from this Court.  In

18  2010, for example, the Obama administration prepared a legislative proposal to

19  extend CALEA to all services that enable communications, but never submitted the

20  proposal to Congress.  *See* Charlie Savage, *U.S. Tries to Make It Easier to Wiretap*

21  *the Internet*, N.Y. Times, Sept. 27, 2010.  In 2013, it advocated a modified plan that

22  would have imposed fines rather than mandates; that proposal was never formally

23  submitted, either.  *See* Charlie Savage, *U.S. Weighs Wide Overhaul of Wiretap*

24  *Laws*, N.Y. Times, May 7, 2013.  In fact, the Obama administration has since

25  dropped the call for new legislation altogether.  *See* Nicole Perlroth & David E.

26  Sanger, *Obama Won't Seek Access to Encrypted User Data*, N.Y. Times, Oct. 10,

27  2015.

28

1     Even absent formal proposals from the Executive Branch, Congress has
2  given these issues considerable attention.  Legislation aimed at expanding law
3  enforcement's investigative capabilities has been discussed in reaction to this very
4  case. *See* Dustin Volz et al., *Key U.S. Lawmaker Suggests Openness to Encryption*
5  *Legislation After Apple Order*, Reuters, Feb. 19, 2016; Cory Bennett & Katie Bo
6  Williams, *Week Ahead: Encryption Fight Heats Up*, The Hill, Feb. 22, 2016.  And
7  legislation has been proposed to block state governments from requiring companies
8  to create encryption backdoors.  *See* Dustin Volz, *U.S. Lawmakers Seek to Bar*
9  *States from Mandating Encryption Weaknesses*, Reuters, Feb. 10, 2016.  That
10  debate illustrates exactly how the democratic process should work.
11     The government ignores that process here and instead seeks powers from the
12  judiciary that the legislature has repeatedly withheld.  That is not the function of the
13  courts, or of the gap-filling All Writs Act.  *See Pennsylvania Bureau of Corr.*, 474
14  U.S. at 41.  The government's reading of the Act would "thoroughly undermine[]
15  both the legislature's own prerogative to reject a legislative proposal effectively and
16  efficiently (without the need to affirmatively ban the proposed authority) and the
17  more general protection against tyranny that the Founders believed required the
18  careful separation of governmental powers."  *In re Order*, No. 15-MC-1902, at 27.
19  Those separation-of-powers concerns are especially acute where, as here, the issues
20  at hand are "a matter of high policy for resolution within the legislative process
21  after the kind of investigation, examination, and study that legislative bodies can
22  provide."  *Diamond v. Chakrabarty*, 447 U.S. 303, 317 (1980).  "That process
23  involves the balancing of competing values and interests, which in our democratic
24  system is the business of elected representatives."  *Id.*  It should not be truncated by
25  ad hoc judicial decisions.
26     Make no mistake:  If the government prevails in this case, it will seek many
27  such decisions.  The government's motion reassures this Court and the public that
28  the request here is a one-time-only hack.  *See* Mot. to Compel 14-15.  But there are

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
LOS ANGELES

- 12 -

BRIEF OF AMICI CURIAE

already strong indications that law enforcement will ask for broad authority under the All Writs Act on facts far different from the terrorism investigation at hand. For example, FBI Director James Comey just days ago told the House Judiciary Committee that this Court's decision will be "potentially precedential" in other cases involving similar technology. *See* Julia Harte & Julia Edwards, *Apple Lawyer, FBI Director Face Off in Congress on iPhone Encryption*, Reuters, Mar. 2, 2016. Manhattan District Attorney Cyrus Vance, Jr., likewise told journalists that he "[a]bsolutely" would seek access to all locked phones linked to criminal proceedings if the government's theory were to prevail here. *See* Katie Benner & Matt Apuzzo, *Narrow Focus May Aid F.B.I. in Apple Case*, N.Y. Times, Feb. 22, 2016. That is exactly why this Court should reject any case-specific arguments the government makes here. Investigative tools meant for extraordinary cases may become standard in ordinary ones. *See New York Tel.*, 434 U.S. at 179 (Stevens, J., dissenting in part) (warning that the "accretion [of arbitrary police powers] is no less dangerous and unprecedented because the first step appears to be only minimally intrusive"). As one court has already observed, "[n]othing in the government's arguments suggests any principled limit on how far a court may go." *In re Order*, No. 15-MC-1902, at 44.

For technology companies like *amici*, the difference between judicial action and legislative action is not merely philosophical and constitutional. It is critical from a practical standpoint that regulatory changes come, if at all, through the legislative process—and not through decisions from individual judges across the country applying the All Writs Act. *Amici* pride themselves on transparency with the public, particularly with respect to sensitive issues such as disclosing users' data. They publish privacy reports or privacy policies online, and take revisions to those policies very seriously.[4] And many of them publicly report information about

---

[4]  *See* Google, *Privacy & Terms*, https://goo.gl/NICNc; Snapchat, *Privacy Policy*, http://goo.gl/EvfTe2; Facebook, *Data Policy*, http://goo.gl/VxoRFQ;

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
LOS ANGELES

**BRIEF OF AMICI CURIAE**

1  the government requests they receive, to the extent permitted by law.  *See* 50 U.S.C.

2  § 1874 (regulating public reporting by persons subject to FISA orders).  Some of

3  *amici* even fought in court to secure that right.

4      A boundless All Writs Act could cripple these efforts.  Under the ad hoc

5  approach the government advocates, the assistance it can request is limited only by

6  its imagination and the case-by-case reasonableness calls made by magistrate

7  judges across the country.  By contrast, when operating within the framework of

8  existing statutes, *amici* can apply the law openly and evenhandedly.  Under current

9  law, companies can describe the types of process they receive—warrants,

10  subpoenas, national security letters, and so on—and explain how they respond.

11  And *amici*'s experiences with law enforcement under existing statutes confirm the

12  wisdom of a statutorily circumscribed approach.  Not only can they better account

13  for users' privacy and security interests (and better communicate with users about

14  those interests), but they can also better assist law enforcement through efficient,

15  consistent, established procedures.  After all, technology companies like *amici*

16  respond to tens of thousands of law enforcement requests in criminal cases each

17  year.  Indeed, even this case was cooperative at the outset.  *See* Dkt. No. 16-32, at

18  2-3 (Feb. 25, 2016) (Decl. of Lisa Olle) (reciting Apple's immediate compliance

19  with several FBI requests).

20      All the virtues of statutory predictability fall away if the government can

21  invoke the All Writs Act as expansively as it seeks to do here.  The American

22  people as *voters* are cut out of this important debate, because their elected

23  representatives have no opportunity to weigh complex policy choices.  And the

24  American people as *consumers* are cut out of the debate, because they cannot select

---

26  Microsoft, *Privacy Statement*, http://goo.gl/mGf4qs; Yahoo, *Privacy Center*,
   http://goo.gl/Ng6xjn; Box, *Privacy Policy*, http://goo.gl/G5JXDT; Mozilla, *Privacy*

27  *Policy*, http://goo.gl/LX4rRi; Dropbox, *Privacy Policy*, http://goo.gl/QQr1u1;

28  WhatsApp, *Privacy Notice*, http://goo.gl/0GQ7LI; Evernote, *Privacy Policy*,
   https://goo.gl/yKbzbq.

1  products based on company policies or security features if the government may

2  override those policies and features without notice.  These repercussions underscore

3  why the Court should decline to extend *New York Telephone* from the installation

4  of pen registers in the 1970s to the creation of security-defeating technology in

5  2016.

6

7  **II.   THE LAW DOES NOT ALLOW FEDERAL AGENTS TO CONSCRIPT COMPANIES INTO DEFEATING THEIR OWN SECURITY SAFEGUARDS AND PRODUCT DESIGNS.**

8

9  **A.   The Government Seeks Here Far More Than The Nonburdensome Technical Assistance Allowed By The All Writs Act.**

10  The government argues that the All Writs Act grants the Court the power to

11  compel any technical assistance from a company that does not require "inordinate

12  effort."  Mot. to Compel 13.  But most of the government's cited cases actually

13  stand for a much narrower proposition:  that a court can require companies to assist

14  the government with nonburdensome technical assistance—that is, with tools

15  companies already have available.  That is an altogether different power from the

16  one the government seeks here, a power to commandeer private engineers working

17  for private companies to write computer code that would disable the security

18  protections their employers have designed into their products.

19  In *New York Telephone*, for instance, the phone company already used pen

20  registers for billing purposes and to trace harassing telephone calls to customers.

21  434 U.S. at 174-175.  The telephone company in *Wire Communications* similarly

22  admitted that it used trap-and-trace devices like the one the government had

23  requested "in response to obscene or annoying calls, or following telephone

24  threats."  616 F.2d at 1126.  And in *In re Application of U.S. for an Order Directing*

25  *a Provider of Communication Services to Provide Technical Assistance to Agents*

26  *of the U.S. Drug Enforcement Administration*, No. 15-1242, 2015 WL 5233551, at

27  *2, *5 (D.P.R. Aug. 27, 2015), the court merely required the phone company to use

28  the tools it employed for court-ordered wiretaps to assist with consensual

1  monitoring of a particular phone. In each of the phone cases, the companies could

2  comply with the court's order by employing pre-existing procedures.

3      That pattern repeats itself outside of the telephone cases. In *United States v.*

4  *Hall*, the credit card company "routinely" compiled the billing records the

5  government had requested. 583 F. Supp. at 721. And the federal agents in

6  *Videotapes*, would review the tapes the court compelled "by using apartment

7  complex equipment that is currently in operation and routinely used by complex

8  employees." 2003 WL 22053105, at *1.[5] In each case, law enforcement worked

9  within companies' existing capabilities.

10      The assistance that the government seeks here is thus different not just in

11  degree, but also in kind. The government is not asking companies to do what they

12  do in the normal course of business; the government is asking companies to change

13  how they do business. To honor an order like the Court issued here, companies

14  must divert engineering talent to fundamentally alter their products. *See* Mot. to

15  Compel 13. Their engineers will have to design, create, test, validate, and deploy

16  entirely new software to undermine security features they previously designed,

17  created, tested, validated, and deployed. *See* Mot. to Vacate 13. The government

18  seeks the power to conscript technology companies' engineers to develop products

19  that they do not want to create, and which they would not create absent government

20  compulsion. That is a far cry from the "nonburdensome technical assistance" that

21  the All Writs Act authorizes. *Plum Creek*, 608 F.2d at 1289.

22      Against this, the government emphasizes that it is technically feasible for

23  companies like Apple to comply with its requests. It references, for example,

24  Apple's capability or ability to comply with the government's demands no fewer

25  than six times in its motion to compel. *See* Mot. to Compel 1, 3 n.2, 6, 10, 11, 14.

26

27    [5]   The apartment complex in *Videotapes* also "di[d] not contest the

28  government's application," further reducing the case's precedential value. *Videotapes*, 2003 WL 22053105, at *1.

BRIEF OF AMICI CURIAE

1   But technical feasibility cannot, and should not, be the standard for reasonableness

2   under the All Writs Act. *Amici*, like Apple, employ top engineering talent. With

3   enough time and resources, *amici*'s engineers could possibly come up with any

4   number of new versions of their companies' products that circumvent or undermine

5   their pre-existing data-security features. But those new versions would not be the

6   same product anymore. Box would not be Box; Gmail would not be Gmail;

7   WhatsApp would not be WhatsApp; and so on.

8       That is the key point. How apps and programs store data is not just—as the

9   government claims—a "public brand marketing strategy." Mot. to Compel 3. It is

10  at the core of the products' identities. Some companies pride themselves on

11  promptly deleting users' data when it is no longer needed. *See, e.g.*, Snapchat,

12  *When are Snaps and Chats Deleted?*, https://goo.gl/adHPnO ("Delete is our

13  default."); David Rowan, *WhatsApp: The Inside Story*, Wired UK, Feb. 19, 2014

14  (WhatsApp does not store users' messages on its servers). Others have designed

15  their services so that users can store and easily search large volumes of data

16  spanning a long stretch of time. Indeed, how companies store and manage

17  customers' data is one way companies tailor their chat, e-mail, social-media, and

18  data-storage solutions to customers' needs. Change those features and the

19  government has changed the product in a fundamental way. The government

20  therefore does not seek unobjectionable technical assistance; it seeks the ability to

21  compel technology companies to modify their products, on spec, for the FBI in

22  ways that are contrary to their core values.

23      The distinction between the use of existing tools and the creation of new ones

24  against companies' wishes is borne out in the Ninth Circuit's All Writs Act case

25  law. *Plum Creek* emphasized that although the Act allows a court to compel a third

26  party "to provide nonburdensome technical assistance," it does not permit "forcing

27  an employer to rescind a company policy so that [a government agency] can more

28  efficiently conduct an investigation." 608 F.2d at 1289-1290. *Amici* have policies

1    against undermining their own security features.  The government seeks the power

2    to force *amici* and other technology companies to rescind those policies, and,

3    worse, the power to impose a new, contrary policy.  That is precisely what *Plum*

4    *Creek* forbids.  *See id.*

5

6        **B.    The Government's Position, If It Prevails, Will Undermine The**
           **Security Of Americans' Most Sensitive Data.**

7        *Amici* do not create security-protecting features just to satisfy their own

8    ideological predilections.  They also do so in response to "consumer demands to

9    protect private data."  Devlin Barrett et al., *Apple and Others Encrypt Phones,*

10   *Fueling Government Standoff*, Wall St. J. (Nov. 18, 2014).  As storing sensitive

11   personal and commercial data electronically becomes less of a luxury and more of a

12   necessity, protecting that data has also become a necessity.  That is why in 2013 the

13   White House rolled out a comprehensive strategy to combat trade-secret theft, with

14   a particular focus on enhanced cybersecurity.  *See* The White House,

15   *Administration Strategy on Mitigating the Theft of U.S. Trade Secrets* 1 (Feb.

16   2013), https://goo.gl/S7pXaD.  Strong privacy protections from companies like

17   *amici* are an important component of that strategy.  *See* Office of the Nat'l

18   Counterintelligence Exec., *Foreign Spies Stealing US Economic Secrets in*

19   *Cyberspace*, A-4 to A-5 (Oct. 2011), http://goo.gl/QidbfG (identifying data

20   encryption and multi-factor authentication measures as "[b]est [p]ractices" for data

21   protection).

22       The government's bid to have technology companies undermine their own

23   security measures is all the more puzzling because the Executive has been

24   *encouraging* companies to increase cybersecurity in consumer products.  The

25   Federal Trade Commission, for instance, has claimed the power to sanction

26   companies that do not adequately secure their customers' data.  *See FTC v.*

27   *Wyndham Worldwide Corp.*, 799 F.3d 236, 240-242 (3d Cir. 2015).  The White

28   House has touted its work with technology companies, including many of the *amici*,

1  to enhance security on consumer accounts. *See* The White House, Office of the

2  Press Sec'y, *Fact Sheet: Cybersecurity National Action Plan* (Feb. 9, 2016),

3  https://goo.gl/2hWPWV ("By judiciously combining a strong password with

4  additional factors, such as a fingerprint or a single use code delivered in a text

5  message, Americans can make their accounts even more secure."). And Director

6  Comey has told the Senate Judiciary Committee that "[t]he development and robust

7  adoption of strong encryption is a key tool to secure commerce and trade, safeguard

8  private information, promote free expression and association, and strengthen cyber

9  security." James B. Comey, Dir., FBI, *Joint Statement with Deputy Attorney*

10  *General Sally Quillian Yates Before the Senate Judiciary Committee* (July 8, 2015),

11  https://goo.gl/Pdht0w; *see also* Amy Hess, Exec. Assistant Dir., Sci. & Tech.

12  Branch, FBI, *Statement Before the House Oversight and Government Reform*

13  *Committee, Subcommittee on Information Technology* (Apr. 29, 2015),

14  https://goo.gl/jzxaLi ("To be clear, we in the FBI support and encourage the use of

15  secure networks and sophisticated encryption to prevent cyber threats to our critical

16  national infrastructure, our intellectual property, and our data.").

17       These are not one-off statements. Until recently, the FBI's webpage listed

18  tips for protecting consumers' mobile devices like "[p]asscode protect your mobile

19  device" and "[d]epending on the type of phone, the operating system may have

20  encryption available." Mike Masnick, Techdirt, *FBI Claims It Has No Record of*

21  *Why It Deleted Its Recommendation to Encrypt Phones* (Feb. 29, 2016),

22  https://goo.gl/P8ewUL. Similarly, the President's Review Group on Intelligence

23  and Communications Technologies recommended in December 2013 that the

24  government "take additional steps to promote security" by "(1) fully supporting and

25  not undermining efforts to create encryption standards; (2) making clear that it will

26  not in any way subvert, undermine, weaken, or make vulnerable generally available

27  commercial encryption; and (3) supporting efforts to encourage the greater use of

28  encryption technology." President's Review Grp. on Intelligence & Commc'ns

1    Techs., *Report and Recommendations: Liberty and Security in a Changing World*

2    22 (Dec. 12, 2013), https://goo.gl/HXghaV. *Amici*'s security features in their

3    products comport with these past recommendations.

4           The government reconciles its conflicting positions by arguing that security

5    is all well and good, just so long as it does not interfere with the execution of a

6    lawful warrant. *See* Mot. to Compel 21. But once a company builds a security-

7    defeating tool, it cannot guarantee that it will be used by law enforcement only and

8    always. *See* Harold Abelson et al., *Keys Under Doormats: Mandating Insecurity by*

9    *Requiring Government Access to All Data and Communications* 2 (July 6, 2015),

10   https://goo.gl/Jv5tCK (observing that "exceptional access would create

11   concentrated targets that could attract bad actors"); The Chertoff Group, *The*

12   *Ground Truth About Encryption and the Consequences of Extraordinary Access*,

13   http://goo.gl/Z9xPpj (concluding that "an extraordinary access requirement is likely

14   to have a negative impact on technological development, the United States'

15   international standing, and the competitiveness of the U.S. economy").

16          As one legislator has explained, "if we put in backdoors for the convenience

17   of the government, those backdoors can be exploited by hackers as well." Erin

18   Kelly, *Bill Would Stop Feds from Mandating 'Backdoor' to Data*, USA Today,

19   Apr. 2, 2015 (quoting Representative Thomas Massie). Not just hackers: Other

20   countries, including countries with less-robust due-process guarantees, would

21   demand similar access. *See* Ellen Nakashima, *Google, Facebook and Other*

22   *Powerful Tech Firms Filing Briefs to Support Apple*, Wash. Post, Feb. 28, 2016.

23   And if companies' security-defeating tools were to fall into the wrong hands, the

24   companies—not the U.S. government—would be the ones left to deal with the

25   fallout of lawsuits, lost customers, and damaged reputations. That very real risk is

26   not merely a "marketing or general policy concern[]." Mot. to Compel 20. It is a

27   danger that any technology company would be blind to ignore.

28

1    The government may believe that the risk to technology companies is so

2    minimal or that the benefit to its investigations so great that the risks are ones that

3    the companies should bear.  But the Ninth Circuit held in *Plum Creek* that the All

4    Writs Act "does not give the district court a roving commission to order a party

5    subject to an investigation to accept additional risks at the bidding of" government

6    agents.  608 F.2d at 1289.  The All Writs Act, the Court explained, "does not

7    authorize a court to order a party to bear risks not otherwise demanded by law, or to

8    aid the government in conducting a more efficient investigation." *Id.* at 1289-1290.

9    Yet that is what the government asks technology companies to do—to use their

10   own personnel to defeat their own products' security and to assume all the risks that

11   the tool the government commanded them to make will fall into the wrong hands.

12   That is simply too great a risk to impose on third parties under the limited, residual

13   authority furnished by the All Writs Act.

14
15   **III.   THE CANON OF CONSTITUTIONAL AVOIDANCE COUNSELS AGAINST THE GOVERNMENT'S EXPANSIVE INTERPRETATION OF THE ALL WRITS ACT.**

16   The canon of constitutional avoidance provides yet another reason to reject

17   the government's expansive interpretation of the All Writs Act.  Under that canon,

18   where "an otherwise acceptable construction of a statute would raise serious

19   constitutional problems, and where an alternative interpretation of the statute is

20   'fairly possible,' [a court is] obligated to construe the statute to avoid such

21   problems." *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001) (citation omitted).  The

22   government's interpretation of the All Writs Act presents grave constitutional

23   problems under the First Amendment:  Computer code is protected speech, and the

24   government asks this Court, under the authority of the All Writs Act, to compel

25   Apple to write code.  It also raises serious due process and separation-of-powers

26   questions. *See In re Order*, No. 15-MC-1902, at 27-30; Mot. to Vacate 18-19, 34.

27   This Court should reject the government's constitutionally problematic reading of

28   the vague terms of the All Writs Act.

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
LOS ANGELES

- 21 -

BRIEF OF AMICI CURIAE

1    Writing computer code can be a creative, complex, and expressive task, and
2    it is a form of protected speech under the First Amendment.  In the Second Circuit's
3    unequivocal words, "software programs qualify as 'speech' for First Amendment
4    purposes."  *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 448 n.22 (2d Cir.
5    2001); *id.* at 449 ("[W]e join the other courts that have concluded that computer
6    code, and computer programs constructed from code can merit First Amendment
7    protection.").  The Sixth Circuit has similarly determined that "computer source
8    code" is "protected by the First Amendment," because it "is an expressive means
9    for the exchange of information and ideas about computer programming."  *Junger*
10   *v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000).  A panel of the Ninth Circuit has
11   likewise held that "encryption software, in its source code form and as employed by
12   those in the field of cryptography, must be viewed as expressive for First
13   Amendment purposes."  *Bernstein v. Dep't of Justice*, 176 F.3d 1132, 1141 (9th
14   Cir. 1999) (footnote omitted).[6]
15         Recent Supreme Court case law strengthens those holdings.  In *Sorrell v. IMS*
16   *Health Inc.*, 131 S. Ct. 2653, 2667 (2011), the Supreme Court reaffirmed the broad
17   principle that "information is speech," and computer code is, at a minimum, a type
18   of information.  In *Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729
19   (2011), the Court held that digital video games are entitled to First Amendment
20   protection.  It explained:  "whatever the challenges of applying the Constitution to
21   ever-advancing technology, the basic principles of freedom of speech and the press,
22   like the First Amendment's command, do not vary when a new and different
23   medium for communication appears."  *Id.* at 2733 (citation and internal quotation
24   marks omitted).  Computer code may be a "new and different medium for
25   communication," but it is not, as a consequence, any less deserving of protection.
26

27   [6]     The Ninth Circuit granted rehearing en banc in *Bernstein*, and withdrew the
28   panel opinion, 192 F.3d 1308 (9th Cir. 1999), but never actually decided the issue
     en banc because the regulations at issue were changed.

1     The government seeks to force Apple and its engineers to write software—
2 that is, to engage in protected speech—against their will.  In the government's own
3 words, the order would require Apple to "writ[e] software code."  Mot. to Compel
4 13.  This Court's order would also require Apple to cryptographically "sign[]" code
5 as authentic when it is clearly nothing more than government compulsion.  Order
6 Compelling Apple, Inc. to Assist Agents in Search at 2, No. 15-MJ-451, Dkt. No.
7 19 (C.D. Cal. Feb. 16, 2016).  That is classic compelled speech.  And as the
8 Supreme Court has explained, "[t]here is certainly some difference between
9 compelled speech and compelled silence, but in the context of protected speech, the
10 difference is without constitutional significance."  *Riley v. Nat'l Fed'n of the Blind*
11 *of N.C., Inc.*, 487 U.S. 781, 796 (1988).  That is because "the First Amendment
12 guarantees 'freedom of speech,' a term necessarily comprising the decision of both
13 what to say and what *not* to say."  *Id.* at 796-797.  Computer code is "protected
14 speech," and technology companies therefore have the right to determine for
15 themselves "what *not* to say."  *Id.*  The government's interpretation of the All Writs
16 Act would invest courts with a "roving commission" to invade that right.  *Plum*
17 *Creek*, 608 F.2d at 1289.
18     The All Writs Act certainly does not confer that power explicitly; it is not a
19 blank check to the federal courts.  Rather, it only authorizes "writs" that are, among
20 other things, "agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).
21 It is certainly not *clear* that an order compelling a third-party to write source code is
22 the sort of "writ[]" authorized by the Act, or that it is "agreeable to the usages and
23 principles of law"—because it is historically unprecedented, because it encroaches
24 on an area fully regulated by Congress, and because it is in tension with
25 constitutional values.  *Id.*
26     In the absence of a clearer statement from Congress, the avoidance canon
27 compels a court to construe the vague All Writs Act in a way that does *not* raise
28 serious First Amendment concerns.  As the Supreme Court has explained, when one

1   interpretation of a statute "presents a significant risk that the First Amendment will

2   be infringed," a court should adopt it only if it is the "affirmative intention of the

3   Congress clearly expressed." *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490,

4   502, 506 (1979) (citations omitted); *see also NAACP v. Button*, 371 U.S. 415, 433

5   (1963) ("Because First Amendment freedoms need breathing space to survive,

6   government may regulate in the area only with narrow specificity."). Congress

7   certainly did not express the clear and affirmative intention to authorize orders

8   compelling speech.

9        In short, the government's reading of the All Writs Act raises serious First

10  Amendment problems, because it would allow a court to compel protected speech.

11  And because the All Writs Act does not clearly and specifically authorize such an

12  order, this Court should decline to grant it.

13                              **CONCLUSION**

14       For the foregoing reasons, the Court should vacate its order compelling

15  Apple to assist the government and deny the government's motion to compel

16  assistance.

17

18  Dated:    March 3, 2016                 Respectfully submitted,

19                                          HOGAN LOVELLS US LLP

20

21                                          By: _____

22                                              Michael M. Maddigan
                                                Neal Kumar Katyal (*pro hac vice*
23                                                  application forthcoming)
                                                Attorneys for *Amici Curiae*
24

25

26

27

28