

1
DURIE TANGRI LLP
2
MARK A. LEMLEY (SBN 155830)
mlemley@durietangri.com
MICHAEL A. FELDMAN (SBN 295780)
3
mfeldman@durietangri.com
217 Leidesdorff Street
4
San Francisco, CA  94111
Telephone:  415-362-6666
5
Facsimile:   415-236-6300

6
AMY L. LANDERS (SBN 169491)
7
all328@drexel.edu
Professor of Law
Drexel University Thomas R. Kline School of Law
8
3200 Market Street
Philadelphia, PA 19104
9
Telephone:  215-571-4795

10
Attorneys for *Amicus Curiae*
Law Professors

11

12
IN THE UNITED STATES DISTRICT COURT

13
FOR THE CENTRAL DISTRICT OF CALIFORNIA

14
EASTERN DIVISION

15
IN THE MATTER OF THE SEARCH OF
AN APPLE IPHONE SEIZED DURING
16
THE EXECUTION OF A SEARCH
WARRANT ON A BLACK LEXUS IS300,
17
CALIFORNIA LICENSE PLATE
35KGD203.

Case No. 5:16-cm-00010-SP

***AMICUS CURIAE* BRIEF OF LAW PROFESSORS IN SUPPORT OF APPLE, INC.**

18

Date:  March 22, 2016
19
Time:  1:00 p.m.
Ctrm:  3 or 4 - 3rd Floor
20
Judge: Honorable Sheri Pym

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ......................................................................................... 1

II.   THIS COURT LACKS JURISDICTION TO ISSUE AND ENFORCE THE
      APPLE ORDER ............................................................................................ 3

III.  NEITHER THE DEPARTMENT OF JUSTICE NOR THE COURTS HAVE
      YET AFFORDED APPLE DUE PROCESS OF LAW ............................... 4

      A.    Apple's Interests at Stake in this Case are Critical ......................... 6

      B.    A More Formalized Procedure to Consider Apple's Perspective is
            Likely to Avoid Arbitrary or Erroneous Decisions ......................... 6

      C.    The Government Has No Substantial Countervailing Interest in
            Expediency ...................................................................................... 8

IV.   THE FIRST CONGRESS INTENDED THE ALL WRITS ACT TO BE
      MORE LIMITED THAN THE GOVERNMENT NOW SUGGESTS .................. 8

V.    THE GOVERNMENT CANNOT USE THE ALL WRITS ACT TO
      REWRITE STATUTORY AUTHORITY CONTROLLING THE
      GOVERNMENT'S ACCESS TO ELECTRONICALLY STORED
      INFORMATION .......................................................................................... 10

      A.    CALEA Specifies Who Must Assist Law Enforcement in Obtaining
            Electronic Information and What Assistance They Must Provide—and
            Specifically Excludes Decryption ................................................. 13

      B.    ECPA Specifies Who Must Assist Law Enforcement in Obtaining
            Electronic Information and What Assistance They Must Provide—and
            Specifically Excludes Encrypted Information ................................ 16

VI.   THE GOVERNMENT'S DEMAND WOULD IMPOSE AN
      UNREASONABLE BURDEN ON BOTH APPLE AND ITS USERS ................. 17

VII.  NEITHER NEW YORK TELEPHONE NOR THE OTHER CASES THE
      GOVERNMENT CITES CAN SUPPORT THE APPLE ORDER ....................... 20

VIII. CONCLUSION ............................................................................................ 25

AMICUS CURIAE BRIEF OF LAW PROFESSORS IN SUPPORT OF APPLE
CASE NO. 5:16-CM-00010-SP

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bd. of Regents of State Colls. v. Roth,*
    408 U.S. 564 (1972)..................................................................5

*Carlisle v. United States,*
    517 U.S. 416 (1996)................................................................11

*Clemons v. Mississippi,*
    494 U.S. 738 (1990)..................................................................4

*Crowley v. CyberSource Corp.,*
    166 F. Supp. 2d 1263 (N.D. Cal. 2001) ...............................17

*Garcia v. City of Laredo,*
    702 F.3d 788 (5th Cir. 2012) ................................................16

*Greene v. McElroy,*
    360 U.S. 474 (1959)..................................................................5

*Hilderman v. Enea TekSci, Inc.,*
    551 F. Supp. 2d 1183 (S.D. Cal. 2008) ...............................16

*In re Application of the U.S. for an Order (1) Authorizing the Use of a Pen*
    *Register & Trap & Trace Device,*
    396 F. Supp. 2d 294 (E.D.N.Y. 2005) ......................12, 17, 18

*In re Application of U.S. for an Order Authorizing an In-Progress Trace of*
    *Wire Commc'ns Over Tel. Facilities,*
    616 F.2d 1122 (9th Cir. 1980) ..............................................23

*In re Application of U.S. for an Order Authorizing Disclosure of Location*
    *Info. of a Specified Wireless Tel.,*
    849 F. Supp. 2d 526 (D. Md. 2011) ............................10, 12, 18

*In re Application of U.S. for an Order Directing X to Provide Access to*
    *Videotapes,*
    No. 03-89, 2003 WL 22053105 (D. Md. Aug. 22, 2003)...........23

*In re iPhone Application Litig.,*
    844 F. Supp. 2d 1040 (N.D. Cal. 2012) ...............................17

*In re Order Requiring Apple, Inc. to Assist in the Execution of a Search*
    *Warrant Issued by this Court,*
    No. 1:15-mc-01902-JO, 2015 WL 5920207 (E.D.N.Y. Oct. 9, 2015)..............5, 12, 21

*In re U.S. for an Order Authorizing Installation & Use of a Pen Register,*
    415 F. Supp. 2d 211 (W.D.N.Y. 2006) .................................12

AMICUS CURIAE BRIEF OF LAW PROFESSORS IN SUPPORT OF APPLE
CASE NO. 5:16-CM-00010-SP

# TABLE OF AUTHORITIES (Cont'd)

**Page(s)**

*In re U.S. for an Order Authorizing the Roving Interception of Oral Commc'ns,*
349 F.3d 1132 (9th Cir. 2003) ...................................................10, 13, 17, 24

*In re U.S. For an Order Directing a Provider of Commc'n Servs. to Provide Tech. Assistance to Agents of the U.S. Drug Enf't Admin.,*
--- F. Supp. 3d ---, No. 15-1242 (M), 2015 WL 5233551 (D.P.R. Aug. 27, 2015) ...................................................................................................4, 23

*In re XXX, Inc.,*
No. 14 Mag. 2258, 2014 WL 5510865 (S.D.N.Y. Oct. 31, 2014) .................5

*In the Matter of Commc'ns Assistance for Law Enf't Act & Broadband Access & Servs.,*
20 F.C.C. Rcd. 14989 (2005), *on reconsideration in part,* 21 F.C.C. Rcd. 5360 (2006)...........................................................................................15

*Mathews v. Eldridge,*
424 U.S. 319 (1976)..................................................................................5

*McIntire v. Wood,*
11 U.S. 504 (1813)..................................................................................10

*Michigan Bell Tel. Co. v. United States,*
565 F.2d 385 (6th Cir. 1977) ...................................................................23

*Mullane v. Cent. Hanover Bank & Tr. Co.,*
339 U.S. 306 (1950)..................................................................................4

*Pa. Bureau of Corr. v. U.S. Marshals Serv.,*
474 U.S. 34 (1985)..................................................................................10

*Plum Creek Lumber Co. v. Hutton,*
608 F.2d 1283 (9th Cir. 1979) ...........................................................10, 23

*Riley v. California,*
134 S. Ct. 2473 (2014)..............................................................................22

*Rock v. Arkansas,*
483 U.S. 44 (1987)....................................................................................4

*Ruckelshaus v. Monsanto Co.,*
467 U.S. 986 (1984)..................................................................................5

*Skinner v. Ry. Labor Execs.' Ass'n,*
489 U.S. 602 (1989)..................................................................................24

*Smith v. Jackson,*
22 F. Cas. 575 (C.C.N.D.N.Y. 1825)........................................................10

iii

**TABLE OF AUTHORITIES (Cont'd)**

**Page(s)**

*Syngenta Crop Prot. v. Henson,*
    537 U.S. 28 (2002) ................................................................................ 4

*United States v. Hall,*
    583 F. Supp. 717 (E.D. Va. 1984) ...................................................... 23

*United States v. New York Tel. Co.,*
    434 U.S. 159 (1977) ................................................... 17, 20, 21, 22

*United States v. Zavalidroga,*
    2 F. App'x 787 (9th Cir. 2001) .......................................................... 10

**Statutes**

18 U.S.C. §§ 2701–2719 ................................................................ passim

28 U.S.C. § 1651 ............................................................................ passim

28 U.S.C. § 2243 ................................................................................ 11

47 U.S.C. § 1001 ............................................................................ passim

47 U.S.C. § 1002 ............................................................................ passim

**Other Authorities**

16B Charles Alan Wright  & Arthur R. Miller,
    *Federal Practice and Procedure* § 4005 (3d ed. 2015) ...................... 4

Charles Warren,
    *New Light on the History of the Federal Judiciary Act of 1789,*
    37 Harv. L. Rev. 49 (1923) ................................................................ 9

David F. Epstein,
    *The Political Theory of The Federalist,* 197–98 (2008) ...................... 9

David Gray & Danielle Citron,
    *The Right to Quantitative Privacy,* 98 Minn. L. Rev. 62 (2013) ........ 24

Deirdre K. Mulligan,
    *Reasonable Expectations in Electronic Communications: A Critical
    Perspective on the Electronic Communications Privacy Act,*
    72 Geo. Wash. L. Rev. 1557 (2004) .................................................. 16

*Gen. Michael Hayden Gives an Update on the Cyberwar,*
    Wall St. J. (Feb. 9, 2016), http://www.wsj.com/articles/gen-michael-
    hayden-gives-an-update-on-the-cyberwar-1455076153 ...................... 19

# TABLE OF AUTHORITIES (Cont'd)

**Page(s)**

H. Abelson et al.,
*Keys under doormats: mandating insecurity by requiring government
access to all data and communications,*
Journal of Cybersecurity, 1–11 (2015) .......................................................... 18

H.R. Rep. No. 103-827 (1994)............................................................................ 15

Henry J. Bourguignon,
*The Federal Key to the Judiciary Act of 1789,*
46 S.C. L. Rev. 647 (1995) ............................................................................. 10

Lonny Sheinkopf Hoffman,
*Removal Jurisdiction and the All Writs Act,*
148 U. Pa. L. Rev. 401 (1999) ......................................................................... 9

Mike McConnell et al.,
*Why the fear over ubiquitous data encryption is overblown,* Wash. Post
(July 28, 2015), https://www.washingtonpost.com/opinions/the-need-for-
ubiquitous-data-encryption/2015/07/28/3d145952-324e-11e5-8353-
1215475949f4_story.html ................................................................................ 20

Orin S. Kerr,
*A User's Guide to the Stored Communications Act, and a Legislator's
Guide to Amending It,* 72 Geo. Wash. L. Rev. 1208 (2004) ......................... 16

Paul Taylor, *Congress's Power to Regulate the Federal Judiciary: What the
First Congress and the First Federal Courts Can Teach Today's
Congress and Courts,*
37 Pepp. L. Rev. 847 (2010) ........................................................................... 9

Priscilla M. Regan,
*Legislating Privacy:  Technology, Social Values and Public Policy* (1995) .............. 16

Susan Landau,
*Surveillance Or Security?: The Risks Posed by New Wiretapping
Technologies* (2010) ....................................................................................... 19

William N. Eskridge, Jr.,
*All About Words: Early Understandings of the "Judicial Power" in
Statutory Interpretation, 1776–1806,* 101 Colum. L. Rev. 990 (2001) ......................... 9

## Rules

Fed. R. Crim. Proc. 41 ........................................................................................ 4

AMICUS CURIAE BRIEF OF LAW PROFESSORS IN SUPPORT OF APPLE
CASE NO. 5:16-CM-00010-SP

**INTEREST OF AMICI**

Amici are law professors at schools throughout the United States. We have no personal interest in the outcome of this case, but a professional interest in seeing that the law develops to encourage creativity and innovation, and to advance the public interest. No one other than the undersigned wrote or funded any portion of this brief. Institutional affiliations are given for identification purposes only.

**I.     INTRODUCTION**

The government has gone to great lengths to sidestep due process in its effort to avoid judicial scrutiny of the merits of its case. And for good reason: its case lacks merit.

The Department of Justice and the FBI demand that Apple dedicate its employees and hundreds of hours of employee time to develop software that provides a way to break into iPhones. That software does not currently exist. In fact, Apple specifically chose not to create it in the course of its business. The government now claims it can conscript Apple to create software Apple does not want to create and then force Apple to assist the government in using that software. The record demonstrates that government access requests will not stop with this single device.[1]

Although the government admits it had the time to—and, in fact, did—first approach Apple informally instead of going directly to the courts, and although the government presents no plausible reason for needing an immediate answer now, the DOJ and FBI filed their demand *ex parte*, depriving this Court of the benefit of Apple's perspective. Moreover the government acknowledges that the motion to compel was not

---

[1] Declaration of Nicolat Hanna in Support of Apple Inc.'s Motion to Vacate Order Compelling Apple, Inc. to Assist Agents in Search and Opposition to Government's Motion To Compel Assistance ("Hanna Decl.") ¶ 5 & Ex. C, *In the Matter of the Search of an Apple iPhone Seized During the Execution of a Search Warrant on a Black Lexus IS300, California License Plate 35KGD203*, No. 5:16-cm-00010-SP ("Case No. 16-10") (C.D. Cal. Feb. 25, 2016), ECF Nos. 16-1 & 16-4.

necessary.[2]

The government's actions cloud the legal and factual landscape.  Once the fog lifts, it is clear that multiple laws, constitutional provisions, and judicial doctrines prohibit precisely what the government demands.  Compelling a private company to create technology with features that the firm deliberately chose to exclude is an unprecedented expansion of judicial power that Congress did not support by passing the All Writs Act.

First, there is a jurisdictional problem.  There is no basis in the record for this Court to assert Article III jurisdiction to issue or enforce the February 16, 2016 Order ("the Apple Order").  The search warrant's authority is already exhausted and the government's motion to compel recognizes that CALEA ("Communications Assistance for Law Enforcement Act") does not provide sufficient authority to support the Apple Order.  Rather, the government's request rests solely on the All Writs Act.  However, the All Writs Act is not an original source of federal jurisdiction and cannot support the government's motion or this Court's order.  The All Writs Act merely provides a source of residual authority *where such jurisdiction independently exists*.

Second, the underlying Order is invalid because it deprives Apple of liberty and property without due process of law.  The government initially took the time to seek Apple's help outside the judicial process.  Only after Apple declined did the government file its *ex parte* application, which did not allow Apple an opportunity to respond.  Even though Apple has now had an opportunity to respond to the government's motion to compel, the underlying Apple Order itself was issued in violation of due process and must be vacated.

///

---

[2] The government acknowledges that "a separate order compelling Apple's compliance with this Court's February 16, 2016, order is not legally necessary . . . ," suggesting that it filed "this noticed motion to provide Apple with the due process and adversarial testing it seeks."  Case No. 16-10 (C.D. Cal. Feb. 19, 2016), ECF No. 1 (Gov't's Mot. to Compel Apple Inc. to Comply with This Court's Feb. 16, 2016 Order Compelling Assistance in Search) at 3 n.3.  However, as discussed below, Apple must be afforded the opportunity to challenge the merits of the Apple Order itself, not merely the motion to compel.

AMICUS CURIAE BRIEF OF LAW PROFESSORS IN SUPPORT OF APPLE
CASE NO. 5:16-CM-00010-SP

Third, CALEA and ECPA ("Electronic Communications Privacy Act") govern the substantive validity of the Order and set out telecommunications carriers' obligations to assist law enforcement. Significantly, when Congress enacted CALEA, it exempted "information services," which includes certain services that Apple provides, from that requirement. The Supreme Court has instructed that where a statutory scheme governs a particular subject matter, the All Writs Act's residual power does not.

Finally, no court has ever issued a valid order that imposes an equivalent burden on a non-party. Our research has not found *any* case that uses the All Writs Act to require a third-party private entity to design and create new software. Some courts have compelled disclosure of already-existing information in cases where the All Writs Act is found applicable. In contrast, the order the government demands in this case would require substantial expenditures of time and talent above and beyond what is appropriate under the All Writs Act. This point is particularly alarming where Apple has made a deliberate decision to *exclude* the features that the government now demands.

The issues in this case—particularly those concerning the All Writs Act—raise important concerns for privacy interests globally and the security of the technical infrastructure on which many in this country depend. The order the government demands here threatens to give the government *de facto* control over the course of technical innovation, favoring police access to evidence over the security of our technical infrastructure as well as individual privacy.

## II. THIS COURT LACKS JURISDICTION TO ISSUE AND ENFORCE THE APPLE ORDER

The government is proceeding in this Court on the basis of a search warrant that Magistrate Judge David Bristow issued on December 3, 2015. *See* Declaration of Christopher Pluhar ¶ 5 & Ex. 1, *In the Matter of the Search of an Apple iPhone Seized During the Execution of a Search Warrant on a Black Lexus IS300, California License Plate 35KGD203*, No. 15-0451-M ("Case No. 15-451") (C.D. Cal. Feb. 16, 2016), ECF No. 16. The search warrant allows law enforcement to search a Black Lexus IS300 and to

3

1  seize certain items, including "digital device[s]" and evidence about those digital devices.

2  The FBI searched the car and found the iPhone that is at issue here.  The government now

3  has that phone and may search it consistent with the limitations imposed by the December

4  3, 2015 warrant.  With that, the warrant's authority is exhausted.

5      The government concedes that neither CALEA nor Federal Rule of Criminal

6  Procedure 41 provides authority to require Apple to create software to access data now

7  stored on the device.  *See* Case No. 16-10, ECF No. 1 at 22.  Instead, the government's

8  request rests solely on the All Writs Act.  *Id.*  However, the All Writs Act cannot support

9  the government's motion or this Court's order.

10     The All Writs Act provides a source of residual authority to federal courts "in aid of

11  their respective jurisdictions" *where such jurisdiction independently exists.  See* 28 U.S.C.

12  § 1651(a).  A court must have Article III jurisdiction before it can issue an extraordinary

13  writ.  16B Charles Alan Wright  & Arthur R. Miller, *Federal Practice and Procedure* §

14  4005 (3d ed. 2015).  By itself, the All Writs Act is incapable of serving as an original

15  source of federal jurisdiction.  *See Syngenta Crop Prot. v. Henson*, 537 U.S. 28, 33

16  (2002).  Therefore, this district court lacks jurisdiction to issue and enforce the Apple

17  Order.  *See In re U.S. For an Order Directing a Provider of Commc'n Servs. to Provide*

18  *Tech. Assistance to Agents of the U.S. Drug Enf't Admin.*, --- F. Supp. 3d ---, No. 15-1242

19  (M), 2015 WL 5233551, at *5 (D.P.R. Aug. 27, 2015).  Because this Court lacks Article

20  III jurisdiction to issue or enforce the Apple Order, it should vacate the order.

21  **III.   NEITHER THE DEPARTMENT OF JUSTICE NOR THE COURTS HAVE**
       **YET AFFORDED APPLE DUE PROCESS OF LAW**
22

23     The right to be heard is fundamental to due process of law in an adversary system

24  in both criminal and civil contexts.  *See Clemons v. Mississippi*, 494 U.S. 738, 769 (1990)

25  (quoting *Rock v. Arkansas*, 483 U.S. 44, 51 & n.9 (1987)); *Mullane v. Cent. Hanover*

26  *Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).  The adversary system relies on the

27  opportunity for both sides to offer their perspectives so that the Court may have a full

28  understanding before it issues a ruling.  Yet the government filed its All Writs Act

4

1  application *ex parte*, requiring this Court to make a decision based on a skewed and

2  incomplete understanding of the facts and legal landscape.  Due process requires more.

3      The Fifth Amendment is clear that "No person shall be . . . deprived of life, liberty,

4  or property, without due process of law."  Courts have consistently applied Fifth

5  Amendment due process protections to the All Writs Act, including similar cases

6  involving Apple.  *See, e.g.*, *In re Order Requiring Apple, Inc. to Assist in the Execution of*

7  *a Search Warrant Issued by this Court*, No. 1:15-mc-01902-JO, 2015 WL 5920207, at *7

8  (E.D.N.Y. Oct. 9, 2015) ("[C]ourts have held that due process requires that a third party

9  subject to an order under the All Writs Act be afforded a hearing on the issue of

10  burdensomeness ***prior to*** compelling it to provide assistance to the Government.")

11  (quoting *In re XXX, Inc.*, No. 14 Mag. 2258, 2014 WL 5510865, at *2 (S.D.N.Y. Oct. 31,

12  2014)) (emphasis added).  In this case, the government seeks to deprive Apple of both

13  property[3] and liberty.[4]  To determine whether due process was adequate to support this

14  deprivation, courts consider three factors: (1) the importance of the individual's interest at

15  stake, (2) the likelihood that more formalized procedures would avoid arbitrary or

16  erroneous decisions by the government, and (3) the countervailing government interest

17  (such as the efficiency of government administrative agencies.  *Mathews v. Eldridge*, 424

18  U.S. 319, 335 (1976).  In this case, each of these factors weighs *against* the government's

19  demand.

20  _____

21  [3] The government demands that Apple develop new software that would be protected both as a trade secret, *see Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) (finding

22  that trade secrets are property rights subject to constitutional protections, such as the takings clause), and as copyrighted software, *see* 3 Patry on Copyright § 9:240 n.2

23  ("Computer programs are, of course, generally classified as 'literary works' [under the Copyright Act].").

24  [4] Apple has a liberty interest in operating its company as it chooses to.  *Cf. Greene v. McElroy*, 360 U.S. 474, 492 (1959) (finding that "the right to hold specific private

25  employment and to follow a chosen profession free from unreasonable governmental interference" is a liberty interest protected by the Due Process Clause); *Bd. of Regents of*

26  *State Colls. v. Roth*, 408 U.S. 564, 572 (1972) (holding that liberty "denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in

27  any of the common occupations of life, [and] to acquire useful knowledge" among other rights).

28

**A.      Apple's Interests at Stake in this Case are Critical**

Apple has made a conscious decision as part of the operation of its business to build in an iPhone Unique ID that is necessary to decrypt the data on the phone and which Apple itself does not know. *See* Case No. 16-10 (C.D. Cal. Feb. 25, 2016), ECF No. 16 (Apple's Mot. To Vacate) at 5–7, 23.  The government's demand would interfere with a private company's decisions about which software and security it will develop and which it will not.  Apple's business is developing technology—both physical and intellectual property.  Whether the government can dictate the technology Apple must develop and force Apple to turn that technology over to the government is a vitally important interest.

**B.      A More Formalized Procedure to Consider Apple's Perspective is Likely to Avoid Arbitrary or Erroneous Decisions**

This Court, and courts addressing similar issues in the future, are likely to reach arbitrary or erroneous decisions without a formalized process for Apple—or another future company—to be heard.  Because this Court issued its February 16, 2016 order without the benefit of a hearing or briefing from Apple, it made its decision on incomplete and misleading information.

For instance, the government represented in its *ex parte* application that it was not asking to place an "unreasonable burden" on Apple because "while the order . . . requires Apple to provide modified software . . . it is not an unreasonable burden for a company that writes software code as part of its regular business." *See* Case No. 15-451 (C.D. Cal. Feb. 16, 2016), ECF No. 18 at 14–16.  This proves too much.  By this same logic, it would not be unreasonably burdensome to demand that Boeing build a custom jet for the government because Boeing builds planes as part of its regular business or to demand that a pharmaceutical company make drugs for executions after it has made the intentional decision not to.  With the benefit of Apple's briefing, the Court can consider Apple's perspective on the burden of developing, testing, implementing, and protecting custom code for this investigation. *See* Case No. 16-10, ECF No. 16 at 23–30.

///

AMICUS CURIAE BRIEF OF LAW PROFESSORS IN SUPPORT OF APPLE
CASE NO. 5:16-CM-00010-SP

Apple's perspective is also critical to the security of consumers using Apple devices. The government demanded that this Court order Apple to develop software without allowing Apple the opportunity to explain the risks involved in the way the government wants Apple to develop its software. Allowing the government to dictate how Apple develops software can create very real privacy and security risks for Apple users. Computer scientists have shown that grave risks arise from requiring the introduction of insecure software. *See* H. Abelson et al., *Keys under doormats: mandating insecurity by requiring government access to all data and communications*, J. of Cybersecurity, 69–79 (2015). Apple is better suited than the government to address potential privacy and security problems in development of its own software. It is therefore critical that Apple have the opportunity to address these considerations to the Court *before* it issues an order.

The government also represented that new Apple software is "necessary" to collect data from the iPhone. *See* Case No. 15-451, ECF No. 18 at 16–17. However, with the benefit of Apple's briefing, the Court learned that the FBI *created* this situation. Case No. 16-10, ECF No. 16 at 11. As Apple explains in its motion to vacate, the iPhone might have been able to initiate an automatic iCloud backup, allowing the FBI access to the information it wants. *See id.* at 29–30. However, the FBI changed the iCloud password on the account associated with the iPhone without consulting Apple, making it impossible to trigger the automatic backup. *See id.*

Finally, the government's application for the Apple Order makes no mention of CALEA or ECPA despite the fact that these statues govern this precise issue: the scope of responsibilities for a third party to provide assistance to law enforcement in obtaining electronic communications evidence. Without Apple's brief, the Court did not have the opportunity to consider the limitations of CALEA, which "does not authorize any law enforcement agency or officer . . . to require any specific design of equipment, facilities, services, features . . . ." 47 U.S.C. § 1002(b)(1)(A). CALEA is directly relevant to the question whether the order the government demands is "agreeable to the usages and

7

principles of law." 28 U.S.C. § 1651(a).

These facts and legal background are vital to a Court's reasoned decision. Without them, the Court risks arbitrary or erroneous decisions.

### C.    The Government Has No Substantial Countervailing Interest in Expediency

The government cannot show any compelling interest in expediency. *Ex parte* proceedings were not necessary because the government had time to ask Apple to assist voluntarily, as the government itself admits. *See* Case No. 15-451, ECF No. 18 at 16–17. If the government had time to ask Apple to assist voluntarily before demanding Court intervention, the Court had time to consider Apple's position *before* issuing its order.

*                 *                 *

The government's *ex parte* motion and this Court's order deprived Apple of its liberty and property without due process of law. Apple was entitled to a hearing and opportunity to be heard *before* this Court issued an order conscripting its services in support of law enforcement. It is not enough that Apple now has the opportunity to challenge the government's motion to compel. The Apple Order itself issued without affording Apple an opportunity to be heard and therefore suffers from the errors and arbitrariness discussed above in Section III(B). Even if the Court denies the government's motion to compel, the Apple Order would still stand and might be considered precedential. Thus, the Court should vacate the underlying Apple Order because it issued in violation of due process.

## IV.    THE FIRST CONGRESS INTENDED THE ALL WRITS ACT TO BE MORE LIMITED THAN THE GOVERNMENT NOW SUGGESTS

The All Writs Act, 28 U.S.C. § 1651 (a), provides that the federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." The All Writs Act derives from the Judiciary Act of 1789, enacted by the country's first Congress in order to create the federal court system.

///

8

The context of this enactment is critical to understanding the present dispute. Congress tasked the federal courts with a significant role that was, nonetheless, constrained. *See* Paul Taylor, *Congress's Power to Regulate the Federal Judiciary: What the First Congress and the First Federal Courts Can Teach Today's Congress and Courts*, 37 Pepp. L. Rev. 847, 857 (2010). When the first Judiciary Act was promulgated, state courts already existed. Yet the Federal system was found to be necessary to, among other things, protect the population's liberty interests "from hasty or undue encroachment by the federal government." William N. Eskridge, Jr., *All About Words: Early Understandings of the "Judicial Power" in Statutory Interpretation, 1776–1806*, 101 Colum. L. Rev. 990, 1055 (2001).

The first Congress did not contemplate that the federal courts would be empowered to exercise independent law-making authority. As Alexander Hamilton articulated, the courts "may truly be said to have neither force nor will, but merely judgment." The Federalist No. 78 (Alexander Hamilton) (Jacob E. Cooke ed., 1961); *see also* David F. Epstein, *The Political Theory of The Federalist* (2008). The All Writs Act was not intended to provide the courts with law-making power.

A review of the historical scholarship demonstrates that writ authority was a comparatively inconspicuous addition to the federal court system. The first Congress extensively deliberated several other aspects of the first Judiciary Act. *See generally*, Charles Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 Harv. L. Rev. 49, 95 (1923). Yet there is virtually no evidence of debate about the All Writs Act. *Id.* at 49; Lonny Sheinkopf Hoffman, *Removal Jurisdiction and the All Writs Act*, 148 U. Pa. L. Rev. 401, 435–36 (1999). The statute's language, considered in association with the lack of any significant discussion on this point, demonstrates that the drafters intended to grant the federal courts only limited authority. *Id.* (stating "the notion that a federal court, once created, would be vested with writ power to aid its existing jurisdiction would have been considered unremarkable"). The statute ensured that the federal system was authorized to issue writs sufficient to preserve its own jurisdiction, which is

9

1   consistent with the understanding and experiences of the drafters in the courts of the day.

2   *See* Henry J. Bourguignon, *The Federal Key to the Judiciary Act of 1789*, 46 S.C. L. Rev.

3   647, 672 (1995).  Early judicial interpretations confirm the understanding that the All

4   Writs Act did not confer the courts with plenary power to issue orders.  *See McIntire v.*

5   *Wood*, 11 U.S. 504, 505–06 (1813) (the courts' power to issue writs "is confined

6   exclusively to those cases in which it may be necessary to the exercise of their

7   jurisdiction"); *Smith v. Jackson*, 22 F. Cas. 575 (C.C.N.D.N.Y. 1825).

8        The Supreme Court's more recent interpretations continue to view the All Writs

9   Act, 28 U.S.C. § 1651(a), as only "a residual source of authority."  *United States v.*

10  *Zavalidroga*, 2 F. App'x 787, 788 (9th Cir. 2001) (citing *Pa. Bureau of Corr. v. U.S.*

11  *Marshals Serv.*, 474 U.S. 34, 43 (1985)).  Today, courts are clear that the All Writs Act

12  "does not give the district court a roving commission" to enlist third parties into law

13  enforcement.  *Plum Creek Lumber Co. v. Hutton*, 608 F.2d 1283, 1289 (9th Cir. 1979).

14  Rather, as the Ninth Circuit recognizes, the All Writs Act applies where there is an

15  unmistakable "gap to fill" in a congressional statutory regime.  *In re U.S. for an Order*

16  *Authorizing the Roving Interception of Oral Commc'ns*, 349 F.3d 1132, 1145 & n.26 (9th

17  Cir. 2003).

18       Courts consistently reject efforts like this one to use the All Writs Act to "issue

19  supplemental orders to effectuate valid orders or warrants [that] constitute an additional

20  invasion of privacy."  *In re Application of U.S. for an Order Authorizing Disclosure of*

21  *Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d 526, 579 (D. Md. 2011).  The

22  historical interpretation of the All Writs Act is irreconcilably inconsistent with the

23  position the government puts forward today.

24  **V.   THE GOVERNMENT CANNOT USE THE ALL WRITS ACT TO**
25  **REWRITE STATUTORY AUTHORITY CONTROLLING THE**
     **GOVERNMENT'S ACCESS TO ELECTRONICALLY STORED**
26  **INFORMATION**

27       Today, although the All Writs Act facilitates extraordinary remedies under very

28  particular circumstances, the section incorporates fundamental limitations that are

1    consistent with the Judiciary Act's original purpose.  Specifically, the Act is considered a
2    "residual source of authority to issue writs that are not otherwise covered by statute."
3    *Pennsylvania Bureau*, 474 U.S. at 43.  Although the All Writs Act empowers federal
4    courts to issue certain types of remedies, "it does not authorize them to issue ad hoc writs
5    whenever compliance with statutory procedures appears inconvenient or less appropriate."
6    *Id.*  Therefore, "[w]here a statute specifically addresses the particular issue at hand, it is
7    that authority, and not the All Writs Act, that is controlling." *Id.*; *Carlisle v. United*
8    *States*, 517 U.S. 416, 429 (1996) (same); *Plum Creek*, 608 F.2d at 1289.  The analysis
9    must proceed under the relevant statute and not the All Writs Act.  *See In re U.S. for an*
10   *Order Authorizing the Roving Interception of Oral Commc'ns*, 349 F.3d at 1145 & n.26.
11       *Pennsylvania Bureau* illustrates the operation of this principle.  In *Pennsylvania*
12   *Bureau*, the Court considered district court orders that required U.S. Marshals to transport
13   state prisoners to the federal trial courts to provide testimony.  474 U.S. at 35.  The Court
14   recognized that a statute, 28 U.S.C. § 2243, required prisoner transport by the "custodian,"
15   meaning the state prisons.  *Id.* at 39.  The Court rejected the argument that the All Writs
16   Act allowed the district court to engage in "'creative' use of federal judicial resources to
17   alleviate the drain on States' fisc" in light of the statute.  *Id.* at 40.  Holding that the All
18   Writs Act could not support such an order, the Court recognized that the statute "expressly
19   commands the custodian to bring his prisoner to the court, but extends this duty to no
20   other." *Id.* at 39.
21       Here, the government has attempted to sidestep this crucial limitation.  Specifically,
22   the government argues that because there is no statute precluding it from forcing Apple to
23   create government-specific software, it can demand the software under the All Writs Act
24   instead.  That is not—and cannot be—the test.  The All Writs Act "does not authorize
25   [federal courts] to issue ad hoc writs." *See id.* at 43.  Indeed, just this week, Judge
26   Orenstein rejected the government's argument in another case where the government
27
28

AMICUS CURIAE BRIEF OF LAW PROFESSORS IN SUPPORT OF APPLE
CASE NO. 5:16-CM-00010-SP

sought to force Apple to bypass the passcode on an Apple device.[5]  Judge Orenstein held that "the established rules for interpreting a statute's text constrain me to reject the government's interpretation that the AWA empowers a court to grant any relief not outright prohibited by law." *Id.*

Other rulings have reached this same conclusion in analogous contexts.[6]  Most notably, *In re Application of the U.S. for an Order (1) Authorizing the Use of a Pen Register & Trap & Trace Device*, 396 F. Supp. 2d 294 (E.D.N.Y. 2005) rejected the government's argument that the All Writs Act empowers a court to require a cell phone provider to furnish the government with a suspect's location.  Observing that Congress had enacted two statutes, ECPA and CALEA, to govern this subject matter, the court explained:

> The government thus asks me to read into the All Writs Act an empowerment of the judiciary to grant the executive branch authority to use investigative techniques either explicitly denied it by the legislative branch, or at a minimum omitted from a far-reaching and detailed statutory scheme that has received the legislature's intensive and repeated consideration.  Such a broad reading of the statute invites an exercise of judicial activism that is breathtaking in its scope and fundamentally inconsistent with my understanding of the extent of my authority.

*Id.* at 326.

Here, two statutes, CALEA, 47 U.S.C. § 1001 et seq., and ECPA, 18 U.S.C. §§ 2701–2719, already provide extensive rules that govern access to electronically communicated and stored information.  For decades, Congress has responded to new technology and new threats to privacy and public safety with a network of carefully

---

[5] *In re Order Requiring Apple, Inc. To Assist in the Execution of a Search Warrant Issued by This Court*, No. 1:15-mc-01902-JO (E.D.N.Y. Feb. 29, 2016), ECF No. 29 at 1.

[6] *See In re Application of U.S. for an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d at 580 ("the All Writs Act cannot be used to circumvent the safeguards set in place by existing law"); *In re U.S. for an Order Authorizing Installation & Use of a Pen Register*, 415 F. Supp. 2d 211, 219 (W.D.N.Y. 2006) (same); *In re Application of U.S. for an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d at 583 ("The government simply cannot use the All Writs Act to circumvent the requirements of the Fourth Amendment and other statutes that already occupy the space.").

AMICUS CURIAE BRIEF OF LAW PROFESSORS IN SUPPORT OF APPLE
CASE NO. 5:16-CM-00010-SP

drafted statutes.  CALEA and ECPA outline a complex regime controlling the government's power to access electronically stored and communicated information held by a range of service providers, including detailed provisions prescribing the entities on which design requirements can be imposed, and the physical and semantic boundaries that limit such assistance.  These statutes "cover the field."  Courts should not disrupt the careful balance that Congress has struck after years of hearings, study, and experience.

The Ninth Circuit limits the All Writs Act to authorize court orders where there is some "gap to fill" due to Congress's failure to consider an area of law.  *In re U.S. for an Order Authorizing Roving Interception of Oral Commc'ns*, 349 F.3d at 1145 & n.26. Here, there are no gaps.  Indeed, there are few areas of law in which Congress has provided more legislative guidance than the search and surveillance of electronically stored and communicated information—as well as the assistance third parties must provide law enforcement in obtaining this information.

Requiring Apple to redesign the iPhone operating system pursuant to an order issued under the All Writs Act to disable security features that prevent guessing or hacking the passcode reflects a profound disruption of Congress's carefully crafted regime.  Such a mandate will have costs not just for Apple, but also for security and privacy globally.  Because Congress can best weigh these difficult social issues, it is Congress's role to answer the contentious, difficult question of when manufacturers must redesign their products to undermine their own privacy protections.  That decision should be left to the legislative power in Congress, not the courts' judicial power under the All Writs Act.

### A.   CALEA Specifies Who Must Assist Law Enforcement in Obtaining Electronic Information and What Assistance They Must Provide—and Specifically Excludes Decryption

In the area of protection of electronically communicated and stored information— and government's power to compel third parties to assist in collecting that information, Congress left no gaps.  CALEA has been amended once and produced 850 pages of legislative history as well as a plethora of regulatory interpretations by the Federal

13

1  Communications Commission. *See, e.g.,* Communications Assistance for Law

2  Enforcement Act, Report and Order, FCC 99-11 (Mar. 15, 1999); Communications

3  Assistance for Law Enforcement Act, Order on Reconsideration, FCC 97-213 (Aug. 2,

4  1999); Communications Assistance for Law Enforcement Act, Second Report and Order,

5  FCC 97-213 (Jan. 29, 1999).

6      CALEA provides a detailed statutory scheme that specifies which kinds of

7  companies must assist the government in its surveillance orders and what assistance those

8  companies must provide.  Congress specifically excluded from its regulatory ambit firms

9  such as Apple, decryption obligations (except in limited circumstances not present here),

10  and, above all, design mandates.

11      First, CALEA explicitly states that it does not require telecommunication carriers to

12  redesign their system configurations, stating that it "*does not authorize* any law

13  enforcement agency or officer . . . to require any specific design of equipment, facilities,

14  services, features, or system configurations to be adopted by . . . any manufacturer of

15  telecommunications equipment, or . . . to prohibit the adoption of any equipment, facility,

16  service, or feature by . . . any manufacturer of telecommunications equipment." 47 U.S.C.

17  § 1002(b)(1).

18      Second, in defining those types of firms subject to assist law enforcement, Congress

19  decided that only "telecommunications carriers" would be obligated to make sure that

20  their "equipment, facilities, or services" allow the government to intercept

21  communications pursuant to a court order or other lawful authorization. *Id.*  CALEA

22  defines "telecommunications carrier" as an "entity engaged in the transmission or

23  switching of wire or electronic communications as a common carrier for hire." 47 U.S.C.

24  § 1001(8)(A).  Apple is not a common carrier, *i.e.*, a telephone company.

25      Rather, the Apple functionality at issue in this case would be classified under

26  CALEA as an "information service," which is defined as "the offering of a capability for

27  generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making

28  available information via telecommunications." 47 U.S.C. § 1001(6).  CALEA explicitly

14

1 | "does not include persons or entities insofar as they are engaged in providing information

2 | services."  47 U.S.C. § 1001(8)(C)(i).

3 | Third, Congress balanced privacy, security, and law enforcement needs by

4 | explicitly excluding from its obligations the duty to "decryp[t], or ensur[e] the

5 | government's ability to decrypt, any communication encrypted by a subscriber or

6 | customer, unless the encryption was provided by the carrier and the carrier possesses the

7 | information necessary to decrypt the communication."  47 U.S.C. § 1002(b)(3).

8 | Finally, CALEA has set forth a procedure for expanding its coverage—which the

9 | government should first make use of.  Section 1001(8)(B)(ii) states that the Federal

10 | Communications Commission can pull under its regulatory authority not simply providers

11 | of "wire or electronic communication" but also a "person or entity engaged in providing

12 | wire or electronic communication switching or transmission service to the extent that the

13 | Commission finds that such service is a replacement for a substantial portion of the local

14 | telephone exchange service."  To the extent that law enforcement is seeking, for example,

15 | email or iMessage content from the iPhone in question, this provision provides a way for

16 | the FBI to go to the Commission to seek an extension of Apple's CALEA obligations.

17 | Indeed, the government already has done so, obtaining FCC authority to monitor VoIP

18 | and other internet-based communications.  *In the Matter of Commc'ns Assistance for Law*

19 | *Enf't Act & Broadband Access & Servs.*, 20 F.C.C. Rcd. 14989, 14989 (2005), *on*

20 | *reconsideration in part,* 21 F.C.C. Rcd. 5360 (2006).

21 | CALEA legislative history also shows Congress's decision to exclude Apple from

22 | any decryption requirements.  Congress intended that collection and surveillance of

23 | electronic information should extend only to telecommunication providers, *i.e.*, telephone

24 | companies.  "The only entities required to comply with the functional requirements are

25 | telecommunications common carriers, the components of the public switched network

26 | where law enforcement agencies have always served most of their surveillance orders."

27 | H.R. Rep. No. 103-827, pt. 1, at 18 (1994).  Similarly, Congress did not intend CALEA to

28 | force firms to maintain an "encryption service for which [a carrier] does not retain the

1 | ability to decrypt communications for law enforcement access." *See also id.* at 24.

2 | **B.   ECPA Specifies Who Must Assist Law Enforcement in Obtaining**
3 | **Electronic Information and What Assistance They Must Provide—and Specifically Excludes Encrypted Information**

4 | ECPA sets forth a comprehensive set of rules that specifies the power of

5 | government to access stored electronic communications.  It was the product of detailed

6 | study, robust debate, and compromise among competing interests.  *See* Deirdre K.

7 | Mulligan, *Reasonable Expectations in Electronic Communications: A Critical Perspective*

8 | *on the Electronic Communications Privacy Act*, 72 Geo. Wash. L. Rev. 1557 (2004)

9 | (discussing background court disputes, Office of Technology Assessment Reports,

10 | congressional hearings, etc.); *see also* Priscilla M. Regan, *Legislating Privacy:*

11 | *Technology, Social Values and Public Policy* 131 (1995) (discussing the formation of the

12 | Privacy and Technology Project of the ACLU and extensive consultations between

13 | privacy groups, technology experts, business groups, and congressional staff).  ECPA's

14 | rules reflect Congress's balance between privacy and the needs of law enforcement,

15 | requiring certain types of firms to provide access to records that they store or possess.

16 | These rules refrain from requiring firms such as Apple from developing new technologies

17 | to undermine its own consumer privacy protections or to assist government in decryption.

18 | Under ECPA,  Apple must assist the government in obtaining records related to the

19 | iPhone stored on Apple's servers.  Presumably, it has already provided access and

20 | assistance to the government with respect to information it possesses.  *See* Orin S. Kerr, *A*

21 | *User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending*

22 | *It*, 72 Geo. Wash. L. Rev. 1208, 1209–13 (2004).  However, ECPA obligations only

23 | extend to records that are, in fact, stored by an electronic communication service provider

24 | or remote computing service provider.  ECPA excludes from this obligation "information

25 | that an individual stores to his hard drive or cell phone [because it] is not in electronic

26 | storage under the statute."  *Garcia v. City of Laredo*, 702 F.3d 788, 793 (5th Cir. 2012).

27 | *See also Hilderman v. Enea TekSci, Inc.*, 551 F. Supp. 2d 1183, 1205 (S.D. Cal. 2008)

28 | ("E-mails stored on the laptop computer are not" subject to ECPA); *In re iPhone*

16

1  *Application Litig.*, 844 F. Supp. 2d 1040, 1057–58 (N.D. Cal. 2012) (iPhones "d[id] not
2  constitute 'facilit[ies] through which an electronic communication service is provided'"
3  and thus ECPA does not cover them); *see also Crowley v. CyberSource Corp.*, 166 F.
4  Supp. 2d 1263, 1271 (N.D. Cal. 2001) ("[Argument that] computers of users of electronic
5  communication service, as opposed to providers of electronic communication service
6  [conceivably subject to ECPA] [be] considered facilities through which such service is
7  provided. . . . [is] destined to failure[.]").

8      ECPA places significant duties on Apple to assist law enforcement, but the
9  government seeks more than ECPA permits.  The government reads the All Writs Act "to
10  grant the executive branch authority to use investigative techniques either explicitly
11  denied it by the legislative branch, or at a minimum omitted from a far-reaching and
12  detailed statutory scheme that has received the legislature's intensive and repeated
13  consideration." *In re Application of the U.S. for an Order (1) Authorizing the Use of a*
14  *Pen Register & a Trap & Trace Device*, 396 F. Supp. 2d at 326.

15              *              *              *

16      Congress, through the democratic process, has weighed and balanced these difficult
17  concerns and created a comprehensive statutory regime, consisting in CALEA and ECPA.
18  That regime—not the All Writs Act—should control.

19  **VI.   THE GOVERNMENT'S DEMAND WOULD IMPOSE AN**
       **UNREASONABLE BURDEN ON BOTH APPLE AND ITS USERS**
20

21      The All Writs Act "may not impose an undue burden on a company enlisted to aid
22  the government." *In re U.S. for an Order Authorizing Roving Interception of Oral*
23  *Commc'ns*, 349 F.3d at 1148 (citing *United States v. New York Tel. Co.*, 434 U.S. 159,
24  172 (1977)).  Nor may the All Writs Act create "disruption to [a third party's business]
25  operations." *In re U.S. for an Order Authorizing Roving Interception of Oral Commc'ns*,
26  349 F.3d at 1145.  *No* court has *ever* looked to the All Writs Act to require a private
27  corporation to develop new, costly technology that creates serious financial burdens,
28  radically disrupts its business plan and disrupts its consumers' long-held privacy and

17

security expectations.  Courts have resisted the government's attempts to use the All Writs Act to collect data using newer, more intrusive technologies.  For instance, courts have rejected its use to obtain the real-time acquisition of prospective cell site information absent probable cause, concluding that such reliance "invites an exercise of judicial activism that is breathtaking in its scope and fundamentally inconsistent with . . . the extent of [judicial] authority."  *In re Application of the U.S. for an Order (1) Authorizing the Use of a Pen Register & a Trap & Trace Device*, 396 F. Supp. 2d at 326; *see also In re Application of U.S. for an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d at 578 ("The government [seeks] . . . precise [cell phone] location information under the All Writs Act.  This may be the most troubling position the government has taken in pursuit of this precise location data") (internal citations omitted).

Congress's restraint in dictating design features stems from the risks such requirements pose not just to individual privacy, but to security in general.  Such requirements threaten the security of information held by individuals, private firms and corporations, and, indeed, by our own local, state, and federal government, many of whom use iPhones to protect confidential information.

Adding custom mechanisms for law enforcement to access software systems, even if they are not, strictly speaking, 'back doors', creates a variety of technical risks to the security of the overall system.  In particular, building the new features required by the Apple Order has uncertain consequences for the security of Apple's iOS environment overall.  If Apple writes the code and gives it to the FBI to use, some or all of the code may fall into malicious hands.  Whereas, if the code is executed within Apple's secure facilities, the connection between the FBI and Apple could become a target for attack.  H. Abelson et al., *Keys under doormats: mandating insecurity by requiring government access to all data and communications*, Journal of Cybersecurity, 1–11 (2015).  A thorough analysis of these risks would depend on the precise implementation approach chosen by Apple, but it is not clear how this Court could monitor the security exposure

18

created by the system as it operates.

Indeed, government's investigatory tools can be and have been misused. *See* Susan Landau, *Surveillance Or Security?: The Risks Posed by New Wiretapping Technologies* (2010). Security experts understand that the use of product update channels, to undermine device security in support of government access poses a serious security threat for three related reasons:

First, establishing a general practice of signing code—whose purpose is unrelated to the product's function and only for the benefit of law enforcement—will provide a vector for attacking cell phones. Requiring new updates pushed by law enforcement will put new pressure on the update cycle and risk diverting developers' attention from the core security of the product.

Second, software updates are essential to maintaining the security of devices and networks as new threats emerge. Their utility depends upon consumer trust that the software delivered improves their product. The use of update channels to open up vulnerabilities in response to law enforcement requests will undermine trust in updates.

Finally, orders to disable aspects of a cryptographic implementation, signal to the industry that investments in robust security may be ill-advised and costly, as they will require countless hours to redesign after the government comes knocking. Apple may have the resources to continue deploying strong encryption, but other companies with fewer resources may be incentivized to build systems ready-made for government access. Yet a technical vulnerability designed to ease law enforcement access also lets in anyone who can find it.

The delicate policy choices at issue are underscored by the number of former National Security, Intelligence, and Defense officials who have come out in support of robust "end-to-end unbreakable encryption" (*Gen. Michael Hayden Gives an Update on the Cyberwar*, Wall St. J. (Feb. 9, 2016), http://www.wsj.com/articles/gen-michael-hayden-gives-an-update-on-the-cyberwar-1455076153), because "the greater public good is a secure communications infrastructure protected by ubiquitous encryption at the

19

1   device, server and enterprise level without building in means for government monitoring."

2   Mike McConnell et al., *Why the fear over ubiquitous data encryption is overblown*, Wash.

3   Post (July 28, 2015), https://www.washingtonpost.com/opinions/the-need-for-ubiquitous-

4   data-encryption/2015/07/28/3d145952-324e-11e5-8353-1215475949f4_story.html.

5       Moreover, an additional set of third parties also risk facing burdens in this case:

6   users of Apple products.  Users may be at additional security risk as a result of the

7   proliferation or mistaken use of the software being created under the Apple Order.  Of

8   course both Apple and the FBI will take care to avoid misuse of the software created here,

9   but we have no means within this proceeding of carefully evaluating these burdens.  In the

10  meantime, users will have reason to wonder whether either Apple or the FBI has

11  introduced vulnerabilities into the iOS environment.

12      The government's requested order here raises the question how the court should

13  evaluate the cost of mandating security design not simply to Apple—but upon society

14  and, indeed, the entire global economy.  The fact that All Writs Act jurisprudence offers

15  no guidance on this question strongly suggests that the court has entered territory much

16  better suited for the democratic policymaking process of a legislature.

17  **VII.   NEITHER NEW YORK TELEPHONE NOR THE OTHER CASES THE**
    **GOVERNMENT CITES CAN SUPPORT THE APPLE ORDER**
18

19      In the government's motion to compel and its underlying application for the Apple

20  Order, the government relies heavily on *New York Telephone*.  434 U.S. at 174–75.

21  However, that case cannot support the weight the government puts on it.

22      *New York Telephone* recognized that the order at issue in that case posed essentially

23  no burden on the telephone company's ongoing operations.  *Id.* ("Certainly the use of pen

24  registers is by no means offensive to it.  The Company concedes that it regularly employs

25  such devices without court order for the purposes of checking billing operations, detecting

26  fraud, and preventing violations of law.").  In contrast, there is every indication that the

27  Apple Order represents a significant outlay of time, expense, and risk to Apple.  *Cf. In re*

28  *Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by this*

20

*Court*, 2015 WL 5920207, at *5 ("there is nothing in the record to suggest that Apple has or wants the ability to defeat customer-installed security codes to access the encrypted data that its customers store on Apple devices after purchasing them."); *id.*, Case No. 15-1902 (E.D.N.Y. Feb. 29, 2016), ECF No. 29 at 38–44 (finding that requiring Apple to bypass an iPhone passcode would place an unreasonable burden on Apple including reputational harm, financial harm, burdens on Apple's ability to compete in the market, and a burden on Apple's ability, as a private entity, to avoid doing what it finds to be offensive).

Apple has submitted evidence that the creation, design, validation and deployment of the software necessary to comply with the Apple Order would take six to ten experienced Apple engineers and employees dedicating a substantial period of time for a minimum of two weeks.[7]  Additionally, such deployment must occur at a secure, isolated facility to minimize the probability of a security leak.[8]  Beyond this, to prevent the possibility that the code might get into the wrong hands and/or to accommodate additional government requests, Apple must maintain and house the government-specific operating system by taking the same levels of precautions needed to protect Apple's most sensitive trade secrets.[9]  The Apple Order requires Apple to violate design decisions that it made intentionally to secure the device.[10]  Under these circumstances, *New York Telephone* cannot support the Apple Order.

The burdens imposed on Apple—and the risks to the public's safety and privacy—are unlike other orders issued under the All Writs Act authority.  The implications of

---

[7] Decl. of Erik Neuenschwander in Supp. of Apple Inc.'s Mot. to Vacate Order Compelling Apple, Inc. to Assist Agents in Search and Opp'n to Gov't's Mot. to Compel Assistance ("Neuenschwander Decl.") ¶ 22, Case No. 16-10 (C.D. Cal. Feb. 25, 2016), ECF No. 16-33.

[8] *Id.* ¶¶ 36–37.

[9] *Id.* ¶¶ 47–49.  *See also* Decl. of Lisa Olle in Supp. of Apple Inc.'s Mot. to Vacate Order Compelling Apple, Inc. to Assist Agents in Search and Opp'n to Gov't's Mot. to Compel Assistance ¶¶ 13–14, Case No. 16-10 (C.D. Cal. Feb. 25, 2016), ECF No. 16-32.

[10] Neuenschwander Decl. ¶¶ 50–53.

AMICUS CURIAE BRIEF OF LAW PROFESSORS IN SUPPORT OF APPLE
CASE NO. 5:16-CM-00010-SP

disrupting the existing encryption system on iPhones are profound. These devices "place vast quantities of personal information literally in the hands of individuals." *Riley v. California*, 134 S. Ct. 2473, 2485 (2014). The software redesign the government demands in this case is arguably *more* privacy invasive. *See generally id.* at 2488–89 (recognizing privacy interests in cell phone content). While the facts of this case mute the privacy risks (the owner of the phone has consented, and the owner of the data is deceased), the background statutory scheme that must inform the court's use of the AWA does not contemplate, nor authorize, device manufacturers to assist the government in hacking lawfully purchased products to facilitate investigations.

Unlike the simple pen register at issue in *New York Telephone*, an iPhone facilitates myriad capabilities that rely on the storage of images, texts, browsing history, calendars, books, films, contact lists, banking information, and travel documentation. Using Apps or a browser, cell phones provide access to data stored remotely. The information stored on a device may concern the device's owner, as well as the owner's friends, family and acquaintances. Although both cases concern phones, a pen register stores numbers dialed from a particular phone line. In contrast, many cell phones "are in fact minicomputers that also happen to have the capacity to be used as a telephone." *Riley*, 134 S. Ct. at 2489.

Importantly, the Supreme Court only allowed the All Writs Act to include pen registers because such expansion was acceptable under Congress's existing electronic privacy regime. "It is clear that Congress did not view pen registers as posing a threat to privacy of the same dimension as the interception of oral communications and did not intend to impose Title III restrictions upon their use." *New York Telephone*, 434 U.S. at 168. Congress judged that the pen register's privacy infringement was not that significant and, therefore, made the decision *not* to regulate it. Here, however, Congress concluded the opposite, finding that mandating particular designs constituted such a threat to privacy and security that CALEA explicitly excludes it. *See* 47 U.S.C. § 1002(b).

As a private company, Apple is legally distinct from the public utility analyzed in *New York Telephone. See, e.g., Michigan Bell Tel. Co. v. United States*, 565 F.2d 385,

22

389 (6th Cir. 1977) ("It is to be emphasized that a telephone company is no ordinary third party. It is a public utility, enjoying a monopoly in an essential area of communications."); *In re Application of U.S. for an Order Authorizing an In-Progress Trace of Wire Commc'ns Over Tel. Facilities*, 616 F.2d 1122, 1129 (9th Cir. 1980) (same). The government does not have the authority to conscript the services of a private company like Apple as it does to conscript the services of a highly regulated public utility. Case No. 15-1902 (C.D. Cal. Feb 29, 2016), ECF No. 29 at 31–32 ("[U]nlike the telephone company—'a highly regulated public utility with a duty to serve the public,'— Apple is a private entity with no greater duty to serve the public than any other business.") (internal citation omitted).

The other cases the government cites are readily distinguishable. In *United States v. Hall*, 583 F. Supp. 717, 721 (E.D. Va. 1984), the credit card records were already maintained by the company and could be generated by "punching a few buttons" and were in the company's possession. *See also In re Application of U.S. for an Order Directing X to Provide Access to Videotapes*, No. 03-89, 2003 WL 22053105, at *3 (D. Md. Aug. 22, 2003) ("the only cooperation required by the apartment complex is merely to provide access to surveillance tapes already in existence, rather than any substantive assistance, and nothing more."). The additional authority cited by the government acknowledges that the All Writs Act "do[es] not provide authority for [the court] to enter the requested order." *In re U.S. for an Order Directing a Provider of Commc'ns Servs. to Provide Tech. Assistance to Agents of the U.S. Drug Enf't Admin.*, 2015 WL 5233551, at *4 (relying on alternative authority). These cases underscore that the All Writs Act does not support the burdensome and intrusive nature of the Apple Order. *Cf. Plum Creek*, 608 F.2d at 1290 ("This circuit has never held that the district court has such wide-ranging inherent powers that it can impose a duty on a private party when Congress has failed to impose one.").

///

///

According to Apple, software on the iPhone that is the subject of the Apple Order was designed to optimize security, a core attribute of its functionality.[11] There may be private information on any iPhone that is more extensive, personal, and all-encompassing than almost any other owned object. It is a fair assumption that most cell phones also include information about those with whom the owner has communicated. To ask Apple to create code that unravels that security threatens harm to both Apple and the public interest. *Cf. In re U.S. for an Order Authorizing the Roving Interception of Oral Commc'ns*, 349 F.3d at 1145 ("The obligation of private citizens to assist law enforcement, even if they are compensated for the immediate costs of doing so, has not extended to circumstances in which there is a complete disruption of a service they offer to a customer as part of their business . . . .").

This case raises important concerns for private enterprise, innovation, privacy, and constitutional rights more broadly. If upheld, the Apple Order will convert Apple into a state actor insofar as it will be compelled to participate in this search as an "agent or instrument of the Government." *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614–15 (1989). To the extent these requests become routine, they raise concerns that companies will be required to design their products to support governmental access going forward. This would have the effect of giving the government de facto control over technical design while also permanently converting Apple and other private companies into state actors, subjecting them to a range of constitutional duties and restraints that normally do not apply to private entities, including those imposed by the Fourth Amendment. *See* David Gray & Danielle Citron, *The Right to Quantitative Privacy*, 98 Minn. L. Rev. 62, 135–36 (2013). This would have a host of consequences for individuals' rights to be secure against unreasonable searches, data security, and scientific and technical advance more generally while also dramatically altering relationships between technology companies and their consumers. As both a constitutional matter and

---

[11] Hanna Decl. Ex. D, Case No. 16-10 (C.D. Cal. Feb. 25, 2016), ECF No. 16-5.

a policy matter, allowing the federal government *de facto* control over the design of technology is therefore an extraordinary remedy that requires careful consideration. CALEA reflects a legislative view that this remedy is appropriate in a very narrow circumstance. The All Writs Act by contrast does not reflect any legislative wisdom suggesting that broader government control over technology companies, their products, and their consumer market is appropriate or constitutional.

## VIII. CONCLUSION

For the reasons described above, the Court should deny the government's motion to compel and vacate its February 16, 2016 order.

AMICUS CURIAE BRIEF OF LAW PROFESSORS IN SUPPORT OF APPLE
CASE NO. 5:16-CM-00010-SP

1  Dated: March 3, 2016                    DURIE TANGRI LLP

2

3                                    By: _____
                                              MARK A. LEMLEY

4                                    Attorneys for *Amicus Curiae*
                                     Law Professors
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMICUS CURIAE BRIEF OF LAW PROFESSORS IN SUPPORT OF APPLE /
CASE NO. 5:16-CM-00010-SP

**Janet Ainsworth**
John D. Eshelman Professor of Law
Seattle University

**Jordan (Jody) M. Blanke**
Ernest L. Baskin, Jr. Distinguished Professor of Computer Information Systems
and Law Stetson School of Business & Economics Mercer University

**Annemarie Bridy**
Professor, University of Idaho College of Law

**Dan L. Burk**
Chancellor's Professor of Law
University of California, Irvine

**Adam Candeub**
Professor of Law, Director, IP, Information, and Communications Law Program
Michigan State University College of Law

**Michael A. Carrier**
Distinguished Professor
Rutgers Law School

**Megan M. Carpenter**
Professor of Law
Co-Director, Center for Law and Intellectual Property (CLIP)
Faculty Director, IP and Technology Law Clinic
Faculty Director, Entrepreneurship Law Clinic
Texas A&M University School of Law

**Anupam Chander**
Professor
University of California, Davis, School of Law

**Andrew Chin**
Associate Professor
University of North Carolina School of Law

**A. Michael Froomkin**
Laurie Silvers & Mitchell Rubenstein Distinguished Professor of Law
University of Miami

**David Gray**
University of Maryland
Francis King Carey School of Law

**Woodrow Hartzog**
Associate Professor
Samford University's Cumberland School of Law

**Stephen E. Henderson**
Judge Haskell A. Holloman Professor of Law
The University of Oklahoma

**Margot E. Kaminski**
Assistant Professor
The Ohio State University Moritz College of Law Affiliated Fellow, Information
Society Project at Yale Law School

**Raymond Ku**
Professor of Law
Case Western Reserve University School of Law

**Mark A. Lemley**
William H. Neukom Professor, Stanford Law School Director, Stanford Program
in Law, Science, and Technology Senior Fellow, Stanford Institute for Economic
Policy Research partner, Durie Tangri LLP co-founder, Lex Machina Inc.

**Richard A. Leo, Ph.D., J.D.**
Hamill Family Professor of Law and Psychology
University of San Francisco

**David S. Levine**
Visiting Research Collaborator, Center for Information Technology Policy,
Princeton University; Associate Professor and Chair, Faculty Development, Elon
University School of Law; Affiliate Scholar, Center for Internet and Society,
Stanford Law School

**Yvette Joy Liebesman**
Associate Professor of Law
Saint Louis University School of Law

**Deirdre K. Mulligan**
Associate Professor of Law
School of Information
University of California at Berkeley

**Ira Steven Nathenson**
Professor of Law
St. Thomas University School of Law

**Blake E. Reid**
Assistant Clinical Professor
Colorado Law

**Neil Richards**
Professor of Law
Washington University

**Jorge R. Roig**
Associate Professor of Law
Charleston School of Law

**Ira Rubinstein**
Senior Fellow and Adjunct Professor
Information Law Institute
New York University School of Law

**Victoria Schwartz**
Associate Professor
Pepperdine University School of Law

**Robert H. Sloan**
Professor and Department Head
University of Illinois at Chicago Dept. of Computer Science

**Stephen F. Smith**
Professor of Law
University of Notre Dame

**Daniel J. Solove**
John Marshall Harlan Research Professor of Law
George Washington University Law School

**Gerry Stegmaier**
George Mason University School of Law

**Daniel J. Weitzner**
Principal Research Scientist, MIT Computer Science and Artificial Intelligence
Lab, Director, MIT Internet Policy Research Initiative

**Michael Zimmer, PhD**
Associate Professor and PhD Program Director, School of Information Studies
Director, Center for Information Policy Research University of Wisconsin-
Milwaukee

## PROOF OF SERVICE

I am a citizen of the United States and resident of the State of California. I am employed in San Francisco County, State of California, in the office of a member of the bar of this Court, at whose direction the service was made. I am over the age of eighteen years, and not a party to the within action. My business address is 217 Leidesdorff Street, San Francisco, CA 94111.

On March 3, 2016, I served the following documents in the manner described below:

### *AMICUS CURIAE* BRIEF OF LAW PROFESSORS IN SUPPORT OF APPLE, INC.

☐ (BY U.S. MAIL) I am personally and readily familiar with the business practice of Durie Tangri LLP for collection and processing of correspondence for mailing with the United States Postal Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at San Francisco, California.

☐ (BY MESSENGER SERVICE) by consigning the document(s) to an authorized courier and/or process server for hand delivery on this date.

☐ (BY FACSIMILE) I am personally and readily familiar with the business practice of Durie Tangri LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

☐ (BY OVERNIGHT MAIL) I am personally and readily familiar with the business practice of Durie Tangri LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☒ BY ELECTRONIC SERVICE: By electronically mailing a true and correct copy through Durie Tangri's electronic mail system from mfeldman@durietangri.com to the email addresses set forth below.

☐ (BY PERSONAL DELIVERY) I caused such envelope to be delivered by hand to the offices of each addressee below.

On the following part(ies) in this action:

Eric David Vandevelde
Gibson Dunn and Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
2132297186

Fax: 2132296186
Email:
evandevelde@gibsondunn.com

*Attorneys for Respondent Apple Inc.*

Theodore J Boutrous, Jr.
Gibson Dunn and Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 900713197
2132297000

Fax: 2132297520

Email: tboutrous@gibsondunn.com

*Attorneys for Respondent Apple Inc.*

AMICUS CURIAE BRIEF OF LAW PROFESSORS IN SUPPORT OF APPLE /
CASE NO. 5:16-CM-00010-SP

Jeffrey G Landis
Zwillgen PLLC
1900 M Street NW Suite 250
Washington, DC 20036
2022963585
Fax: 2027065298
Email: jeff@zwillgen.com

*Attorneys for Respondent Apple Inc.*

Nicola T Hanna
Gibson Dunn and Crutcher LLP
3161 Michelson Drive 12th Floor
Irvine, CA 926124412
9494513800
Fax: 9494514220
Email: nhanna@gibsondunn.com

*Attorneys for Respondent Apple Inc.*

Allen W Chiu
AUSA Office
of US Attorney
National Security Section
312 North Spring Street Suite 1300
Los Angeles, CA 90012
2138942435
Fax: 2138946436
Email: allen.chiu@usdoj.gov

*Attorneys for USA*

Theodore B Olson
Gibson Dunn and Crutcher LLP
1050 Connecticut Avenue NW
Washington, DC 200365306
2029558668
Fax: 2025309575
Email: tolson@gibsondunn.com

*Attorneys for Respondent Apple Inc.*

Marc J Zwillinger
Zwillgen PLLC
1900 M Street NW Suite 250
Washington, DC 20036
2022963585
Fax: 2027065298
Email: marc@zwillgen.com

*Attorneys for Respondent Apple Inc.*

Tracy L Wilkison
AUSA Office of US Attorney
Chief, Cyber and Intellectual Property
Crimes Section
312 North Spring Street 11th Floor
Los Angeles, CA 900124700
2138940622
Fax: 2138940141
Email: tracy.wilkison@usdoj.gov

*Attorneys for USA*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 3, 2016, at San Francisco, California.

MICHAEL A. FELDMAN

AMICUS CURIAE BRIEF OF LAW PROFESSORS IN SUPPORT OF APPLE /
CASE NO. 5:16-CM-00010-SP