LODGED

2016 MAR -3 AM 11: 23

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

BY

Daniel F. Katz*
dkatz@wc.com
Kannon K. Shanmugam*
kshanmugam@wc.com
Richmond T. Moore*
rtmoore@wc.com
David M. Krinsky*
dkrinsky@wc.com
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

William Faulkner (SBN 83385)
wfaulkner@mcmanislaw.com
MCMANIS FAULKNER
One California Plaza
300 So. Grand Avenue, 37th Floor
Los Angeles, CA 90071
Telephone: (408) 279-8700
Facsimile: (408) 279-3244

*Pro Hac Vice* Admission Pending

Darren B. Bernhard*
darren.b.bernhard@intel.com
Vice President
Director of Antitrust & Commercial Litigation
INTEL CORPORATION
1155 F Street, N.W.
Washington, DC 20004
Telephone: (202) 626-4380

Tanya L. Hunter (SBN 197761)
tanya.hunter@intel.com
Associate General Counsel
Antitrust & Commercial Litigation
INTEL CORPORATION
2200 Mission College Blvd.
Santa Clara, CA 95054
Telephone: (408) 765-2318
Facsimile: (408) 765-5157

*Attorneys for Intel Corporation*

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

IN THE MATTER OF THE SEARCH OF AN APPLE IPHONE SEIZED DURING THE EXECUTION OF A SEARCH WARRANT ON A BLACK LEXUS IS300, CALIFORNIA LICENSE PLATE 35KGD203

ED No. CM 16-10-SP

**BRIEF OF INTEL CORPORATION AS AMICUS CURIAE IN SUPPORT OF APPLE INC.**

**Hearing:**

| | |
|---|---|
| Date: | March 22, 2016 |
| Time: | 1:00 p.m. |
| Place: | Courtroom 3 or 4 |
| Judge: | Hon. Sheri Pym |

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

INTEREST OF AMICUS CURIAE .......... 1

SUMMARY OF ARGUMENT .......... 1

ARGUMENT .......... 3

I. ENCRYPTION TECHNOLOGY IS ESSENTIAL FOR THE SECURITY OF THE GLOBAL ECONOMY AND CRITICAL INFRASTRUCTURE .......... 3

II. THE ALL WRITS ACT DOES NOT AUTHORIZE WEAKENING THE SECURITY OF TECHNOLOGY COMPANIES' PRODUCTS .......... 5

A. CALEA Does Not Require The Assistance Sought From Apple .......... 6

B. The Government Cannot Use The All Writs Act To Circumvent CALEA .......... 8

III. GRANTING THE GOVERNMENT'S PROPOSED RELIEF WOULD ESTABLISH A DANGEROUS PRECEDENT .......... 11

A. Intel And Other Companies Are Likely Targets of Similar Demands .......... 12

B. Granting The Government's Proposed Relief Would Create Precedent For Other Courts, Law-Enforcement Agencies, And Foreign Governments .......... 13

C. The Government's Proposed Relief Raises Important Issues That Should Be Addressed Through Vigorous Public Debate .......... 14

CONCLUSION .......... 15

# TABLE OF AUTHORITIES

## CASES

*Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998) .......... 11

*In re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued By This Court*, 2016 WL 783565, Misc. No. 15-1902 (E.D.N.Y. Feb. 29, 2016) .......... 9, 10, 11

*In re Application of the U.S. for an Order (1) Authorizing the Use of a Pen Register & a Trap & Trace Device*, 396 F. Supp. 2d 294 (E.D.N.Y. 2005) .......... 10

*In re Application of U.S. For An Order*, 849 F. Supp. 2d 526 (D. Md. 2011) .......... 10

*Pennsylvania Bureau of Correction v. U.S. Marshals Service*, 474 U.S. 34 (1985) .......... 6

*Plum Creek Lumber Co. v. Hutton*, 608 F.2d 1283 (9th Cir. 1979) .......... 6

*Riley v. First National Fed. of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) .......... 11

*United States v. New York Telephone Co.*, 434 U.S. 159 (1977) .......... 10, 11

## STATUTES

28 U.S.C. § 1651 .......... 5, 6

47 U.S.C. § 1001 .......... 6, 7

47 U.S.C. § 1002 .......... 6, 7

## TABLE OF AUTHORITIES
## (Continued)

## OTHER AUTHORITIES

Craig Whitlock & Missy Ryan, *U.S. Suspects Russia In Hack Of Pentagon Computer Network*, Wash. Post (Aug. 6, 2015) .....4

*Digital Telephony and Law Enforcement Access to Advanced Telecommunications Technologies and Services: Joint Hearings on H.R. 4922 and S. 2375 Before the S. Subcomm. On Technology and the Law of the S. Comm. on the Judiciary and the H. Subcomm. On Civil and Constitutional Rights of the H. Comm. on the Judiciary*, 103rd Cong. 11 (1994) (testimony of FBI Director Louis J. Freeh) .....8

H.R. Rep. No. 103-827, pt. 1 (1994) ..... 7, 8

Karoun Demirjian, *Apple Case Creates Fervor For Encryption Bill In Congress*, Wash. Post (Feb. 25, 2016) ..... 13

Matt Apuzzo et al., *Apple and Other Tech Companies Tangle with U.S. over Data Access*, N.Y. Times (Sept. 7, 2015) .....5

Mike McConnell, Michael Chertoff & William Lynn, *Why The Fear Over Ubiquitous Data Encryption Is Overblown*, Wash. Post (July 28, 2015) .....4

Office of Personnel Management, Cybersecurity Resource Center .....4

Paul Mozur, *New Rules in China Upset Western Tech Companies*, N.Y. Times (Jan. 28, 2015) ..... 14

Peter Swire & Kenesa Ahmad, *Encryption and Globalization*, 13 Colum. Sci. & Tech. L. Rev. 416 (2012) .....3

President's Review Group on Intelligence & Communications Technologies, Liberty and Security in a Changing World (2013) .....4

Saba Hamedy, *Sony Execs' Salaries, Employee SSNs Allegedly Leaked In Breach*, L.A. Times (Dec. 2, 2014) .....4

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ..... 11

## INTEREST OF AMICUS CURIAE

Intel is one of the world's leading technology companies. Intel develops and manufactures computer, communication, and other electronic components that are used in servers, desktops, laptops, tablets, smartphones, and wearables. Intel also develops and sells software and services that integrate security and technology. Intel's products are used in hundreds of millions of devices around the world by everyday citizens, companies, and government agencies, among many others.

Through its expertise in hardware and software, Intel embeds security in many facets of computing, and it offers solutions and services to help secure the world's most critical systems and networks. Intel thus has a unique perspective on the potential consequences of a ruling that would weaken security features in technology products. Intel submits this brief to assist the Court in considering the issues raised by this case.

## SUMMARY OF ARGUMENT

This case presents the vitally important question whether the government has the authority to force a company to develop technology for the purpose of circumventing the security features of its products. That question implicates the need to achieve two related but separate goals: assisting law enforcement to obtain information to conduct its investigations, on the one hand, and protecting the privacy and security interests of the general public, on the other.

Crucially, Congress has already considered how to achieve these goals—and has made the deliberate judgment *not* to confer the authority the government seeks here. In the Communications Assistance for Law Enforcement Act (CALEA), Congress specifically addressed what types of technical assistance companies should provide to law enforcement. After careful consideration, Congress decided that companies must provide law enforcement with certain assistance in intercepting data but are not required affirmatively to decrypt information stored on their customers' devices.

The Department of Justice and the FBI have made it clear in recent years that, because of advancements in encryption technology, they are dissatisfied with the limitations imposed by CALEA. As a result, the government has implemented a strategy of attempting to compel technical assistance from companies through the All Writs Act of 1789, thereby using that statute to obtain the same authority that Congress withheld in CALEA. But the All Writs Act plainly does not confer the sweeping authority that the government claims. The All Writs Act provides courts with ancillary, "gap-filling" jurisdictional authority in the absence of more specific congressional action; it does not permit law-enforcement agencies to defy Congress's will on an issue it has carefully considered and, under the guise of "gap-filling," to claim authority those agencies would simply like to have. The eighteenth-century Congress that drafted the All Writs Act would be surprised to see it used to override a specific judgment made by its twentieth-century successor. This Court should reject the government's improper use of the All Writs Act to alter the solution Congress reached in CALEA.

Even if Congress had not already made the judgment in CALEA to withhold such authority from the government, it would be bad policy to permit the government to compel companies to weaken the security features of their products in order to assist law enforcement. Companies such as Intel are in the business of improving the security of their technology products, not undermining it. Requiring companies such as Intel to weaken the security of their products would have serious repercussions for personal privacy and the security of the digital infrastructure. And if the government's proposed relief were granted, technology companies would be subject to the same types of demands from other law-enforcement agencies in the United States, as well as foreign governments. Law-enforcement agencies have a critical mission to protect national security and the American people. Recognizing the importance of that mission, Intel responds to lawful demands for information from

government agencies. But Intel opposes a government mandate to weaken security features in technology products.

For purposes of this motion, however, the key point is that evaluating these competing and important policy considerations is a matter for Congress in the first instance. Should Congress wish to reconsider the solution adopted in CALEA, it is of course free to do so. But before the government is given the broad authority to force a company to develop technology for the purpose of circumventing security features, the issues that such authority would raise should be discussed and debated through the democratic process, with consultation involving industry and other affected stakeholders. Because the government currently does not have that authority, Apple's motion to vacate should be granted.

## ARGUMENT

### I. ENCRYPTION TECHNOLOGY IS ESSENTIAL FOR THE SECURITY OF THE GLOBAL ECONOMY AND CRITICAL INFRASTRUCTURE

The dispute between Apple and the government is part of a broader ongoing debate over developments in encryption technology. Encryption is critical to the global economy because it allows users to communicate and store information securely and confidentially. Almost every sector of our economy relies on robust encryption technology to protect against unauthorized access to sensitive information. "In fact, encryption is the norm, not the exception, and is used in innumerable ways—from protecting critical public infrastructure and sensitive personal information, to securing communications and commercial transactions."[1] Intel's customers demand hardware and software products that permit encryption.

The importance of strong encryption is highlighted by recent security breaches. In November 2014, cybercriminals breached the computer systems of Sony Pictures

[1] Peter Swire & Kenesa Ahmad, *Encryption and Globalization*, 13 Colum. Sci. & Tech. L. Rev. 416, 453 (2012).

Entertainment and reportedly obtained the Social Security numbers and other personal identifying information of tens of thousands of individuals.[2] The government also recently reported that hackers had infiltrated the systems of the Office of Personnel Management (OPM) and stolen the personal information of 21.5 million individuals, including 5.6 million fingerprints.[3] Hackers have also penetrated the e-mail system used by the Joint Chiefs of Staff.[4]

These documented security breaches, and the potential for others like them, have led many experienced government officials to reject weakening cybersecurity as a means to achieve greater national security. As an editorial by several high-ranking former national security officials recently explained: "[T]he greater public good is a secure communications infrastructure protected by ubiquitous encryption at the device, server and enterprise level without building in means for government monitoring."[5]

Encryption technology has evolved significantly to meet the growing threat of security breaches. To enhance the security of their products, companies have in recent years created encryption technology where individual users' devices (*e.g.*, computers, tablets, and smartphones) have their own decryption keys to which only the users have access. Where keys are stored only on users' devices, the

---

[2] Saba Hamedy, *Sony Execs' Salaries, Employee SSNs Allegedly Leaked In Breach*, L.A. Times (Dec. 2, 2014) <goo.gl/0JVkot>.

[3] *See* OPM, Cybersecurity Resource Center <goo.gl/ukW8gb>.

[4] Craig Whitlock & Missy Ryan, *U.S. Suspects Russia In Hack Of Pentagon Computer Network*, Wash. Post (Aug. 6, 2015) <goo.gl/WKCb1M>.

[5] Mike McConnell, Michael Chertoff & William Lynn, *Why The Fear Over Ubiquitous Data Encryption Is Overblown*, Wash. Post (July 28, 2015) <goo.gl/c0BSCP>; *see also* President's Review Group on Intelligence & Communications Technologies, Liberty and Security in a Changing World at 22 (2013) (arguing that "[t]he US Government should take additional steps to promote security, by . . . supporting efforts to encourage the greater use of encryption technology for data in transit, at rest, in the cloud, and in storage") < goo.gl/45w2LN>.

manufacturer no longer holds keys to decrypt the data. Therefore, the use of this technology largely places the ability to protect a user's information in the user's own hands.[6] Some companies that offer remote data storage in the "cloud" also permit customers to have exclusive control over the decryption keys to their data.

One consequence of these developments in encryption technology is that it is more difficult for law-enforcement officials to obtain certain data. Officials can no longer access encrypted data simply by obtaining a master decryption key from the manufacturer; instead, they must find another mechanism to retrieve data from the device, such as obtaining individual decryption keys from the devices themselves. Law-enforcement officials are thus increasingly seeking to enlist the assistance of technology companies in retrieving decryption keys from their customers' devices or finding another way to defeat the encryption.

In this case, the government is seeking to compel Apple to take an unprecedented step: to create new software intended to weaken the existing security features of an Apple product in order to facilitate an effort to unlock the iPhone by a "brute force" attack on its passcode. To be clear, the government is not asking Apple to extract data from a device using a key that Apple has, because Apple does not possess the encryption key for the iPhone in question. Instead, the government hopes to commandeer Apple's resources and software engineers to create software that has not yet been developed for the purpose of undermining the security features present on the phone. This attempt to force a technology company to decrease the security of its technology is both unprecedented and unauthorized.

## II. THE ALL WRITS ACT DOES NOT AUTHORIZE WEAKENING THE SECURITY OF TECHNOLOGY COMPANIES' PRODUCTS

Enacted by the First Congress in 1789, the All Writs Act provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs

[6] *See, e.g.*, Matt Apuzzo et al., *Apple and Other Tech Companies Tangle with U.S. over Data Access*, N.Y. Times (Sept. 7, 2015) <goo.gl/Y9984t>.

necessary and appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). As the Ninth Circuit has explained, the All Writs Act "is not a grant of plenary power to the federal courts," but is "designed to aid the courts in the exercise of their jurisdiction." *Plum Creek Lumber Co. v. Hutton*, 608 F.2d 1283, 1289 (9th Cir. 1979). The purpose of the All Writs Act is to "fill[] the interstices of federal judicial power when those gaps threatened to thwart the otherwise proper exercise of federal courts' jurisdiction." *Pennsylvania Bureau of Correction v. U.S. Marshals Service*, 474 U.S. 34, 41 (1985).

Consistent with the gap-filling function performed by the All Writs Act, the Supreme Court has made clear that, "[w]here a statute specifically addresses the particular issue at hand, it is *that authority*, and not the All Writs Act, that is controlling." *Pennsylvania Bureau of Correction*, 474 U.S. at 43 (emphasis added). The Act does not "authorize [courts] to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate." *Id.*

**A. CALEA Does Not Require The Assistance Sought From Apple**

The All Writs Act does not apply here because, when Congress enacted CALEA, it expressly refused to confer the authority that the government seeks. CALEA imposed technical-assistance requirements on certain "telecommunications carrier[s]." *See* 47 U.S.C. § 1002(a). In enacting CALEA, however, Congress considered whether companies should be obligated to provide technical assistance to unlock encrypted messages, and decided not to impose that requirement. Because Congress made a considered judgment not to confer such authority in CALEA, the government cannot claim that authority through the backdoor of the All Writs Act.

*First,* Congress declined to impose technical-assistance requirements on companies that provide "information services," such as Apple. 47 U.S.C. § 1002(b)(2)(A). Those services were defined to include "electronic messaging services," *id.* § 1001(6)(B)(iii), which include e-mail and instant messaging. They also included "service[s] that permit[] a customer to retrieve stored information from,

or file information for storage in, information storage facilities"—that is, services that store and process data that have reached a destination and are at rest (whether in a computer, a handheld device, or in the cloud). *Id.* § 1001(6)(B)(i). Apple is a provider of "information services" and, as such, is indisputably not subject to CALEA's technical-assistance requirements.

*Second,* even if Apple were subject to those requirements, it would still not be obliged to provide technical assistance for the purpose of penetrating end-to-end encryption. Under Section 1002(b)(3), the telecommunications carriers covered by CALEA "shall not be responsible for decrypting, *or ensuring the government's ability to decrypt*, any communication encrypted by a subscriber or customer, unless the encryption was provided by the carrier and the carrier possesses the information necessary to decrypt the communication." *Id.* § 1002(b)(3) (emphasis added). In other words, CALEA requires a company to decrypt data if it has access to a "master key." But if a user has encrypted data on his or her iPhone and Apple does not have the information "necessary to decrypt" that phone, Apple has no responsibility to "ensur[e] the government's ability to decrypt" that iPhone. *Id.* § 1002(b)(3). For this additional reason, CALEA's express language precludes the government's proposed relief.

In enacting CALEA, Congress squarely considered where to draw the line in allowing the government to compel access via third parties to encrypted technology. In the legislative process, Congress was warned that "new and emerging technologies" would pose "legitimate impediments" to the FBI's surveillance efforts. H.R. Rep. No. 103-827, pt. 1, at 14. Congress nonetheless deliberately chose not to interfere with those technologies, because one of its goals was to "protect[] the privacy of communications . . . without impeding the introduction of new technologies, features, and services." *Id.* at 9. Indeed, the House Report makes clear that, because Congress wanted to "protect[] the right to use encryption," nothing in CALEA "would prohibit a carrier from deploying an encryption service for which it

does not retain the ability to decrypt communications for law enforcement access." *Id.* at 24. Apple deployed precisely such an encryption service on the iPhone, and CALEA imposes no obligation on Apple to assist in defeating that encryption.

The legislative history also shows that the FBI was fully aware of CALEA's limitations. During the hearings that led to CALEA's passage, then-FBI director Louis Freeh told Senator Leahy that the government had elected not to seek authority to compel third-party companies to decrypt devices:

> Mr. FREEH. . . . We are not looking to introduce any feature package that impedes technology. And, interestingly enough, last Friday I sat in my building with 38 representatives of the industry, telecommunications companies, and we asked them. We said give us one example of a technological advancement or improvement which you believe this feature package would inhibit. And there was complete silence in the room.
>
> Senator LEAHY. I might suggest one: A private company that wants to build a computer, fax machine, telephone or whatever that is encrypted.
>
> Mr. FREEH. Well, but that is a different problem. We are never asking the phone companies and this legislation does not ask them to decrypt. It just tells them to give us the bits as they have them. If they are [en]crypted, that is my problem. But that is not going to be addressed in the legislation.[7]

### B. The Government Cannot Use The All Writs Act To Circumvent CALEA

The government contends that, while CALEA's express language does not permit the relief it seeks, CALEA does not occupy the field and is silent on whether it can order a technology company to weaken the security of its technology products.

---

[7] *Digital Telephony and Law Enforcement Access to Advanced Telecommunications Technologies and Services: Joint Hearings on H.R. 4922 and S. 2375 Before the S. Subcomm. On Technology and the Law of the S. Comm. on the Judiciary and the H. Subcomm. On Civil and Constitutional Rights of the H. Comm. on the Judiciary*, 103rd Cong. 11 (1994) (testimony of FBI Director Louis J. Freeh).

As a result, the government believes it can rely on the All Writs Act to provide the requisite authority. But the fact that Congress chose *not* to grant certain authority to the government in CALEA does not mean that Congress has not addressed the issue. Given that Congress specifically considered granting, and ultimately declined to grant, the authority the government seeks, resort to the All Writs Act is misplaced. In light of Congress's considered decision in CALEA not to convey the authority that the government seeks here, the government's reliance on the All Writs Act is an attempted end-run around the legislative process.

In a recent opinion addressing a government demand to unlock an iPhone, a magistrate judge squarely rejected the government's attempt to rely on the All Writs Act. *In re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued By This Court*, 2016 WL 783565, Misc. No. 15-1902 (E.D.N.Y. Feb. 29, 2016) (*Apple Order*). In that case, the court first examined CALEA, along with other federal statutes, and reasoned that "[t]he absence from that comprehensive scheme of any requirement that Apple provide the assistance sought here implies a legislative decision to prohibit the imposition of such a duty." *Id.* at 20. The court then explained that, even if CALEA "does not erect such a barrier to relief on its own terms," *id.* at 21, the All Writs Act still "cannot be a means for the executive branch to achieve a legislative goal that Congress has considered and rejected," *id.* at 26. The court explained the stunningly broad implications of the government's view of the All Writs Act:

> [The government's] preferred reading of the law—which allows a court to confer on the executive branch any investigative authority Congress has decided to withhold, so long as it has not affirmatively outlawed it—would transform the [All Writs Act] from a limited gap-filling statute that ensures the smooth functioning of the judiciary itself into a mechanism for upending the separation of powers by delegating to the judiciary a legislative power bounded only by Congress's superior ability to prohibit or preempt.

*Id.* The court also recognized that the government's use of the All Writs Act was a transparent attempt to circumvent the legislative process: "It is also clear that the government has made the considered decision that it is better off securing such crypto-legislative authority from the courts . . . rather than taking the chance that open legislative debate might produce a result less to its liking." *Id.* at 29.

Similarly, in *In re Application of U.S. For An Order*, 849 F. Supp. 2d 526 (D. Md. 2011), a district court rejected the FBI's attempt to invoke the All Writs Act to obtain real-time GPS location data from a suspected criminal's cellphone, concluding that "[t]he government simply cannot use the All Writs Act to circumvent . . . statutes that already occupy the space." *Id.* at 583. The court explained that the attempted use of the All Writs Act "may be the most troubling position the government has taken in pursuit of this precise location data," because "the government seeks an end run around constitutional and statutory law." *Id.* at 578. As the court reasoned, "the government appears to see the All Writs Act as an alternative source of inherent authority, rather than a limited, residual one." *Id.* at 579*; see also In re Application of the U.S. for an Order (1) Authorizing the Use of a Pen Register & a Trap & Trace Device*, 396 F. Supp. 2d 294, 326 (E.D.N.Y. 2005) (declining to "read into the All Writs Act an empowerment of the judiciary to grant the executive branch authority to use investigative techniques either explicitly denied it by the legislative branch, or at a minimum omitted from a far-reaching and detailed statutory scheme").

*United States v. New York Telephone Co.*, 434 U.S. 159 (1977), relied on heavily by the government, does not require a different result and only highlights the absence of support for the government's broad view of the All Writs Act. According to the government, "*New York Telephone Co.* further illustrates that it is appropriate for a court to rely on the All Writs Act unless a statute specifically addresses the particular issue at hand." Gov't Mem. 23 [ECF #1]. But the government fails to mention that, in *New York Telephone*, the Supreme Court repeatedly explained that the use of the All Writs Act as a gap-filler was appropriate only insofar as it "was

consistent with the intent of Congress." 434 U.S. at 172. The issue in *New York Telephone* was whether the government could compel a telecommunications carrier to provide assistance in installing pen registers, which are mechanical devices used to intercept the numbers dialed on a telephone but not the content of the oral communications. *Id.* at 161 n.1. Although no statute expressly required the carriers to provide the FBI with technical assistance, the Court afforded that authority to the government under the All Writs Act because "Congress clearly intended to permit the use of pen registers by federal law enforcement officials." *Id.* at 176. The Court reasoned that "Congress did not view pen registers as posing a threat to privacy of the same dimension as the interception of oral communications." *Id.* at 168. This case presents the opposite situation. CALEA reflects Congress's intent *not* to confer the requested authority on the government. *Apple Order* 20. *New York Telephone* undermines, not supports, the government's position.

In sum, given the abundant evidence from the text and legislative history of Congress's intent, the government's invocation of the All Writs Act is improper. This Court should reject the government's sweeping and indefensible interpretation of the All Writs Act and grant Apple's motion.[8]

## III. GRANTING THE GOVERNMENT'S PROPOSED RELIEF WOULD ESTABLISH A DANGEROUS PRECEDENT

The issue before this Court has far-reaching policy implications. If the government's proposed interpretation of the All Writs Act were correct, there is no

[8] The government's overreaching on the All Writs Act provides a sufficient basis to adjudicate this case and grant Apple's requested relief. It bears noting, however, that an order forcing a company to create code to undermine the security features of its products also potentially runs afoul of the First Amendment and raises due process concerns. *See, e.g.*, *Riley v. First National Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 796-97 (1988) (explaining that compelled speech restricts content and is subject to rigorous scrutiny); *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (recognizing that "[t]he touchstone of due process is protection . . . against arbitrary action of government").

logical reason why the government's authority would be limited to Apple or iPhones; the Act could also be used to require Intel and other technology companies to comply with similar requests. It would establish a precedent for other courts, law-enforcement agencies, and foreign governments. Forcing companies to create technology to bypass security features would only weaken security and stifle innovation. Because of the importance of these policy choices—for privacy rights and security—they should be decided after public debate and deliberation; they should not be decided by resort to the All Writs Act, an ancillary source of judicial authority.

### A. Intel And Other Companies Are Likely Targets of Similar Demands

Because Intel designs, manufactures, and distributes a wide variety of technologies—including the chips in devices ranging from servers to wearables, as well as software and services that are focused on security—it is likely to be profoundly affected by the precedent that this Court sets. Intel's products include microprocessors used in a large number of the world's computers. Microprocessors are the primary computing "engine" in today's computers; in many cases, it is Intel's chips that actually perform encryption and decryption. Many of Intel's chips are designed with features to facilitate encryption and to allow encryption to be used more securely and in new ways. In addition, Intel is a leading developer and seller of computer security software and services.

If the Court forces Apple to develop new software to help the government break the security features that Apple designed into its iPhone, developers of hardware components such as Intel may be subject to similar orders demanding that they devote engineering resources to defeating the security features of their own products. The government could also ask Intel to develop or enable technology that would provide access to computers with Intel software installed on them.

Similarly, the government could enlist Intel to assist the government in its own effort to defeat those security features. For example, it could require Intel to "sign"

the government's own software. It is now commonplace for software updates to be "cryptographically sign[ed]." *See* Neuenschwander Decl. ¶ 18, 27 [ECF #16-33]. Cryptographic signing is a technology—based on encryption technology—that can be used to ensure that code or data can only be modified by an authorized user. That technology, in turn, is used to ensure that software—for example, software updates—are legitimate products of their purported manufacturers, and not counterfeits that have been modified to contain malicious code. *See id.* Cryptographic signing is thus crucial to computer security in the modern world. The authority the government is seeking here raises the specter that the government will force Intel or other manufacturers to "sign" software updates the government has created.

Given the scope of Intel's products and services and its focus on security, it is likely that a ruling in the government's favor on its demand against Apple would lead to similar demands against Intel and other technology companies.

### B. Granting The Government's Proposed Relief Would Create Precedent For Other Courts, Law-Enforcement Agencies, And Foreign Governments

If the Court accepts the government's expanded view that it has the power to command Apple to undermine the security of its products, it will set a legal precedent that could have far-reaching consequences, both in the United States and beyond. As Apple notes in its motion, law-enforcement officials across the United States have already sought assistance from Apple in many other cases. *See* Apple Mot. 3 [ECF 16]. Indeed, the government has acknowledged that this Court's decision will set a precedent that will be "instructive for other courts."[9]

A ruling in the government's favor will have global ramifications as well. Like Apple, Intel has operations in numerous countries, and it is subject to differing laws and regulations worldwide. Foreign countries—particularly those with laws less

---

[9] Karoun Demirjian, *Apple Case Creates Fervor For Encryption Bill In Congress*, Wash. Post (Feb. 25, 2016) <goo.gl/eH2U4C> (quoting FBI Director Comey).

protective of privacy interests than the United States—might view a ruling in the government's favor as an invitation to require technology companies such as Intel to undermine the security of their products to suit foreign government interests. Indeed, foreign governments have already made onerous demands on technology companies to obtain data for law-enforcement purposes.[10]

### C. The Government's Proposed Relief Raises Important Issues That Should Be Addressed Through Vigorous Public Debate

Intel's fundamental position is that technology companies should not be forced to undermine the security technology they have strived to create. Intel is in the business of improving the security of its technology products, not defeating it. The government should not interfere with Intel's ability to protect the privacy and security of its customers. While law-enforcement and national-security agencies have a critical mission, no company should be compelled to weaken the security of its products in pursuit of that mission. The government's attempt to undermine the security of technology products in order to meet its law-enforcement objectives raises profound policy issues. Those issues should be discussed and debated through the democratic process, with consultation involving industry and other affected stakeholders.

As matters currently stand, however, the government does not have the authority to force a company to develop technology for the purpose of circumventing the security features of its products. Congress deliberately chose not to confer that authority in CALEA, and the government may not use the All Writs Act to circumvent Congress's considered judgment. Apple's motion to vacate should therefore be granted.

---

[10] *See, e.g.*, Paul Mozur, *New Rules in China Upset Western Tech Companies*, N.Y. Times (Jan. 28, 2015) <goo.gl/GZd6eA> (discussing Chinese regulations "requiring companies that sell computer equipment to Chinese banks to turn over secret source code, submit to invasive audits and build so-called back doors into hardware and software").

## CONCLUSION

For the foregoing reasons, Intel respectfully requests that Apple's motion to vacate be granted.

Respectfully submitted,

By: [signature]

Daniel F. Katz*
Kannon K. Shanmugam*
Richmond T. Moore*
David M. Krinsky*
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

William Faulkner (SBN 83385)
MCMANIS FAULKNER
One California Plaza
300 South Grand Avenue, 37th Floor
Los Angeles, CA 90071
Telephone: (408) 279-8700
Facsimile: (408) 279-3244

Darren B. Bernhard*
Vice President and Director of
Antitrust & Commercial Litigation
INTEL CORPORATION
1155 F Street, N.W.
Washington, DC 20004
Telephone: (202) 626-4380

Tanya L. Hunter (SBN 197761)
INTEL CORPORATION
2200 Mission College Boulevard
Santa Clara, CA 95054
Telephone: (408) 765-2318
Facsimile: (408) 765-5157

**Pro Hac Vice* Admission Pending

*Attorneys for Intel Corporation*

## CERTIFICATE OF SERVICE

I, Olivia Spaulding, declare as follows:

I am employed in the County of Riverside, California; I am over the age of 18 years and am not a party to this action. My business address is Bosco Legal Services, Inc., 4651 Brookhollow Circle, Suite C, Riverside, CA 92509. On March 3, 2016, I served the foregoing Motion of Intel Corporation for Leave to File Brief of Amicus Curiae and its attachments on the parties stated below, by placing them in a sealed envelope with postage thereon fully prepaid for delivery to the following:

Theodore J. Boutrous, Jr.
Nicola T. Hanna
Eric D. Vandevelde
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071

Theodore B. Olson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036

Marc J. Zwillinger
Jeffrey G. Landis
ZWILLGEN PLLC
1900 M Street N.W., Suite 250
Washington, DC 20036

Eileen M. Decker
United States Attorney
Patricia A. Donahue
Assistant United States Attorney
Chief, National Security Division
Tracy L. Wilkinson
Assistant United States Attorney
Chief, Cyber and Intellectual Property Crimes Section
Allen W. Chiu
Assistant United States Attorney
Terrorism and Export Crimes Section
1500 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012

This certificate is executed on March 3, 2016, in Riverside, California. I certify under penalty of perjury that the foregoing is true and correct.

Olivia Spaulding
Name: Olivia Spaulding