# Exhibit EE

CQ CONGRESSIONAL TRANSCRIPTS
Congressional Hearings
March 1, 2016 - Final

# House Judiciary Committee Holds Hearing on Encryption Security and Privacy, Panel 1

## LIST OF PANEL MEMBERS AND WITNESSES

GOODLATTE:
We ask all the members of the media that are taking thousands of pictures here, I'm sure they got some excellent ones of the director, but we ask you to please clear aside so we can begin the hearing.

The Judiciary Committee will come to order and without objection the chair is authorized to declare recesses of the committee at any time. We welcome everyone to this afternoon's hearing on, "The Encryption Tightrope: Balancing American Security and Privacy. And I will begin by recognizing myself for an opening statement.

We welcome everyone today to this timely and important hearing on encryption. Encryption is a good thing. It prevents crime. It prevents terrorist attacks. It keeps our most valuable information safe. Yet it is not used as effectively today as is necessary to protect against the ever increasing sophistication of foreign governments, criminal enterprises and just plain hackers.

We see this manifest almost every week in the reports of losses of massive amounts of our most valuable information, from government agencies, retailers, financial institutions and average Americans. From identity theft to the compromising of our infrastructure, to our economic and military security, encryption must play an ever increasing role and the companies that develop it must be encouraged to increase its effectiveness.

Encryption is a topic that may sound arcane or only the province of techies, but in fact, it's a subject whose solutions will have far reaching and lasting consequences. The Judiciary Committee is a particularly appropriate forum for this congressional debate to occur.

001

As the committee of exclusive jurisdiction over the United States constitution, the Bill of Rights and the federal criminal laws and procedures, we are well versed in the perennial struggle between protecting Americans' privacy and enabling robust public safety.

This committee is accustomed to addressing many of the significant legal questions arising from laws that govern surveillance and government access to communications, particularly the Wiretap Act, the Electronic Communications and Privacy act, the Foreign Intelligence Surveillance Act and the Communications' Assistance to Law Enforcement Act, otherwise known as CALEA.

Today's hearing is a continuation of the committee's work on encryption: work that Congress is best suited to resolve. As the hearing title indicates, society has been walking a tight rope for generations in attempting to balance the security and privacy of Americans' communications with the needs of our law enforcement and intelligence agencies.

In fact, the entire world now faces a similar predicament, particularly as our commerce and communications bleed over international boundaries on a daily basis. Encryption in securing data in motion and in storage is a valuable technological tool that enhances Americans' privacy, protects our personal safety and national security, and ensures the free flow of our nation's commerce.

Nevertheless as encryption has increasingly become a ubiquitous technique to secure communications among consumers, industry and governments, a national debate has arisen concerning the positive and negative implications for public safety and national security.

This growing use of encryption presents new challenges for law enforcement seeking to obtain information during the course of its investigations and even more foundationally, tests the basic framework that our nation has historically used to ensure a fair and impartial evaluation of legal process used to obtain evidence of a crime.

We must answer this question: how do we deploy ever stronger, more effective encryption without unduly preventing lawful access to communications of criminals' and terrorists' intent on doing us harm. This now seems like a perennial question that has challenged us for years.

In fact, over 15 years ago I led congressional efforts to ensure strong encryption technologies and to ensure that the government could not automatically demand a back door key to encryption technologies. This enabled the U.S. encryption market to thrive and produce effective encryption technologies for legitimate actors, rather than see the market head completely overseas to companies that do not have to comply with basic protections.

However, it is true this technology has been a devious tool of malefactors. Here is where our concern lies. Adoption of new communications technologies by those intending harm to the American people is outpacing law enforcement's technological capability to access those communications in legitimate criminal and national security investigations.

Following the December 15 terrorist attack in San Bernardino, California, investigators recovered a cell phone owned by the county government but used by one of the terrorists responsible for the attack.

After the FBI was unable to unlock the phone and recover its contents a federal judge ordered Apple to provide reasonable technical assistance to assist law enforcement agents in obating access to the data on the device, citing the All Writs Act as its authority to compel.

Apple has challenged the court order, arguing that its encryption technology is necessary to protect its customers' communications, security and privacy and raising both constitutional and statutory objections to the magistrate's order. This particular case has some very unique factors involved and as such, may not be an ideal case upon which to set precedent.

And it is not the only case in which this issue is being litigated. Just yesterday, a magistrate judge in the eastern district of New York, ruled that the government can not compel Apple to unlock an iPhone pursuant to the All Writs Act.


GOODLATTE:
It is clear that these cases illustrate the competing interests at play in this dynamic policy question, a question that is too complex to be left to the courts and must be answered by Congress.

Americans surely expect that their private communications are protected. Similarly, law enforcement's sworn duty is to ensure that public safety and national security are not jeopardized if possible solutions exist within their control.

This body as well holds its own constitutional prerogatives and duties. Congress has a central role to ensure that technology advances so as to protect our privacy, help keep us safe and prevent crime and terrorist attacks.

Congress must also continue to find new ways to bring to justice criminals and terrorists. We must find a way for physical security not to be at odds with information security.

Law enforcement must be able to fight crime and keep us safe, and this country's innovative companies must at the same time have the opportunity to offer secure services to keep their customers safe.

The question for Americans and lawmakers is not whether or not encryption is essential -- it is -- but instead whether law enforcement should be granted access to encrypted communications when enforcing the law and pursuing their objectives to keep our citizens safe.

I look forward to hearing from our distinguished witnesses today as the committee continues its oversight of this real-life dilemma facing real people all over the globe.

It's now my pleasure to recognize the ranking member of the committee, the gentleman from Michigan, Mr. Conyers, for his opening statement.


CONYERS:
Thank you, Chairman Goodlatte.

Members of the committee and our (inaudible) and distinguished guests, I want to associate myself with your comments about our jurisdiction.

It is not an accident that the House Judiciary Committee is the committee of primary jurisdiction with respect to the legal architecture of government surveillance.

In times of heightened tension, some of our colleagues will rush to do something, anything, to get in -- get out in front of an issue. We welcome their voices in the debate, but it is here in this committee room that the House begins to make decisions about the tools and methods available to law enforcement.

I believe that it is important to stay up front, before we get into the details of the Apple case, that strong encryption keeps us safe even as it protects our privacy.

Former National Security Agency Director Michael Hayden said only last week that America is more secure with unbreakable end-to-end encryption. In this room, just last Thursday, Former Secretary of Homeland Security Michael Chertoff testified that, in his experience, strong encryption laws help law enforcement more than it hinders any agency in any given case.

The National Security Council has concluded that the benefits to privacy, civil liberties and cyber security gained from encryption outweigh the broader risk created by weakening encryption.

And Director Comey himself has put it very plainly: universal strong encryption will protect all of us, our innovation, our private thoughts and so many other things of value from thieves of all kinds.

We will all have lockboxes in our lives that only we can open, and in which we can store all that is valuable to us. There are lots of good things about this.

Now, for years, despite what we know about the benefits of encryption, the Department of Justice and the Federal Bureau of Investigation have urged this committee to give them the authority to mandate that companies create backdoors into their secure products.

I've been reluctant to support this idea for a number of reasons. The technical experts have warned us that it is impossible to intentionally introduce flaws into secure products -- often called backdoors -- that only law enforcement can exploit to the exclusion of terrorists and cyber criminals.

The tech companies have warned us that it would cost millions of dollars to implement and would place them at a competitive disadvantage around the world.

005

The national security experts have warned us that terrorists and other criminals will simply resort to other tools entirely outside the reach of our law enforcement and intelligence agencies. And I accept that reasonable people can disagree with me on each of these points.

But what concerns me, Mr. Chairman, is that, in the middle of an ongoing congressional debate on this subject, the Federal Bureau of Investigation would ask a federal magistrate to give them the special access to secure products that this committee, this Congress and the administration have so far refused to provide.

Why has the government taken this step and forced this issue? I suspect that part of the answer lies in an e-mail obtained by the Washington Post and reported to the public last September.

In it, a senior lawyer in the intelligence community writes that, although the legislative environment towards encryption is very hostile today, it could turn in the event of a terrorist attack or a criminal event where strong encryption can be shown to have hindered law enforcement.

He concluded that there is value in keeping our options open for such a situation. I'm deeply concerned by this cynical mindset, and I would be deeply disappointed if it turns out that the government is found to be exploiting a national tragedy to pursue a change in the law.

I also have doubts about the wisdom of applying the All Writs Act, enacted in 1789, codified in 1911 and last applied to a communications provider by the Supreme Court in 1977, to a profound question about privacy and modern computing in 2016.

I fear that pursuing this serious and complex issue through the awkward use of an inept statute was not and is not the best course of action. And I'm not alone in this view.

Yesterday, in the eastern district of New York, a federal judge denied a motion to order Apple to unlock an iPhone under circumstances similar to those in San Bernardino.

The court found that the All Writs Act, as construed by the government, would confer on the courts an over-broad authority to override individual autonomy.

006

However, nothing in the government's argument suggests any principal limits on how far a court may go in requiring a person or company to violate the most deeply rooted values.

We could say the same about the FBI's request in California. The government's assertion of power is without limiting principle, and likely to have sweeping consequences whether or not we pretend that the request is limited to just this device or just this one case.


CONYERS:
This committee and not the courts is the appropriate place to consider those consequences, even if the dialogue does not yield the results desired by some in the law enforcement community.

I'm grateful that we are having this conversation today back in the forum in which it belongs -- the House Judiciary Committee.

And so I thank the chairman very much, and I yield back.


GOODLATTE:
Thank you, Mr. Conyers.

And without objection, all other members' opening statements will be made a part of the record.

We welcome our distinguished witness of today's first panel, and if you would please rise, I'll begin by swearing you in.

Do you swear that the testimony that you're about to give shall be the truth, the whole truth and nothing but the truth, so help you God?


COMEY:
I do.


GOODLATTE:
Thank you very much. Please be seated.

**007**

I'll now begin by introducing our first distinguished witness today, Director James Comey of the Federal Bureau of Investigation. Director Comey began his career as an assistant United States attorney for both the Southern District of New York and the Eastern District of Virginia. After the 9/11 terrorist attacks, Director Comey returned to New York to become the United States attorney for the Southern District of New York.

In 2003, he was appointed deputy attorney general under the United States Attorney General John Ashcroft. Director Comey is a graduate of the College of William and Mary and the University of Chicago Law School.

Director, welcome. Your entire written statement will be made a part of the record. And I ask that you summarize your testimony in five minutes. And we have the timing light that you're well familiar with on the table.

Again, welcome. We're pleased that you are here, and you may begin your testimony.


COMEY:
Thank you so much, Mr. Chairman and Mr. Conyers. Thank you for hosting this conversation and for helping us all talk about an issue that I believe is the hardest issue I've confronted in government, which is how to balance the privacy we so treasure that comes to us through the technology that we love, and also achieve public safety which we also all very much treasure.

I worry a little bit that we've been talking past each other, both folks in the government and folks in the private sector, when it comes to this question of encryption, which we in the government call "going dark." What I'd like to do is just take three or four minutes and try to frame how I think about it, in a way I hope is fair, fair- minded. And if it's not, I hope you'll poke at me and tell me where you think it's not. But these are the things I believe to be true.

First, that the logic of encryption will bring us in the not too distant future to a place where all of our conversations and all of our papers and effects are entirely private. That is, where no one can listen to our conversations, read out texts, read out e-mails, unless we say so. And

no one can look at our stuff, read out documents, read things we file away without our agreement. That's the first thing I believe, that the logic of encryption is taking us there.

The second thing I believe is, as both you and Mr. Conyers said, there's a lot of good about this, a lot of benefits to this. All of us will be able to keep private and keep protected from thieves of all kinds the things that matter most to us -- our ideas, our innovation, our secret thoughts, our hopes, our dreams. There is a lot to love about this. We will all be able to have storage spaces in our life that nobody else can get into.

The third thing I believe is that there are many costs to this. For the last two centuries, public safety in this country has depended in large measure on the ability of law enforcement agents going to courts and obtaining warrants to look in storage areas or apartments, or to listen with appropriate predication oversight to conversations.

That is the way in which law enforcement brings us public safety. It is very, important and it's been part of the balance in ordered liberty, that sometimes the people's stuff can be looked at, but only with predication and only with oversight and approval by an independent judiciary.

The fourth thing I believe is that these two things are in tension in many contexts, increasingly in our national security work, and in law enforcement work generally across the country. We see it obviously in ISIL's efforts to reach into this country, and using mobile messaging apps that are end-to-end encrypted, task people to kill innocent people in the United States.

That is a huge feature of our national security work and a major impediment to our counterterrorism work because even with a court order, what we get is unreadable. Use a technical term, it's gobbledygook. We cannot de-crypt that which is covered by strong encryption.

We also see it in criminal work across the country. Very tragically, last year in Baton Rouge, where a pregnant woman eight months pregnant was killed by somebody she opened the door to, and her mom says she kept a diary, but it's on her phone, which is locked. And so the case remains unsolved.

009

And most recently and most prominently, as both Mr. Conyers and the Chairman mentioned, we see it in San Bernardino -- a case where two terrorists in the name of ISIL killed 14 people and wounded 22 others at an office gathering and left behind three phones, two of which, the cheaper models, they smashed beyond use; and the third was left locked. In any investigation that's done competently, the FBI would try to get access to that phone.

It's important that it's a live ongoing terrorism investigation, but in any criminal investigation, a competent investigator would try and use all lawful tools to get access to that device. And that's what you see happening in San Bernardino.

The San Bernardino case is about that case. It obviously highlights the broader issue and of course it will be looked upon by other judges and other litigants, but it is about the case and trying to do a competent job of understanding: Is there somebody else? And are there clues to what else might have gone on here? That is out job.

The fifth thing I believe is that democracies resolve these kind of really hard questions through robust debate. I think the FBI's job is very very limited. We have two jobs. The first is to investigate cases like San Bernardino and to use tools that are lawful and appropriate. The second thing, it's our job to tell the American people the tools you are counting on us to use to keep you safe are becoming less and less effective.

It is not our job to tell the American people how to resolve that problem. The FBI is not some alien force imposed upon America from Mars. We are owned by the American people. We only use the tools that are given to us under the law. And so out job is simply to tell people there is a problem.

Everybody should care about it. Everybody should want to understand if there are warrant-proof spaces in American life, what does that mean? And what are the costs of that? And how do we think about that?

I don't know what the answer is. It may be the American people through Congress and the courts decide it's too hard to solve, or law enforcement can do its job well enough with strong encryption covering our communications and our papers and effects, or that it's something that we have to find a way to fix to achieve a better balance. I don't know.

010

My job is to try to offer thoughtful explanations about the tools the FBI has and to bring them to the attention of the American people, and then answer questions about that. So I'm very, very grateful for this forum; very, very grateful for this conversation. There are no demons in this debate. The company is not evil. The government is not evil. You have a whole lot of good people who see the world through different lenses, who care about things. All care about the same things, in my view. The companies care about public safety. The FBI cares about innovation and privacy.

We devote our lives to trying to stop people from stealing our innovation, our secrets, and hacking in to our devices. We care about the same things, which should make this in a way an easier conversation, which I very much look forward to.

Thank you.


GOODLATTE:
Thank you, Director Comey.

We'll now proceed under the five-minute rule with questions for the witness. And I'll begin by recognizing myself.

Director, there has been quite a bit of debate about the government's reliance on the All Writs Act, which most people had never heard of until the last week or so. That is being used in this case to try to compel Apple to bypass the auto-erase functions on the phone. It has been characterized as an antiquated statute dating back to 1789 that was never intended to empower the courts to require a third party to develop new technology.

How do you respond to that characterization? Has the FBI relied on the act in the past to gain access to iPhones or other similar devices? And is the act limited to the circumstances in which Congress has already imposed a statutory duty on a third party to provide assistance?


COMEY:
Thank you, Mr. Chairman.

I smile a little bit when I hear that because old doesn't mean bad, at least I hope it doesn't because I'm rapidly approaching that point. The Constitution is as old or older than the All Writs Act, and I think that's still a pretty useful document.

It's a tool that I use. I think there's some members of the committee who are former federal prosecutors. Every assistant U.S. attorney knows it. I used it when I started as an AUSA in 1987. It is an act that Congress passed when the Constitution was a baby so there was a vehicle for judges to get their orders complied with. And it's been used, many, many, many times and interpreted by the courts many times, including by the Supreme Court.

The cases at hand are simply about, as I understand it, what is the reach of the All Writs Act? It's still good law, but how far does it extend, especially given how technology has changed? And I think the courts are going to sort that out. There was a decision yesterday in New York. There will be decisions in California. There will probably be lots of others because this is a problem law enforcement is seeing all over the country.


GOODLATTE:
Let me ask you about that decision in New York, because in its brief in the California case, Apple argues that a provision of CALEA (ph) another federal statute, actually prohibits the magistrate from ordering it to design a means to override the auto erase functions on the phone.

Just yesterday a magistrate in New York upheld that argument. Can you comment on that?


COMEY:
Not in an intelligent way because I haven't read the decision out of New York. I understand the basic contours of the argument. I don't fully get it honestly because CALEA (ph) is about data in motion, and this is about data at rest. But I also think this is the kind of thing judges do, they take acts of Congress and try and understand so what does it mean especially given changing circumstances.

So I expect it will be bumpy. There will be lots of lawyers paid lots of -- for hours of work, but we will get to a place where we have the courts with an understanding of its reach.

GOODLATTE:
Now, if the FBI is successful in requiring Apple to unlock this phone, that won't really be a one-time request, correct?

COMEY:
Well, the issue of locked phones certainly not because it's become a...

GOODLATTE:
Well, it will set a precedent for other requests from the Federal Bureau of Investigation and all -- and any other law enforcement agency to seek the same assistance in many, many, many other cases.

COMEY:
Sure, potentially, because if any decision of a court about a matter is potentially useful to other courts, which is what a precedent is. I happen to think having talked to experts there are technical limitations to how useful this particular San Bernardino technique will be given how the phones have changed. But sure, other courts, other prosecutors, other lawyers for companies will look to that for guidance or to try and distinguish it.

GOODLATTE:
So that technology once developed, which I presume they could destroy again but then will have to recreate hundreds of times, how confident are you, whichever procedure Apple decided to pursue, how confident are you that what you are requesting -- which is the creation, effectively, of a key, a code -- how confident are you that will -- that will remain secure and allow all the other customers of Apple, and when this is applied to other companies' technology as well, how confident are you that it will not fall into the wrong hands and make everyone's communication devices less secure, not more secure?

COMEY:

First, I've got to -- I've got to quibble a little with the premise of your question. I hear folks talk about keys and back doors. I actually don't see that this way. I mean, there are issues about back door. This is about -- there's already a door on that iPhone, essentially, we're asking Apple take the vicious guard dog away, let us try to pick the lock.

The later phones, as I understand the 6 and after, there aren't doors. So there isn't going to be can you take the guard dog away and let us pick the lock. But look, I have a lot of faith -- and maybe I don't know them well enough -- in the companies' ability to secure their own information. The icloud, for example, is not encrypted, right, but I don't lie awake at night worrying about whether they're able to protect the contents of the icloud. They are very, very good at protecting their information and their innovation.

So one thing is for certain, but I think these folks are pros.

GOODLATTE:
Thank you very much. Chair recognizes the ranking member, Mr. Conyers, for his questions.

CONYERS:
Thank you, Chairman Goodlatte. And welcome again to our forum. You're a very regular visitor to the Judiciary Committee.

Director Comey, it's been suggested that Apple has no interest in helping law enforcement in any criminal case and that the company cares more about marketing than about investigating a terrorist attack. In your view, are companies like Apple generally cooperative when the FBI asks for assistance, accompanied by appropriate legal process? Did Apple assist with this particular investigation?

COMEY:
I think in general, all American companies, and I can't think of an exception sitting here, who want to be helpful especially when it comes to public safety because they have families and children just as we do. So that's the attitude we're met with. And in this particular case, as in many others, Apple was helpful to us.

014

We had lots of good conversations about what we might be able to do to get this device open, and we got to a place where they said for reasons that I don't question their motive we're not willing to go further. And the government made a decision, we still have an avenue to pursue with the judge, we'll go to the judge. But I don't question their motives.

CONYERS:
All right. Thank you. I sense that you're still reluctant to speak about how your success in this case might set a precedent for future actions. You indicated last week this litigation may guide how other courts handle similar requests. Could you elaborate on that, please?

COMEY:
Sure. There's no -- first of all, let me say this. I've been trying to explain to people this case in San Bernardino is about this case, and the reason I've tried to say that so much publicly is I worry very much about the pain, frankly, to the victims in this case when they see this matter that's so important to them becoming a vehicle for a broader conversation.

So I want to make sure that everybody, especially the FBI remains grounded in the fact this is about that case. My wife has a great expression she uses to help me be a better person which is it's not about you, dear. This case in San Bernardino is not about the FBI, it's not about Apple, it's not about Congress, it's not about anything other than trying to do a competent investigation in an ongoing active case.

That said, of course, any decision by a judge in any form is going to be potentially precedential in some other form, not binding, but guidance, either positive or against. The government lost a case yesterday in Brooklyn, we could lose the case in San Bernardino and it would be used as precedent against the government. That's just the way the law works, which I happen to think is a good thing.

CONYERS:
Thank you. If you succeed in this case, will the FBI return to the courts in future cases to demand that Apple and other private companies assist you in unlocking secure devices?

COMEY:

015

Potentially, yes. If the All Writs Act is available to us and if the relief under the All Writs Act as explained by the courts fits the powers of the statute, of course.

CONYERS:
And finally, I think we can acknowledge then that this case will set some precedent. And if you succeed, you will have won the authority to access encrypted devices, at least for now. Given that you've asked us to provide you with that authority since taking your position at the Bureau and given that Congress has explicitly denied you that authority so far, can you appreciate our frustration that this case appears to be little more than an end run around this committee?

COMEY:
I really can't, Mr. Conyers. First of all, I don't recall a time when I've asked for a particular legislative fix. In fact, the administration's position has been they're not seeking legislation at this time.

But also we're investigating a horrific terrorist attack in San Bernardino. There's a phone that's unlocked that belonged to one of the killers. The All Writs Act we've used since I was a boy, we think is a reasonable argument to have the court to use the All Writs Act to direct the company to open that phone. That's what this is about. If I didn't do that, I ought to be fired, honestly.

I can also understand your frustration at the broader conversation because it goes way beyond this case. This case will be resolved by the courts, it does not solve the problem we're all here wrestling with.

CONYERS:
I thank the director. And I yield back any unused time. Thank you, Mr. Chairman.

GOODLATTE:
Thank you. And the chair recognizes the gentleman from Ohio, Mr. Chabot, for five minutes.

CHABOT:

016

Thank you, Mr. Chairman. I have a statement from the Application
Developers Alliance here that I'd like to have included in the record.


GOODLATTE:
Without objection, it will be made a part of the record.


CHABOT:
Thank you, Mr. Chairman. And Director Comey, like yourself I happen to
be a graduate of the College of William & Mary, so I'm going to start with
a tough question. Anything nice you'd like to say about the College of
William & Mary?

(LAUGHTER);


COMEY:
I could tell there was a glow coming from your seat. That's explained by
your being a member of the Tribe. Best thing that ever happened to me
beside -- I actually met my wife there. That's the best thing that
happened to me, second best is that I was there.


CHABOT:
Excellent. Yeah, it's a great place to go. There's two members currently
-- Ms. Titus of Nevada is also a graduate. Now, this hearing is about
electronic data security, or as you...


GOODLATTE:
Chair is happy to extend additional time to the gentleman for
recognizing an important Virginia educational institution.

(LAUGHTER)


CHABOT:
I appreciate the chairman. And as already indicated this is about
electronic data security or as you described it keeping our stuff online
private. So I'd like to ask you this, and it may seem a little off topic, but I
don't think it is. A few weeks back, the FBI's general counsel James

Baker acknowledged that the FBI is, quote, "working on matters related to Former Secretary of State Hillary Clinton's use of a private e-mail server," unquote.

And then the White House Press Secretary Josh Earnest stated that, quote, "some officials over there" -- referring to the FBI -- "had said that Hillary Clinton is not a target of this investigation and that it's not trending in that direction," unquote. And the president then weighed in, even though he apparently had never been briefed on the matter, commenting that he didn't see any national security implications in Hillary's e-mails. And obviously this is a matter of considerable import.

Is there anything that you can tell us as to when this matter might be wrapped up one way or the other?


COMEY:
I can't. Congressman, as you know, we don't talk about our investigations. What I can assure you is that I am very close personally to that investigation to ensure that we have the resources we need, including people and technology, and that it's done the way the FBI tries to do all of its work: independently, competently and promptly. That's our goal. And I'm confident it's being done that way. But I can't give you any more details beyond that.


CHABOT:
I certainly understand and I appreciate it. I thought you might say that, but you can't blame me for trying. Let me move on. If Apple chose to comply with the government's demand, maybe it does have the technical expertise and time and finances to create such a vulnerability so we can get in and get that information.

But let me ask you, what about a small business? I happen to be the chairman of the House Small Business Committee. Wouldn't such a mandate to say a small company, a start-up, say with four or five, six employees, wouldn't that be a huge burden on a small business to have to comply with this sort of thing?


COMEY:

It might be. And that's one of the factors as I understand it, courts consider in passing on an All Writs Act request, the burden to the private actor, how much would it cost them and how much time and effort.

And I think Apple's argument in this case is it would take a ton of effort, time and money to do it and so that's one of the reasons we shouldn't be compelled to do it. So it's a consideration built into the judicial interpretations of the act.

CHABOT:
Thank you. As chair of the committee, we'd ask you certainly to consider how this could affect -- you know, seven out of ten new jobs created in the economy are small business folks, half of the people employed in this country in the private sector are small businesses. And I think we should always consider that.

Let me move onto something else. In this testimony from our December 2015 hearing about HR-699, the E-mail Privacy Act, Richard Littlehale, the assistant special agent in charge of Criminal Investigation Division of the Tennessee Bureau of Investigations, voiced a frustration with the increasing technological capabilities of both criminals and noncriminals.

Rather than trying to arguably infringe on the fourth amendment rights of all Americans, would it be possible to better train our law enforcement officers and equip them to keep up with this changing world that we're discussing today?

COMEY:
Well, there's no doubt that we have to continue to invest in training so that all of our folks are digitally literate and able to investigate in that way. The problem we face here is all of our lives are on these devices, which is why it's so important that they be private.

That also means all of criminals' and pedophiles' and terrorists' lives are on these devices. And if they can't -- if they're warrant proof, even if a judge can't order access to a device, that is a big problem. I don't care how good the cop is. I don't care how good the agent is, that is a big problem. So that we can't quite train our way around.

CHABOT:
Thank you very much. I'm almost out of time, so let me conclude with, go tribe, thank you.


GOODLATTE:
Chair thanks the gentleman, recognize the gentleman from New York, Mr. Nadler.


NADLER:
Thank you. Since we've gone a little far afield here, let me do so again very briefly to point out that among others, Thomas Jefferson, who among his minor accomplishments was the founder of the Democratic Party, he was also a graduate of William & Mary.

Mr. Comey -- Director Comey, the -- we're all certainly very condemning of the terrorist attack in San Bernardino. And we all -- our hearts go out to the families of the victims and I commend the FBI for everything you've done to investigate this matter.

Now, the two terrorists are dead and another co-conspirator, the neighbor, is in jail. You've used the USA Freedom Act to track their phone calls and investigate -- which this committee wrote last year -- to track their phone calls and investigate everyone they ever spoke to on that phone.

The FBI has done a great job already. Now let me ask you a few questions. It's my understanding that we have found that the attack in San Bernardino was not in any way planned or coordinated by ISIS, is that correct? It may have been inspired by it but not directed or planned by it.


COMEY:
Right. So far as we know, correct.


NADLER:
And you have -- have you eliminated any connection between the two suspects and any overseas terrorist organization?


020

COMEY:
Eliminated any?


NADLER:
Have you seen any evidence of any? That's a better way of putting it.


COMEY:
We have not seen any evidence of that.


NADLER:
OK. Now, given those facts, there's no evidence of coordination with anybody else, it's the two home grown, self- motivated, perhaps inspired by ISIS, terrorists. Now, the investigators seize the iPhone in question on December 3rd.

The FBI reached out to Apple for assistance on December 5th. Apple started providing the FBI with information -- I would gather from the information I gathered, the same day. But then the next day, on December 6th, at the instruction of the FBI, San Bernardino County changed the password to the iCloud account associated with that device.

They did so without consulting Apple at the instruction or suggestion of the FBI. And changing that password foreclosed the possibility of an automatic backup that would have allowed Apple to provide you with this information without bypassing it's own security and thus necessitating in the first place, the application to the court that you made that we're discussing today.

In other words, if the FBI hadn't instructed San Bernardino County to change the password to the iCloud account, all this wouldn't have been unnecessary and you would have had that information. So my question, is why did the FBI do that?


COMEY:

I have to -- first of all, I want to choose my words very, very carefully. I said there is no evidence of direction from overseas terrorist organizations. This is a live investigation and I can't say much more beyond that. This investigation is not over. And I worry that embedded in your question was that you understood me to be saying that.

Second, I do think, as I understand from the experts, there was a mistake made in the -- in that 24 hours after the attack, where the county at the FBI's request, took steps that made it hard -- impossible later to cause the phone to backup again to the iCloud.

The experts have told me I'd still be sitting here -- I was going to say unfortunately -- fortunately, I'm glad I'm here. But we would still be in litigation because the experts tell me there's no way we would have gotten everything off the phone from a backup. I have to take them at their word, but you're -- either -- that part or premise to your question is accurate.


NADLER:
OK. So second part of my question -- excuse me. The second part of my question is, it wasn't until almost 50 days later, on January 22nd, when you served the warrant. Given the allegedly critical nature of this information, why did it take the FBI 50 days to go to court?


COMEY:
I think there were a whole lot of conversations going on in that interim with companies, with other parts of the government, with other resources to figure out if there was a way to do it short of having to go to court.


NADLER:
OK. Thank you. Now, getting off this specific case because I do think we all understand that it's not just a specific case. It will have widespread implications in law and however the courts resolve this, which is essentially a statutory interpretation case, the buck is going to stop here at some point.

We're going to be asked to change the law. So, encryption software is free, open-source and widely available. If Congress were to pass the law forcing U.S. companies to provide law enforcement with access to encrypt its systems, would that law stop bad actors from using their own encryption?

COMEY:
It would not.

NADLER:
It would not. So the bad actors would just get around it.

COMEY:
Sure. Encryption's always been available to bad actors -- nations...

NADLER:
So if we were to pass a law saying that Apple and whoever else had to put back doors or whatever you want to call them into their systems, the bad actors -- and with all the appropriate -- with all the -- not appropriate, all the concomitant surrenders of privacy, et cetera, the bad actors could easily get around that by making their own encryption systems?

COMEY:
The reason I'm hesitating is I think we're mixing together two things, data in motion and data at rest. The bad guys couldn't make their own phones, but the bad guys could always try and find a device that was strongly encrypted. The big change happened in the fall of 2014 when the companies flipped from available encryption to default. And that's the shadow going dark in an apartment.

NADLER:
Yes, but couldn't foreign companies and bad actors generally do that? Whatever we said?

COMEY:

023

Sure, potentially people could say I love this American device but because I worry about a judge ordering access to it, I'm going to buy this phone from a Nordic country that's different in some way. That could happen. I have a hard time seeing it happen a lot, but it could happen.

NADLER:
Thank you. My time has expired. Thank you.

ISSA:
Chairman, what I would like to ask for your unanimous consent, some documents be placed in the record at this time. I'd like to ask for unanimous consent that patent number 02407302, patent...

GOODLATTE:
Without objection.

ISSA:
Thank you. Additionally 27353, another patent. Additionally, a copy of the USA Today, entitled, "Ex-NSA Chief Backs Apple on iPhone". Additionally, from science and technology, an article that says "Department of Homeland Security awards $2.2 million to Malibu, California company for mobile security research and in other words, an encryption-proof, unbreakable phone.

Additionally and lastly, the article in Politico today on the New York judge's ruling in favor of Apple.

GOODLATTE:
Without objection they will all be made a part of the record.

ISSA:
Thank you, Mr. Chairman.

GOODLATTE:
Gentleman is recognized for five minutes.

024

ISSA:

Thank you Mr. Chairman. Justice Scalia said it's best -- said best what I'm going to quote almost 30 years ago in Arizona v. Hicks, in which he said, "there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of all of us." I think that stands as a viewpoint that I want to balance when asking you questions.

As I understand the case, and there's a lot of very brilliant lawyers and experienced people that know about All Writs Act, but what I understand is that you, in the case of Apple in California, are demanding through a court order that Apple invent something.

Fair to say that they have to create something. And if that's true, then my first question to you is, the FBI is the premier law enforcement organization, with laboratories that are second to none in the world.

Are you testifying today that you and/or contractors that you employ could not achieve this without demanding an unwilling partner do it?

COMEY:

Correct.

ISSA:

And you do so because you have researched this extensively?

COMEY:

Yes. We've worked very, very hard on this. We're never going to give up, but we've worked...

ISSA:

Did you receive the source code from Apple? Did you demand the source code?

COMEY:

Did we ask Apple for their source code? I don't -- not that I'm aware of.

ISSA:

OK. So you couldn't actually figure -- hand a software person the source code and say, "can you modify this to do what we want," if you didn't have the source code.

So who did you go to, if you can tell us, that you consider an expert on writing source code changes that you want Apple to do for you? You want them to invent it, but who did you go to?

COMEY:

I'm not sure I'm following the question.

ISSA:

Well, you know -- I'm going to assume that the burden of Apple is X. But before you get to the burden of Apple doing something it doesn't want to do because it's not in its economic best interests and they've said that they have real ethical beliefs that you're asking them to do something wrong -- so to (ph) their moral fiber, but you are asking them to do something, and there's a burden.

No question at all -- there's a burden. They have to invent it. And I'm asking you, have you -- have you fully viewed the burden to the government? We have. We spend $4.2 trillion every year. You have a multi-billion-dollar budget.

Is the burden so high on you that you could not defeat this product, either through getting the source code and changing it or some other means? are you testifying that?

COMEY:

I see. I -- we wouldn't be litigating if we could. We have engaged all parts of the U.S. government to see does anybody have a way, short of asking Apple to do it, with a 5c running iOS 9 -- to do this, and we do not.

ISSA:

OK. Well, let's go through the 5c running iOS 9. Is -- does the 5c have a non-volatile memory in which all of the encrypted data and the selection switches for the -- the phone settings are all located in that encrypted data?

COMEY:
I don't know.

ISSA:
Well, it does. And take my word for it for now.

So that means that you can, in fact, remove from the phone all of its memory -- all of its non-volatile memory -- its disk drive, if you will -- and set it over here, and have a true copy of it that you could conduct infinite number of attacks on.

Let's assume that you can make an infinite number of copies once you make one copy, right?

COMEY:
I have no idea.

ISSA:
Well, let's go through what you asked -- and I'm doing this because I came out of the security business, and this befuddles me, that you haven't looked at the source code and you don't really understand the disk drive -- at least to answer my rather -- you know, dumb questions, if if you will.

If there's only a memory, and that memory -- that non-volatile memory sits here, and there's a chip, and the chip does have an encryption code that was burned into it, and you can make 10,000 copies of this chip -- this non-volatile memory hard drive -- then you can -- you can perform as many attacks as you want on it.

Now you've asked specifically Apple to defeat the finger code so you can attack it automatically, so you don't have to punch in codes. You've asked them to eliminate the -- the ten and destroy (ph).

**027**

But you haven't, as far as I know, asked them, "OK, if we make 1,000 copies or 2,000 copies of this and we put it with the chip and we run five tries -- 00 through 04 -- and then throw that image away and put another one in and do that 2,000 times, won't we have tried -- with a non-changing chip and an encryption code that is duplicated 2,000 times -- won't we have tried all 10,000 possible combinations in a matter of hours?"

If you haven't asked that question, the question is how can you come before this committee, and before a federal judge, and demand that somebody else invent something if you can't answer the questions that your people have tried this?

COMEY:
Firstly, I'm the director of the FBI. If I could answer that question, there'd be something dysfunctional in my leadership.

ISSA:
Now, I only asked if your people had done these things. I didn't ask you if that would work. I don't know if that would work. I asked you who did you go to -- did you get the source code?

Have you asked these questions? Because you're expecting somebody to obey an order to do something they don't want to do, and you haven't even figured out whether you could do it yourself.

You've just told us, "well, we can't do it," but you didn't ask for the source code, and you didn't ask the questions I asked here today, and I'm just a -- I'm just a guy that...

GOODLATTE:
The time of the gentleman has expired, and the director is permitted to answer the question.

COMEY:

I -- I did not ask the questions you're asking me here today, and I'm not sure I fully even understand the questions. I have reasonable confidence -- in fact, I have high confidence that all elements of the U.S. government have focused on this problem, and I've had great conversations with Apple.

Apple has never suggested to us that there's another way to do it other than what they've been asked to do in the All Writs Act. It could be, when the Apple representative testifies, you'll ask him and we'll have some great breakthrough, but I don't think so.

I'm totally open to suggestions. Lots of people have e-mailed ideas. I've heard about mirroring, and maybe this is what you're talking about. We haven't figured it out.

But I'm hoping my folks are watching this, and if you've said something that makes good sense to them, we'll jump on it. We'll let you know.


ISSA:
Thank you.


GOODLATTE:
The chair recognizes the gentlewoman from California, Ms. Lofgren, for five minutes.


LOFGREN:
Thank you, Mr. Chairman. And thank you, Director Comey, for your service to our country and your efforts to keep us safe. It is appreciated by every member of this committee, and along with your entire agency, we do value your service and appreciate it.

I -- I remember, in law school, the phrase, "bad cases make bad law." I'm sure we all have heard that. And I think this might be a prime example of that rule.

We can't think of anything worse than what happened in San Bernardino -- two terrorists murdering innocent people. It's outrageous. It -- it -- it sickens us, and it sickens the country.

029

But the question really has to be, what is the rule of law here? Where -- where are we going with this? And as I was hearing your opening statement, talking about a world where everything is private, it may be that the alternative is a world where nothing is private.

Because once you have holes in encryption, the rule is it's not a question of if, but when those holes will be exploited, and everything that you thought was protected will be revealed.

Now, the United States law often tends to set international norms, especially when it comes to technology policy. And in fact, China removed provisions that required backdoors when its counterterrorism law passed in December because of the strong international norm against creating cyber weaknesses.

But last night, I heard a report that the ambassadors from America -- the United States, Canada, Germany and Japan sent a joint letter to China, because they're now thinking about putting a hole in encryption in their new policy.

Did you think about the implication for foreign policy, what China might do, when you filed the motion in San Bernardino? Or was that not part of the equation?


COMEY:
Yeah, I don't think -- I don't remember thinking about it in the context of this particular investigation, but I think about it a whole lot broadly, which is one of the things that makes it so hard.

There are undoubtedly international implications -- actually, I think less to the device encryption question, more to the data in motion question. But yeah, I have no doubt that there's international implications.

I don't have good visibility into what the Chinese require from people who sell devices in their country. I know it's an important topic.


LOFGREN:
Before I forget, Mr. Chairman. I'd like to ask unanimous consent to put in the record an op-ed that was printed in the Los Angeles Times today, authored by myself and my colleague Mr. Issa, on this subject.

030

GOODLATTE:

How could anyone object to that being part of the record?

(LAUGHTER)

LOFGREN:

I just note that, in terms of the -- you mentioned that the code at Apple -- that they've done a pretty good job of protecting their code, and you didn't remember anything getting out loose.

LOFGREN:

But I do think -- you know, if you take a look, for example, at the situation with Juniper Networks, where they had -- they -- their job is cybersecurity, really, and they felt that they had strong encryption, and yet there was a vulnerability. And they were hacked and it put everybody's data, including the data of the U.S., I mean, of the FBI and the State Department and the Department of Justice at risk and we still don't know what was taken by our enemies.

Did you think about the Juniper Networks issue when you filed the All Writs Act report, you know, remedy in San Bernardino?

COMEY:

No, but I think about that and a similar of similar intrusions and hacks all day long because it's the FBI's job to investigate those and stop those.

LOFGREN:

I was struck by your comment that Apple hadn't been hacked, but in fact, icloud accounts have been hacked in the past. I think we all remember in 2014 the female celebrity accounts that were hacked from the cloud, from icloud and CNBC had a report that China likely attacked icloud accounts. And then in 2015, last year, Apple had to release a patch in response to concerns that there had been brute force attacks on icloud accounts. So I'm anticipating, we'll see, that Apple will take further steps to encrypt and protect not only its operating system that it has today but also the protection as well as the icloud accounts.

031

And I'll just close with this. I have on my iphone all kinds of messaging apps that are fully encrypted. Some better than others. Some were designed in the United States, a bunch of them were designed in other countries. And I'm not -- I wouldn't do anything wrong on my iphone, but if I were a terrorist I could use any one of those apps and communicate securely and there wouldn't be anything that the U.S. government -- not the FBI, not the Congress or the president -- could do to prevent that from occurring.

So I see this as, you know, the question of whether my security is going to be protected but the terrorists will continue abate. And I thank you, Mr. Comey, for being here. I yield back, Mr. Chairman.


GOODLATTE:
The chair thanks the gentlewoman. And the chair recognizes the gentleman from Texas, Mr. Poe, for five minutes.


POE:
Thank you, Director. Appreciate you being here. Start with a little -- some basics. The Fourth Amendment protects citizens from government. Citizens have rights, government has power. There is nowhere I see in the Fourth Amendment that there is a "except for terrorist case" exception or fear case that the Fourth Amendment should be waived.

I signed lots of warrants in 22 years from everybody, including the FBI. Four corners of the warrant, what is to be searched, and law enforcement typically would fulfill the duty or ability in that warrant as far as they could, which is a good thing, and return the warrant.

Now we have a situation where the issue is not lawful possession. The FIB is in lawful possession of the San Bernardino phone, lawful possession of the phone in New York. You agree with me on that?


COMEY:
Yes.


POE:

So we're not talking about whether the phones are in lawful possession, the issue is whether -- the specific issue is whether government can force Apple in this case to give them the golden key to unlock the safe because they can't develop the key. I know that's kind of simplistic, but is that a fair statement or not?

COMEY:
No.

POE:
It's not?

COMEY:
I think it...

POE:
Well, let me ask you this. OK, you say it's not. Apple developed this software and gives it to -- and unlocks the phone, but this is not the only phone in question, is that correct? There are other phones that the FBI has in lawful possession that you can't get into.

COMEY:
Sure. Law enforcement increasingly encounters phones, investigations all over the place that can't be unlocked.

POE:
OK, so...

COMEY:
That's in the Baton Rouge case too.

POE:
All right, there are several. How many of those cases do you have in lawful possession that you want to get into the phone but you can't get into it because you don't have the software to break into it or to get into it?

COMEY:

I don't know -- I don't know the number. A lot.


POE:

A lot.


COMEY:

And they're all different, which is what makes it hard to talk about any one case without being specific about what...


POE:

But you're in lawful possession of all these phones. This is not the issue of whether the FBI lawfully possesses them. You have these phones, you can't get into them. Here's a specific phone, you want iphone, Apple to develop software to get to this phone.

My question is what would prevent the FBI from then taking that software and going at all those other phones you have and future phones you see?


COMEY:

I see. This seems like a small difference, but I think it's actually kind of a big difference. The ask, the direction from the judge is not to have Apple get us into the phone, it's to have Apple turn off by developing software that will tell the phone to turn off the auto erase and the delay features so that we can try and guess the password.

And so in theory, if you had another 5C running IOS-9, which is what makes this relief possible, I mean it when I say it's obsolete because I understand the 6s, there is no door for us even to try and pick the lock on so it wouldn't work, but if there were phones in the same circumstances, sure. You could ask for the same relief from a court to try and make effective the search warrant.


POE:


034

So rather than giving you the key, it's really you want Apple to turn the security system off so you -- they can get into the phone or you can get into the phone.


COMEY:
Yeah. My homely was take away the drooling watchdog that's going to attack us if we try and open it. Give us time to pick the lock.


POE:
Or like the Viper system that Mr. Issa developed. Turn off the Viper system so you can get into the phone.

And it boils down to the fact of whether or not government has the ability to demand that occur. We have two court rulings, they're different; I've read the opinions. They different -- a little different cases. Would you agree, or not, Congress has to resolve this problem? We shouldn't leave it up to the judiciary to make this decision, Congress should resolve the problem and determine exactly what the expectation of privacy is in these particular situations of encryption or no encryption, key or no key. Would you agree or not?


COMEY:
I think that the courts are competent -- and this is what we've done for 230 years to resolve the narrow question about the scope of the All Writs Act, but the broader question we're talking about here goes far beyond phones or far beyond any case. This collision between public safety and privacy. the courts cannot resolve that.


POE:
So courts -- and only Congress should then resolve what is the expectation of privacy in this high-tech atmosphere of all this information stored in many different places -- on the cloud, on the phone, wherever it's stored. And would you agree or not? I'm just asking since Congress resolved this issue of expectation of privacy of the American citizens.


COMEY:

I think Congress certainly has a critical role to play. Like I said, since the founding of this country, the courts have interpreted the Fourth Amendment and the Fifth Amendment, so they are competent. That's an independent branch of government, but I think there's a huge role for Congress to play. And we're playing it today, I hope.

POE:
Well I agree with you. I think it's Congress responsibility to determine the expectation of privacy in this high- tech world. And I yield back, Mr. Chairman.

GOODLATTE:
The time of the gentleman has expired. The gentleman from Tennessee is recognized for five minutes. There is 9:45 remaining in this vote. I'll take a chance if the gentleman from Tennessee will.

COHEN:
If you want to go, I'll go or I'll come back.

GOODLATTE:
Well, I'm trying to move it along as...

COHEN:
Thank you.

GOODLATTE:
...and not keep the director any longer than we have to. So go ahead.

COHEN:
Director Comey, are there limitations that you could see in permitting the FBI or government in a court to look into certain records, certain type of cases, certain type of circumstances that you could foresee? Or do you want it open for any case where there could be evidentiary value?

COMEY:

036

I'm not sure I'm following you. I like the way we have to do our work, which is go to a judge in each specific case and show lawful authority and a factual basis for access to anybody's stuff.


COHEN:

But if -- but if we decided to pass a statute and we thought it should be limited in some way maybe to terrorism or maybe to something where you -- there's a reasonable expectation that a person's life is in jeopardy or that you could apprehend somebody who has taken somebody's life.

Have you thought about any limits because, you know, under what you're saying, you go to a court -- I mean, you can go to a court for cases that are not capital cases. And that's -- I don't think anybody here is --

But the public's fascinated or -- not, say, riveted on it, it's the fact that what happened in San Bernardino was so awful and if we can find some communication or some list of -- in the -- that was in the cloud that these people contacted, you know, Osama bin Laden's cousin and that they get the -- and find out that he had something to do with it, then that's important. But if you're talking about getting into somebody's information to find out who they sold, you know, two kilos or two bags or whatever, it's a whole different issue.

Where would you limit it if you were coming up with a statute that could satisfy both your interest in the most important cases and yet satisfy privacy concerns?


COMEY:

Yeah, I see. I'm sorry. I misunderstood the question. I don't know, and haven't thought about it well enough. And frankly, I don't think that ought to be the FBI making that -- offering that -- those parameters to you. There is precedent for that kind of thing. We can only seek wiretaps, for example, on certain enumerated offenses in the United States. So it has to be really serious stuff before a judge can even be asked, to allow us to listen to someone's communications in the United States. It can't just be any offense.

So there's precedent for that kind of thing, but I haven't thought about it well enough.

COHEN:
Thank you. Because I'm slow in getting up there to vote and the Republicans hit the (inaudible) real quickly, I'm going to yield back the balance of my time and start to walk fast.

GOODLATTE:
The chair thanks the gentleman.

The committee will stand in recess. We have two votes on the floor with seven minutes remaining in the first vote.

Mr. Director, we appreciate your...

(CROSSTALK)

(RECESS)

GOODLATTE:
The committee will reconvene and continue with questions for Director Comey.

And the chair recognizes the gentleman from Utah, Mr. Chaffetz, for five minutes.

CHAFFETZ:
Thank you, Mr. Chairman.

And to the director, thank you so much for being here. As I've mentioned before, my grandfather was a career FBI agent so I have great affinity for the agency and what you do and how you do it. They almost always make us proud.

But the big question for our country is, you know, how much privacy are we going to give up in the name of security. And as you said, there's no easy answer to that.

038

But when historically, with all the resources and assets of the federal government, all the expertise, all the billions of dollars, when has it been the function of government to compel or force a private citizen or a company to act as an agent of the government to do what the government couldn't do?

COMEY:
I suppose that's a legal question in lots of different circumstances. Private entities have been compelled by court order to assist, again, through the All Writs Act. New York Telephone is the Supreme Court case -- the seminal case on the topic.

CHAFFETZ:
So let's talk for a moment about what you can see and what you can do. With all due respect to the FBI, they did -- they didn't do what Apple had suggested they do in order to retrieve the data, correct? I mean, when they went to change the password, that kind of screwed things up, did it not?

COMEY:
Yeah, I don't know that that's accurate, actually. I -- I wasn't there, don't have complete visibility, but I agreed with the questioner earlier. There was an issue created by the effort by the county, at the FBI's request, to try and reset it to get into it quickly.

CHAFFETZ:
And -- and -- and if they didn't reset it, then they could have gone to a WiFi -- local WiFi -- a known WiFi access and performed that backup so they could go to the Cloud and look at that data, correct?

COMEY:
Right. You could get in the Cloud. Through that mechanism, anything that was backuppable, to make up a word -- the Cloud, but that -- that does not solve your full problem. I think I'd still be sitting here talking about it, otherwise.

039

CHAFFETZ:

But let's talk about what the government can see, on using a phone. And it's not just an iPhone, but you can look at metadata, correct?

COMEY:

Yes.

CHAFFETZ:

The -- the -- the metadata is not -- not encrypted, correct? If I called someone else, or that phone had called other people, all of that information is available to the FBI, correct?

COMEY:

In most circumstances, right -- metadata...

CHAFFETZ:

In this case -- let's talk about this case. You -- you want to talk about this case. You can see the metadata, correct?

COMEY:

My understanding is we can see most of the metadata.

CHAFFETZ:

How would you define metadata?

COMEY:

I was just going to say that. Metadata, as I understand it, is records of time of contact, numbers assigned to the particular caller or texter. It's everything except content. You can't see what somebody said, but you can see that I texted to you, in theory.

My understanding is, with texts in particular, that's tricky, particularly texting using iMessage. There's limitations to our ability to see the metadata around that. Again, I'm not an expert, but that's my understanding.

040

CHAFFETZ:

And do you believe that geolocation, if you're tracking somebody's actual -- where they are, is that content, or is that metadata?

COMEY:

My understanding is it depends upon whether you're talking historical or real-time, when it comes to geolocation data. But it can very much implicate the warrant requirement, and does, in the FBI's work, a lot.

CHAFFETZ:

So that's what we're trying to -- what I -- what's -- what's frustrating to me, being on judiciary, being the chairman of the Oversight Committee, there is nobody on this panel as -- in a republic representative of the people, that have been able to see what the guidance is post-Jones (ph) in understanding how you interpret and what you're actually doing or not doing with somebody's geolocation.

COMEY:

You've asked that of the FBI and not been able to get it?

CHAFFETZ:

The Department of Justice today (ph) have been asking for this for years. What's frustrating is the Department of Justice is asking for more tools, more compulsion, and we can't even see what you're already doing.

We can't even see to the degree you're using StingRays and how they work. I mean, I think I understand how they work, but what sort of requirements are there? Is it articulable suspicion? Is it -- is there a -- is there a probable cause warrant that's being used or needed?

And it's not just the FBI. I mean, you've got the IRS and Social Security and others using StingRays -- again, other tools that, I would argue, are actually content into the -- to somebody's life and not just the metadata that you are able to see.

So how do we get exposure? How do we -- how do we help you if we can't -- if you routinely refuse -- and I say "you", meaning the Department of Justice -- access and explaining to us what tools you already do have and what you can access? How is -- how do we solve that?

COMEY:
Yeah, I don't -- I don't have a great answer, sitting here. I'll go find out what's been asked for and what's been given. I like the idea of giving as much transparency as possible, because I think people find it reassuring, at least with respect to the FBI, to take cell phone -- cell phone tower simulators -- we always use search warrants.

And so that -- that shouldn't be that hard to get you that information.

CHAFFETZ:
What I worry about -- you may be responsible, but I don't know what the IRS is doing with them, and I have a hard time figuring out when that's -- when that is responsible.

Last comment, Mr. Chairman. To what degree are you able to access and get into -- either in this case or broadly -- are you able to search social media in general? And are you using that as an effective tool to -- investigate and combat what you need to do?

GOODLATTE:
The time of the gentleman has expired. The witness can answer the question.

COMEY:
Social media is a feature of all of our lives, and so it's a feature of a lot of our investigations. Sometimes it gives us useful information, sometimes not. It's hard to answer in the abstract. But it's a big part of our work.

GOODLATTE:
Chair thanks the gentleman, and recognizes the gentleman from Georgia, Mr. Johnson, for five minutes.

JOHNSON:

Thank you, Director Comey.

The framers of our Constitution recognized a right to privacy that Americans would enjoy. Fourth Amendment pretty much implies that right to privacy, does it not?

COMEY:

I'm not a constitutional scholar. I think a scholar, if he were sitting here, might say it's not the Fourth Amendment that's the source of the right to privacy. It's other amendments to the Constitution.

But that's a technical answer. The Fourth Amendment is critically important because it's a restriction on government power. You may not look at the people's stuff -- their houses, their effects -- without a warrant and without independent judiciary.

JOHNSON:

But it also grants, impliedly (ph), to the government, the Fourth Amendment, the authority to search and seize when -- when -- when the search or seizure is reasonable. Is that correct?

COMEY:

Again, to be technical, I think the answer is Congress has given the government that authority through statute. The Fourth Amendment...

JOHNSON:

Well, I mean, the Fourth Amendment...

COMEY:

... is a restriction on that authority.

JOHNSON:

043

... the Fourth Amendment says that the right of the people to be secure in their place -- in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue not -- but upon probable cause, supported by oath or affirmation.

And what I'm reading into the Fourth Amendment is that the people do have a right to privacy, have a right to be secure in their persons, houses, papers and effects, but I'm also reading into it an implied responsibility of the government to, on occasion, search and seize.

Is -- would that be your reading of it also?

COMEY:
Yes.

JOHNSON:
And -- of course, upon probable cause. But there are some circumstances where, in the hot pursuit, or at the time of an arrest, there are some exceptions that have been carved out, to where a warrant is not always required to search and seize. Is that correct?

COMEY:
Yes. You mentioned one -- the so-called exigent circumstances doctrine, where if you're in the middle of an emergency and you're looking for a gun that a bad guy might have hid -- you know, in a -- in a car, or something, you don't necessarily have to go get the warrant.

If you have the factual basis, you can do the search, and then have the judge look at it and validate it.

JOHNSON:
Now, even in a situation where exigent circumstances exist, technology has now brought us to the point where law enforcement or government is preempted from being able to search and seize. Is that correct? Technology has produced this result.

COMEY:

044

Yeah, I think technology has allowed us to create zones of complete privacy, which sounds like an awesome thing until you really think about it. But those zones prohibit any government action, under the Fourth Amendment or under our search authority.

JOHNSON:
Well, it's actually a zone of impunity, would it not be? A zone where bad things can happen and the security of Americans can be placed at risk.

COMEY:
Potentially, yes, sir.

JOHNSON:
And that is the situation that we have with end-to-end encryption. Is that not correct?

COMEY:
I think that's a fair description -- where we have communications where, even with a judge's order -- can't be intercepted.

JOHNSON:
Now, you said that you were not a constitutional scholar, and neither am I. But does it seem reasonable that our -- that the framers of the Constitution meant to exempt any domain from its authority to be able to search and seize, if it's based on probable cause, or some exigent circumstance allows for a search and seizure with less than a warrant and a showing of probable cause?

COMEY:
I doubt that they -- obviously, I doubt that they imagined the devices we have today and the ways of communicating. But I also doubt that they imagined there would be any place in American life where law enforcement, with lawful authority, could not go.

045

And the reason I say that is the First Amendment talks about the people's homes. Is there a more important place to any of us than our homes? So from the founding of this country, it was contemplated that law enforcement could go into your house with appropriate predication and oversight.

So to me, the logic of that tells me they wouldn't have imagine any box or storage area or device that could never be entered.

JOHNSON:
So from that standpoint, to be a strict constructionist about the Constitution and the Fourth Amendment, it's ridiculous that anyone would think that we would not be able to take our present circumstances and shape current law to appreciate the niceties of -- of today's practical realities.

I know I'm rambling a little bit. But did you understand what I just said?

COMEY:
I understand what you said, sir.

JOHNSON:
Would you agree or disagree with me?

GOODLATTE:
Time for the gentleman has expired. The director may answer the question.

COMEY:
I think it's the kind of question that democracies were built to wrestle with and that the Congress of the United States is fully capable of wrestling with in a good way.

JOHNSON:
Well, we have been...

GOODLATTE:

The time for the gentleman has expired.


JOHNSON:

Thank you.


GOODLATTE:

The chair recognizes the gentleman from Pennsylvania, Mr. Marino for five minutes.


MARINO:

Thank you, chairman. Mr. Director, it's always a pleasure.


COMEY:

Same, sir.


MARINO:

I'm going to expand a little bit on one of Judge Pole's (ph) questions. Is the bureau asking Apple to simply turn over the penetration code for the bureau to get into or that you want the penetration code at your disposal? Do you understand what I'm saying?


COMEY:

As I understand the judge's order, the way it could work out here is that the maker of the phone would write the code, keep the phone and the code entirely in their office space and the FBI would send the guesses electronically. So, we wouldn't have the phone. We wouldn't have the code. And that's my understanding of it.


MARINO:

That's a good point to clarify. Because there's some -- been a lot of rumors out there. I'm going to switch to the courts a little bit here. Do you see the federal court resolving the warrant issue that the bureau's presently faced with, whatever way that decision eventually comes down, or should Congress legislate the issue now, if at all?

COMEY:

I don't -- I appreciate the question. I don't think that's for me to say. I do think the courts -- some people have said, so, in the middle of this terrorism investigation, why didn't you come to Congress?

Well, because we're in the middle of a terrorism investigation. And so, I think the courts will sort that out faster than any legislative body could but only that particular case. The broader question, as I said earlier, I don't see how the courts can resolve this tension between privacy and public safety we're all feeling.

MARINO:

Another good point. Given that most of the our social, professional and very personal information is on our desktop computers, our laptops and pads and now more than ever, on these things, what is your position on notching up the level at which members of the federal judiciary can approve a warrant to access critically valuable evidence to solve a horrific felony, particularly when fighting terrorism?

COMEY:

Do you mean making the threshold something above probable cause?

MARINO:

No, not the threshold. The judicial -- the federal judicial individuals making this decision. Right now I understand, it's a magistrate. When I was at the state level, we could do some things at sort of the magistrate level or the District Court, but then we had to go to the Superior Court and working in the federal system with you, we had to go to one or two different levels. What is your position on that?

COMEY:

I see what you're saying. So instead of having the magistrate judges decide these questions, the District Court might?

MARINO:

yes, and no disrespect to Magistrate Courts, I'm very good friends with a lot of those brilliant people who will eventually, I know, go to the bench. But, from a perspective of the public that a more narrowly defined, limited number of people making that decision concerning the electronics that we have?

COMEY:
Honestly, Congressman, I haven't thought about that. I agree with you, I have a number of friends who are magistrate judges and they are awesome and they think well and they rule well. I think they're fully capable of handling these issues. But I haven't thought about it well enough to react other than that.

MARINO:
OK. And just for the record, I've managed a couple of prosecution offices and I've never gone to the experts, whether it's in DNA or whether it's in these electronics that ask them did you complete everything that you should have completed.

GOODLATTE:
Thank you, Mr. Marino.

The chair recognizes the gentlewoman from California Ms. Chu, for five minutes.

CHU:
Director Comey, my district is next to San Bernardino. After the terror attack we mourned the loss of 14 lives and empathized with the 22 wounded. And there is indeed fear and anxiety amongst my constituents. So, our discussion here today is particularly important to the people back home. There are many in our area that want answers, but there are also many that feel conflicted about putting their own privacy at risk.

So, my first question to you is, under federal law we do not require technology companies to maintain a key to unlock encrypted information in the devices they sell to customers.

049

Some of the witnesses we'll hear from today argue that if such a key or software was developed to help the FBI access a device used by Syed Farook, it would make the millions of other devices in use today vulnerable.

How can we be sure that we're not creating legal or technical backdoors to U.S. technology that will empower other foreign governments in taking advantage of this loophole?

COMEY:
That's a great question. I think what you have to do is just talk to people on all sides of it who are true experts, which I am not, but I've also talked to a lot of experts. And I'm an optimist. I actually don't think we've given this the shot that it deserves. I don't think the most creative and innovative people in our country have had an incentive to try and solve this problem.

But when I look at particular phones -- in the fall of 2014, the makers of these phones could open them and I don't remember people saying the world was ending at that point and that we're all exposed. And so, I do think judgments have been made that are not irreversible, but I think the best way to get at it talk to people about it.

So why do you make the phone this way and what is the possibility? The world I imagine is a world where people comply with warrants. How they do it is entirely up to them. Lots of phone makers and providers of e-mail and text today provide secure services to their customers and they comply with warrants.

That's just the way they've structured their business and so it gives me a sense of optimism that this is not an impossible problem to solve. Really, really hard and it will involve you all talking to the people who really know this work.

CHU:
Well, I'd like to talk about law enforcement finding technical solutions. I understand there may be other methods or solutions for law enforcement when it comes to recovering data on a smartphone.

050

Professor Landau argues in her testimony later today that solutions to accessing the data already exist within the forensic analysis community, solutions which may include jailbreaking the phone amongst others.

Or she says other entities within the federal government may have the expertise to crack the code. Has the FBI pursued these other methods or tried to get help from within the federal government such as from agencies like the NSA?

COMEY:
Yes, is the answer. We've talked to anybody who will talk to us about it and I welcome additional suggestions. Again, you have to be very specific; 5c running iOS-9, what are the capabilities against that phone? There are versions of different phone manufacturers and combinations of model and operating system that it is possible to break a phone without having to ask the manufacturer to do it.

We've not found a way to break the 5c running iOS-9. And as I said, in a way, this is kind of yesterday's problem because the 5c, although I'm sure it's a great phone, has been overtaken by the 6 and will be overtaken by others that are different in ways that make this relief yesterday.

CHU:
So, let me ask this, like smartphones, safes can be another form of storage of personal information. Similarly to how technology companies are not required to maintain a key to unlock encryption, safe manufacturers are not required to maintain keys or combinations to locks.

Given this, law enforcement has been able to find a way to get into safes under certain circumstances or obtain critical information through other avenues. So, how does this differ from unlocking a smartphone?

It's clear that technology is outpacing law enforcement's ability to get information from devices like the iPhone even with the proper warrant. But isn't it the FBI or the law enforcement agency who bears the responsibility to figure out the solution to unlock the code?

COMEY:

051

I'll take the last part, first. Sure, if we can figure it out. The problem with the safe comparison is there's no safe in the world that can't be opened. If our experts can't crack it we'll blow it up, we'll blow the door off. And so, this is different. The awesome, wonderful power of encryption changes that and makes that comparison frankly inept.

And so sure, where law enforcement can appropriately, lawfully figure out how to do it, we will and should. But there will be occasions and it's going to sweep across, again, with the updating of phones and the changing of apps where we communicate end-to-end encrypted, it's going to sweep across all of our work and outstrip our ability to do it on our own.

CHU:
Thank you, I yield back.

GOODLATTE:
The chair thanks the gentlewoman. The gentleman from South Carolina, Mr. Gowdy, is recognized for five minutes.

GOWDY:
Thank you, Mr. Chairman. Mr. Director, thank you for your service to the country. And I do appreciate your acknowledge and that of my colleagues, of the difficulty in reconciling competing, binary constitutional principles like public safety, national security and privacy.

And I confess up front, my bias is towards public safety. Because of this loosely held conviction I have that the right to counsel, the right to free speech, the right to a jury trial just isn't of much use if you're dead.

So, I reconcile those competing principles in favor of public safety. And my concern as I hear you testify, is that I have colleagues and others who are advocating for these evidence-free zones. They're just going to be compartments of life where you are precluded from going to find evidence of anything.

GOWDY:

And I'm trying to -- I'm trying to determine whether or not we as a society are going to accept that; that there are certain, no matter how compelling the government's interest is in accessing that evidence, we are declaring right now this is an evidence-free zone; you can't go here no matter whether it's a terrorist plot -- and I'm not talking about the FENE (ph) case. That's a drug case. The case the magistrate decided yesterday in New York is a drug case.

Those are a dime a dozen. National security? There's nothing that the government has a more compelling interest in than that, and we're going to create evidence-free zones? Am I missing something? Is that -- is that how you see it? You just can't go in these categories unless somebody consents?


COMEY:
That's my worry and why I think it's so important we have this conversation. Because even I on the surface think it sounds great when people say, "Hey, you buy this device; no one will ever be able to look at your stuff." But there are times when law enforcement saves our lives, rescues our children and rescues our neighborhoods by going to a judge and getting permission to look at our stuff.

And so again, I come to the case of the Baton Rouge, eight-month pregnant women, shot when she opens her door. He mom says she keeps a diary on her phone. We can't look at the diary to figure out what might have been going on in her life. Who was she texting with? That's a problem. I love privacy. But all of us also love public safety and it's so easy to talk about buy this amazing device; you'll be private.

But you have to take the time to think: OK, there's that, and what are the costs of that? And that's where this collision is coming in.


GOWDY:
Well, I love privacy, too, but I want my fellow citizens to understand that most of us also in varying degrees also love our bodies and the physical integrity of our body. But since Schmerber (ph), the government has been able to access orders for either blood against the will of the defendant, or in some instances surgical procedures against the will of the defendant.

So, when I hear my colleagues say: Have you ever asked a nongovernment actor to participate in the securing of evidence? Absolutely. That's what the surgeon does. If you have a bullet from an officer who was shot, and a defendant, you can go to a judge and ask the judge to force a nurse or surgeon to anesthetize and remove that bullet.

So if you can penetrate the integrity of the human body in certain categories of cases, how in the hell you can't access a phone, I just find baffling.

But let me ask you this. If Apple were here, and they're going to be here, how would they tell you to do it? If there were a plot on an iPhone to commit an act of violence against, say hypothetically, an Apple facility, and they expected you to prevent it, how would they tell you to access the material on this phone?

COMEY:
I think they would say what they've said, which I believe is in good faith, that we have designed this in response to what we believe to be the demands of our customers to be immune to any government warrant, or our -- the manufacturer's efforts to get in that phone. We think that's what people want.

And that may be so, except I would hope folks would look at this conversation and say: Really? Do I want that? And take a step back and understand that this entire country of ours is based on a balance. It's a hard one to strike, but it's so seductive to talk about privacy as the ultimate value. In a society where we aspired to be safe and have our families safe and our children safe, that can't be true.

We have to find a way to accommodate both.

GOWDY:
So -- so Apple on the one hand wants us to kind of weigh and balance privacy, except they've done it for us. They have said, at least as it relates to this phone, we've already done that weighing and balancing and there is no governmental interest compelling enough for us to allow you to try to guess the password of a dead person's phone that is owned by a city government.

054

I -- there's no balancing to be done. They've already done it for us. I would just -- I would just tell you, Director, in conclusion, we ask the bureau and others to do a lot of things -- investigate crime after it's taken place; anticipate crimes; stop it before it happens. And all you're asking is to be able to guess the password and not have the phone self-destruct. And you can go into people's bodies and remove bullets, but you can't go into a dead person's iPhone and remove data. I just find it baffling, but I'm out of time.

GOODLATTE:
The gentleman's time has expired.

The chair recognizes the gentleman from Florida, Mr. Deutch, for five minutes.

DEUTCH:
Thank you, Mr. Chairman.

Director Comey, thank you for being here. Thank you for your service and that of the men and women who work for you. We're all grateful for what they do.

And I just wanted to take a moment before I ask you a couple of questions here to let you know that Bob Levinson, who was an agent for over 20 years, 28 years at the Justice Department, continues to be missing. I want to thank you for what you've done. I want to thank you for the Facebook page in Farsi that you've put up. I'd love a report on the effectiveness and what you've heard from that.

And I want to more than anything else, on behalf of Bob's family, I want to thank you for -- for never forgetting this former agent. And I'm grateful for that.

COMEY:
Thank you, sir. He'll never be forgotten.

DEUTCH:

Now, I want to agree with Mr. Gowdy that if this were as easy as public safety or privacy, I think most of us, probably all of us, if we had to make the choice, we're going to opt for public safety for the very reason that Mr. Gowdy spoke of.

But what I'm -- I have some questions. What I'm confused about is this. The tool that you would need to take away the dogs, take away the vicious guard dogs, is a tool that would disable the auto- erase. There's some confusion as to whether there's an additional tool that you're seeking that would allow you to rapidly test possible pass codes. Is there a second tool as well?

COMEY:
Yes, I think there's actually three elements to it. And I've spoken to experts. I hope I get this right. The first is what you said, which is to disable the self-destruct, auto-erase type feature. The second is to disable the feature that between successive guesses, as I understand, the IOS-9 (ph). It spreads out the time. So even if we got the ability to guess, it would take years and years to guess. So do away with that function.

And the third thing is, which is smaller, is set it up so that we can send you electronic guesses, so we don't have to have an FBI agent sit there and punch in 1-2-3-4, 1-2-3, like that.

DEUTCH:
And once they created that, would you expect them -- after this case, would you expect them to preserve that or destroy it?

COMEY:
I don't know. It would depend on what the judge's order said. I think that's for the judge to sort out. That's my recollection.

DEUTCH:
And so, here's the issue. I think that vicious guard dog that you want to take away, so that you can pick the lock, is one thing. But in a world where we do -- I mean, it's true -- there are awful people, terrorists, child predators, molesters who do everything on here. But so -- so do so

056

many of the rest of us. And we would like a pack of vicious guard dogs to protect our information to keep us safe. Because there's a public safety part of that equation as well.

And the -- the example of surgical procedures, the reason that I don't think applies here is because in that case, we know the only one doing the surgical procedure is the doctor operating on behalf of law enforcement. But when this tool is created, the fear obviously is that it might be used by others; that there are many who will try to get their hands on it, and will then put at risk our information on our devices.

And how -- do you -- how do you balance it? It's -- I don't -- this a really hard one for me. This isn't an either-or. I don't see it as (inaudible) option. So, how do you do that?


COMEY:
I think it's a reasonable question. I also think it's something the judge will sort out. Apple's contention, which again I believe is made in good faith, is that there would be substantial risk around creating this software. On the government side, count us skeptical, although we could be wrong, because I think the government's argument is: That's your business to protect your software, your innovation. This would be usable in one phone.

But again, that's something the judge is going to have to sort out. It's not an easy question.


DEUTCH:
If -- if it's -- it's the case, though, that it's usable in more than one phone, and that it applies beyond there, then the public safety concerns that we may have, that a lot of us have about what would happen if the bad guys got access to our phones and our children's phones, in that case, those are really valid, aren't they?


COMEY:
Sure. The question that I think we're going to have litigation about is how reasonable is that concern. And, you know, slippery slope arguments are always attractive, but I mean, I supposed you could say, well, Apple's engineers have this in their head. What if they're

057

kidnapped and forced to write software? That's why the judge has to
sort this out, between good lawyers on both sides making all reasonable
arguments.

DEUTCH:
And I -- just finally, Mr. Chairman, I just worry when we talk about the
precedential value, the discussion is taking place wholly within a
domestic context. There are countries around the world where we know
very well that the governments do their best to monitor what happens in
their country, and through people's cell phones are able to squash
dissent, are able to take action to throw people in jail and to torture
people.

And I think that precedential value is something else that we have to
bear in mind as we engage in this really important, really difficult debate.
And I yield back, Mr. Chairman.

GOODLATTE:
The chair thanks the gentleman.

GOODLATTE:
And recognizes the gentleman from Florida, Mr. DeSantis for five
minutes.

DESANTIS:
Good afternoon, Director Comey. When you're looking at a case like the
Apple case and you want to be able to, as you said, remove the guard
dogs and then the FBI go in, are you concerned about preserving the
evidentiary value that can then we used, or are you more interested in
just getting the information for intel purposes so that you can use that
for counterterrorism?

COMEY:
Our hope is to do both, but if we have to choose, we want the
information first and then we'd like it obviously to be in a form that could
be used if there was a court proceeding against somebody someday.

DESANTIS:
But I guess is there -- are there instances in which maybe a company would provide the data but would provide it to you in a way that you would not necessarily be able to authenticate that in court?

COMEY:
Sure, that happens all the time.

DESANTIS:
And that's something that the FBI -- if that's what you get, then you're fine with that?

COMEY:
It depends upon the case, but in general, that's a tool that we use, private cooperation where we may not be able to use the information in court.

DESANTIS:
And in terms of this, the guy in San Bernardino, it wasn't even his phone and then the owner of the phone has consented for the FBI to have the information. Is that correct?

COMEY:
Right. We have a search warrant for the phone. The guy who was possessing it is obviously dead, and the -- and the owner of the phone has consented.

DESANTIS:
What's the best analogous case to what you're trying to do here? Because people will look at it and say, well, you're basically commandeering a company to have to do these things, that's typically not the way it works. So what would you say is the -- outside of the technology context, what would be an analogous case?

COMEY:

Case 5:16-cm-00010-SP   Document 177-2   Filed 03/15/16   Page 61 of 93   Page ID #:2761

Well, everyone in the United States to some degree has an obligation to cooperate with appropriate authority. The question that the court has to resolve under the All Writs Act is what are the limits of that. Apple's argument is that might be OK if it's -- requires us to hand you something we've already made, to open a phone, but if we're going to make something new, that's beyond the scope of the law.

As you know, that's something courts do every day in the United States, trying to understand a law and interpret its scope based on a particular set of facts. So that's what'll be done in San Bernardino, in a different context it's being done in Brooklyn, in the -- in the drug case in Brooklyn. I think it's being done in different stages all over the country because in investigation after investigation law enforcement is encountering these kind of devices.


DESANTIS:
Have you -- in your cases have you gotten an order under the All Writs Act to just have a defendant, if you have a search warrant, produce the code?


COMEY:
I don't know of a -- I don't of a similar case.


DESANTIS:
In terms of -- I know some of the technology companies are concerned about if they're creating ways to I guess penetrate their systems, that's creating, like, a back door. And my -- I guess my concern is terrorists obviously want to operate in a variety of spheres. One of the ways that they get a lot of bang for their buck is cyber attacks. And so if companies were creating more access for law enforcement in some of these situations, would that create more vulnerability for people and be more likely that they were subjected to a potential cyberattack?


COMEY:

Potentially, sure. If there were access tools that got loose in the wild or that could be easily stolen or available to bad people, it's a concern. As I said, a huge part of the Bureau's work is protecting privacy by fighting against those cybercriminals, so it's something we worry about every day.

DESANTIS:
Well how would you, then, provide assurances if you're requesting a company to work with you that this doesn't get out into the wild so to speak?

COMEY:
Well, I think in the particular case, we have confidence, I think it's justified, that Apple is highly professional at protecting its own innovation and its own information. So the idea here is you keep it. You figure out how to store it. You even take the phone and protect it. I think that's something they do pretty well. But, again, that is something the judge will sort out.

Apple's argument I think will be that's not reasonable because there are risks around that. Even though we're good at this, it could still get away from us and the judge will have to figure that out what's reasonable in that circumstance.

DESANTIS:
Great. Thank you. I yield back the balance of my time.

GOODLATTE:
The chair thanks the gentleman and recognizes the gentleman from Illinois, Mr. Gutierrez.

GUTIERREZ:
Thank you, Mr. Chairman. And thank you, Director Comey, for coming in and being here with us this afternoon. I won't take my five minutes so I'll make a couple of comments and -- beginning by saying that I hope all of the members of the committee will take note that the director is actually answering our questions, and that is obviously very refreshing in that we get a lot of witnesses here and if they bring them, we might

not like them, if we bring them, they don't seem to like them. And it's good to get information without passing judgment. And I think that's what you've done very well here today.

You're not passing judgment on Apple and their motivations. And I think in not questioning people's motivation it's easier to get a solution. Because once you do that, everybody kind of says, OK, let's get all our defenses up, and really what we need to be doing is defending the American people and not Apple or any company or the FBI for that matter, but defending the American people. So I want to thank you for that.

And I just want to suggest that we continue these conversations. I buy a house, I have no reasonable expectation that if you get a warrant you're going to go into my -- any drawer in my bedroom. When I buy the house, I don't have any expectation of privacy once you get a warrant to come.

And I do expect you to get one. I come from a time when I wasn't quite sure the Chicago Police and law enforcement was actually getting warrants in the City of Chicago in the 1960s to get that, so we want to be a little careful and make sure.

I'm trusting of you. If you were the FBI agent, I'd say no problem, Director Comey, come on in. But unfortunately, there are human beings at all the different levels of government, and I just want to say that I'm happy you came because I don't -- I don't have that expectation in my car. I don't have that expectation in -- I don't use the computer a lot, I still write, I don't have any expectation.

But the difference is, and I think you've made it and I think this committee should take it into consideration, we do put a lot of information in these contraptions, and the reason we put them there is because we don't want to put them on a notebook, we want to keep them private. But I don't have any expectation -- I really don't have any expectation once I put this if you have a lawful warrant you should be able to get it even from my computer, if you have...

I think that's where you're going. Could you -- is that where you think -- have I heard you right?


COMEY:

I do. I agree with you, except I think the case for privacy's even stronger than you said. You do have a reasonable expectation of privacy in your home, in your car and in your devices. The government under our Constitution is required to overcome that by going to an independent judge, making a showing of probable cause and getting a warrant.

We need to talk about as a country is we're moving to a place where there are warrant-proof places in our life. And yes, these devices are spectacular because they do hold our whole lives. They're different than a briefcase. They're different than a drawer. So it is a source with -- a place with a tremendous reasonable expectation of privacy. But if we're going to move to a place where that is not possible to overcome that, that's a world we've never lived in before in the United States.

That has profound consequences for public safety, and all I'm saying we shouldn't drift there, right? Companies that sell stuff shouldn't tell us how to be, the FBI shouldn't tell us how to be. The American people should say the world is different. How do we want to be and figure that out.


GUTIERREZ:
Yeah, I think that's -- I think we're on the same place, then, because I do have a reasonable expectation of privacy in my home. But if you go to court, you convince the judge and you overcome it, I have never had any expectation that a court order, because I bought something, a court -- I'm going to be able to overcome a court order. So I think we're in the same place.

So thank you so much, Director, for coming in and sharing your time. I hope you can share more time so we can talk some more. Thank you.


GOODLATTE:
The chair recognizes the gentleman from Iowa, Mr. King for five minutes.


KING:
Thank you, Mr. Chairman. Director, thanks for your testimony here and your leadership of the FBI.

I'm curious about this from a -- from a perspective that has to do with our global war against radical Islamic terrorists. And I have laid out a strategy to defeat that ideology. I would take it back to our ability some years past to be able to identify their cell phones and get into their -- get into their cell phones in such a way that we also got into their heads which drove them into the caves and really it diminished a lot of their otherwise robust activity that they might have -- that al Qaeda might have carried out against us. I think that was a successful effort.

Now we have a global cyberoperations going on with I think by your numbers from a previous report I read well over 100,000 ISIS activities on Twitter and other cyberactivity in a single day. And so I'm interested in how the parameters that have been examined thoroughly by a lot of the lawyers on this panel might apply to an all-out cyberwarfare against ISIS and any of their affiliates or subordinates that I think is necessary if we're going to defeat that ideology.

And so I'm thinking in terms of if this Congress might diminish, slow down or shut down access to this phone, it also means access to any other phone that they might be using. They would have a high degree of confidence that they could operate with a level of impunity in the cyberworld out there.


KING:
Do you have any comments you'd like to make on the implications that being locked out of a opportunity to unlock this phone might mean to a global war on terror that could be prosecuted in the next administration, aggressively across the fields of cyber warfare?

I would just add to that for the sake of enumerating them, financial warfare, educational warfare and human intelligence and the network that would be necessary, not just the kinetic activity, to defeat radical Islamic terrorism.


COMEY:
Thank you, Mr. King. This conversation we're having today and I hope will continue is really important for domestic law enforcement, but it has profound implications for among other things, our counterterrorism work.

064

Because since Mr. Snowden's revelations, terrorist trade craft changed. And they moved immediately to encrypted apps for their communication and trying to find devices that were encrypted, wrap their lives in encryption, because they understand the power of encryption. And so there's no place we see this collision between our love for privacy and the security of encryption and public safety than in fighting terrorism, especially ISIL.

Because for the FBI's responsibility which is here in the United States, every day we're looking for needles in a haystack and increasingly the most dangerous needles go invisible to us because that's when ISIL moves them to an encrypted app that's end-to-end encrypted and a judge's order is irrelevant there.

That's why this is such an urgent feature of our work. It has huge implications for law enforcement overwhelmingly, but it has profound implications in the fight against terrorism.


KING:
Do you get any signals that the American public or the United States Congress is contemplating some of the things that you've discussed here to the depth that it would be a component in the decision making?


COMEY:
I don't know. I know everybody's interested in this and everybody, all thoughtful people, see both sides of this and are trying to figure out how to resolve it, how to resolve it practically, how to resolve it technically and the other challenge is not to make it harder.

There is no it. There isn't a single it. There's all different kinds of manifestations of this problem we call going dark. So what I see is, people of goodwill who care about privacy and safety, wrestling with this. Court cases are important but they are not going to solve this problem for us.


KING:
Let me suggest that -- I'll just say I think it's a known and a given that ISIS or ISIL is seeking a nuclear device. And pretty much said that publicly. If we had a high degree of confidence that they had -- that they

were on the cusp of achieving such capability and perhaps a capability of delivering it, if that became part of the American consciousness, do you think that would change this debate that we're having here today?

COMEY:
I do worry that it's hard to have nuanced, complicated conversations like this in an emergency and in the wake of a disaster, which is why I think it's so important we have this conversation now. Because in the wake of something awful happening, it will be hard to talk about this in a thoughtful, nuanced way. And so I think that's why I so welcome the chairman having this hearing and having further conversations about it.

KING:
I thank you, director. And I will just state that my view is that I want to protect the constitutional rights of the American people, and I'd like to be able to have this framed in law that reflects our constitutional rights.

But I would like to have us consider how we might keep a nation safe in the face of this and how we might prosecute a global war against radical Islam, even in the aftermath of a decision that might be made by either a judge or the United States Congress.

I thank you, Mr. Chairman, and I yield back the balance of my time.

GOODLATTE:
Chairman thanks the gentleman. The gentlewoman from California, Ms. Bass, is recognized for five minutes.

BASS:
Thank you, Mr. Chair, and thank you, Director Comey, for your time and your patience with us today. I had a town hall meeting in my district on Sunday and actually a couple hundred people showed up. And it was a general town hall meeting talking about issues that Congress is dealing with.

And much to my surprise, this was a burning issue. And many of my constituents came to ask me questions and I told them that they could suggest some questions and I would ask you. And maybe you could speak to some of my constituents today so I can send them a clip of your testimony.

Basically, in general, they had a hard time believing -- I mean, they were not supportive. They don't want, you know, Apple to comply. But they had a hard time believing that the FBI couldn't already do this and so a couple of the questions were, how have so many others cracked iPhones and shared their findings with videos and how-to articles?

And given that you described it not as a back door but getting the dogs, you know, away so that you can pick the lock, their question was, what other intelligence community agencies has the FBI worked with, considering there's at least 12 in the government. Between all of these agencies, how is it that you haven't been able to call the dogs off and pick the lock?


COMEY:
Actually, 16 other members of the U.S. intelligence community. It pains me to say this, because I -- in a way we benefit from the myth that is the product of maybe too much television, the only thing that's true on television is we remain very attractive people, but we don't have the capabilities that people sometimes on TV imagine us to have.

If we could have done this quietly and privately, we would have done it. Right? This litigation is difficult. It's especially difficult as I said, for the people who were victimized in San Bernardino and so we really can't. As I said, there may be other models, other permutations and combinations where we have different capabilities.

But I'm here to tell you, here -- and again, maybe tonight someone will call us and say I thought of something. Apple is very good at what it does. It's a a wonderful company who makes wonderful products, right? They have set out to design a phone that can't be opened.

And they are darn near succeeding. I think with the 6 and beyond they will have succeeded. That doesn't make them bad people, that just poses a challenge for us that we're not yet up to meeting without intervention from courts.

067

BASS:

Since you can clone iPhone contents to compatible hardware and test passwords on the clones without putting the original at risk, can't you use so-called brute force methods to guess the pass code?

COMEY:

Not with -- I think this is what Mr. Issa was asking about. I think a lot of tech experts ask, why can't you mirror the phone in some way and then play with the mirror. For reasons I don't fully understand, not possible in this circumstance.

So we do want to try and brute force the phone, that is the multiple guesses. But we need first -- we'll do that ourselves, but we need removed the auto-erase function and the delay between guesses function which would make us take ten years to guess it.

If we have those removed, we can guess the phone's password with our computing power in 26 minutes is what we're told, because we have enormous computing power in the U.S. government. But we need to be able to bring it to bear without the phone killing itself.

BASS:

Thank you. I yield back the balance of my time.

GOODLATTE:

The chair recognizes the gentleman from Idaho, Mr. Labrador, for five minutes.

LABRADOR:

Thank you, Mr. Chairman, thank you Director for being here. Thank you for what you're doing. I know you have a very difficult job as you are trying to balance both security and privacy. I do have a few questions.

As you -- as you are looking at the laws that are in place like CALEA and FISA or the other different avenues that we're talking about, something that concerns me is that this is very different than some of the examples that have been given here.

068

For example, when you have -- when you're going into a home, if you're asking for a key, if you go to the landlord, the key's already made. And you can go to the landlord and you can say, I have a warrant here and that key is made. Can you please give me a key for that? Or the method of creating that key even if the key does not exist is already -- does already exist. This is very different than that. Would you agree?

COMEY:
Yes. Exactly right. There's a difference between, hey, landlord, you have this spare key. Judge directs you to give it to us. Hey, landlord, we need you to make a key for this lock. That's a legal question as to whether the particular statutory authority we're using here, the All Writs Act extends to that.

LABRADOR:
Right.

COMEY:
We think in the government, there's a reasonable argument to be made it does and should and on the other side, lawyers for Apple argue it doesn't and that's what the judge will sort out.

LABRADOR:
But this goes even one step further. In this scenario the landlord can create the key, has the ability to create the key and the technology to create this key already exists.

In the Apple case, that's not the case. They have never created the key that you're asking for, isn't that correct?

COMEY:
I don't know whether that's correct or not.

LABRADOR:

069

Well, as far as we know, as far as they're letting us know, there's no way for them as they're telling it -- because if not, I think they would be violating the judge's order. If they have an ability to do this, I do agree with you that they would be violating the judge's order, but what they're telling us that the ability does not exist. Isn't that correct?

COMEY:
I think that's right. I think obviously, their general counsels are very smart guys here, he can talk about this. But I think what they're saying is we can do it but it requires us to sit at a keyboard and write new code that doesn't currently exist.

Whether there's a meaningful distinction between that and someone who already has a key legally, is something a judge will have to sort out.

LABRADOR:
So what concerns me is the old legal maxim that you know, bad cases make bad law. This is clearly a bad case. We all want you to get access to this phone through legal means because maybe it would uncover some of the problems that we have in the Middle East.

LABRADOR:
Maybe there's some evidence in there that could really lead us to take some terrorists down. I think we are all there. But the problem is that this is a bad case. This is a person who obviously is dead, who does -- has never given his code to somebody else.

And -- and I'm concerned that -- that as we're looking down this road, what we're doing is we're opening the door for other -- other things that could actually be detrimental to -- to our safety and security. For example, I think you've testified many times that we're getting hacked all the time, isn't that correct?

COMEY:
Yes.

LABRADOR:

So maybe one of the reasons that Apple is refusing to do this, or -- or is hesitant to do something like this -- because they know that even they get hacked. And when you open -- when you create that key that doesn't exist at all right now, you're actually opening up every other phone that's out there.

Do you -- do you see how that could be a concern?

COMEY:
I see the argument. The question the judge will have to decide is, is that a reasonable argument.

(CROSSTALK)

LABRADOR:
I'm sorry, no, (inaudible).

COMEY:
OK.

LABRADOR:
You said that Apple is highly -- they are -- they are highly professional in keeping secrets. Would you say that the federal government also has very good people that are highly professional in keeping secrets?

COMEY:
Parts of it.

(UNKNOWN)
Me, too.

LABRADOR:
Recently, we've learned that there's been a hacking incident at the IRS. Are you -- are you familiar with that?

COMEY:
Yes.

LABRADOR:

So that's -- that's what I'm concerned about. The moment that you open
up that door, the -- the moment that you open up that key that doesn't
currently exist, you're actually allowing all these hackers that are out
there -- and some of them are our enemies that are trying to do us
harm, whether it's economic harm or whether it's actual terrorism --
they're out there looking for ways to actually get into your iPhone, into
my iPhone, into everybody else's iPhone.

And at some point -- that's why you have such a difficult job, is we have
to balance that safety and security. Do you think that this capability that
you're asking for will -- can only be used pursuant to a warrant?

COMEY:

The capability that the judge has directed Apple to provide?

LABRADOR:

Correct (ph).

COMEY:

I think that's the way it's -- that's the procedural posture of it -- there's a
warrant, and the judge is (ph) issued an order.

LABRADOR:

That's how it is issued right now. But do you think that that can only be
obtained through a warrant? Or are you seeking to obtain it later
through other means other than warrants?

COMEY:

I don't know how we would, if it's in Apple's possession, unless they
voluntarily gave it to someone. There'd have to be judicial process...

LABRADOR:

OK.

COMEY:

... if they maintained it afterwards.

LABRADOR:
All right. Thank you very much. I've run out of time.

COMEY:
Thank you.

GOODLATTE:
The chair thanks the gentleman, recognizes the gentleman from Louisiana, Mr. Richmond, for five minutes.

RICHMOND:
Thank you -- thank you, Mr. Chairman. Before I start, I'd like to enter into the record two articles -- one is from the Toronto Star, titled "Encrypted evidence is increasingly hampering criminal investigations, police say".

And another one is from the Baton Rouge Advocate, which says, "The Brittney Mills murder case has put Baton Rouge in the middle of the national cell phone encryption debate".

GOODLATTE:
(OFF-MIKE)

RICHMOND:
Thank you, Mr. Chairman. And let me just say -- and, Director Comey, you have mentioned the Brittney Mills case a number of times. And I just want to paint the scenario for everyone in -- in the room, and put a face with it.

This is Brittney Mills, and this is Brittney Mills almost eight months pregnant with her daughter. In May of last year, Brittney was murdered in my district. She was a mother. She was eight months pregnant with her second child at the time. Someone came to her door and killed her. And a couple days later, her unborn child -- or born child -- also died.

And according to her family and her friends, she kept a very detailed diary in her phone. And her family, who are here today -- Ms. Mills, Ms. Barbara Mills, will you please stand -- and Tia and Roderick?

Her family would like the phone opened so that our district attorney, who is also here today -- thank you for standing -- our district attorney, who is also here today, Hillar Moore, can use that to attempt to find the murderer who committed this crime.

And I guess my question, as we balance privacy, public safety, and criminal justice -- that are we in danger of creating an underground criminal sanctuary for some very disturbed people? And how do we balance that?

COMEY:

We are in danger of that. Until these awesome devices -- and that's what makes it so painful -- they're wonderful -- until this, there was no closet in America, no safe in America, no garage in America, no basement in America that could not be entered with a judge's order.

We now live in a different world, and that's the point we're trying to make here. Before we drift to a place where a whole lot of other families in incredible pain look at other district attorneys and say, "what do you mean you can't, you have a court order?" -- before we drift to that place, we gotta talk about it, because privacy is awesome.

But stopping this kind of savagery and murder and pedophilia, and all the other things that hide in the dark spaces in American life, is also incredibly important to us.

That's why this conversation matters so much. But it's also why we have to talk to each other. There are no demons in this conversation. We care about the same things. But it is urgent, and there's no more painful circumstance to demonstrate it than in the death of that beautiful woman and her baby.

RICHMOND:

Well, and -- and I do appreciate you saying we have to talk to each other, because just in the small time that I was able to put the representatives of Apple and the district attorney in the room, I think we made some progress, and maybe some alternatives, and maybe we'll get somewhere.

But it is a -- a very difficult balancing act, and I think the people from Apple are very well-intentioned and have some real concerns.

But let me ask you this -- I took a congressional delegation trip over to the Ukraine. And we -- when we landed our plane, we were on the runway, and our security advisers came on to the back and said, "if you don't want your phone hacked and people to have access to your text messages, your pictures, your e-mails and everything else, we advise you to power your phone off and leave it on the plane.

"And no one is in close enough proximity right now to do it, so if you need to make a call, make a call. But when we get closer to the terminal, you need to power that phone down."

So, does Ukraine have better technology -- well, they were really worried about Russian hackers. But does Russia have that much of a technology advantage over us that they can get into my phone while I'm on it, and it's in my possession, and we can't get into a phone that we have in our possession?


COMEY:
The difference -- and I'm -- I'm going to be careful about what I say in an open setting, is that some countries have different control over their infrastructure, and require providers in their country to make accommodations that we do not require here, to give them greater surveillance capabilities than we would ever imagine in the United States.

That's the first thing. Second thing is, we are a rule of law country. The FBI is not cracking into your phone or listening to your communications, except under the rule of law and going to a judge. Those are the two big differences.

But countries have capabilities, and in part based on accommodations that device makers and providers have made in those countries that are different than this country.

RICHMOND:
Thank you, Mr. Chairman. I see my time has expired.

GOODLATTE:
The chair recognizes the gentlewoman from Washington state, Ms. DelBene, for five minutes.

DELBENE:
Thank you, Mr. Chair, and thank you, Director Comey, for being with us, and for all of your time.

I worked my career in technology, on e-mail and mobile communications, and constantly heard from customers -- both consumers and businesses and even the government -- to make sure that information was protected and that devices were secure.

And in your testimony, you state that you're simply asking to ensure that you can continue to obtain electronic information and evidence, and you seem to be asking technology companies to -- to freeze in place or revert back to systems that might have been easier to access.

But don't you think, in general that that's much -- an oversimplification of this issue? Because we all know that bad actors want to exploit vulnerabilities to -- breaking into any number of things, from a phone, a personal device, to our power grid.

These things aren't static. They're changing constantly, and they're getting smarter every day. The bad actors are getting smarter every day, and we need to be smarter every day in terms of protecting information.

So, in that type of environment, how would you expect a technology company not to continue to evolve their security measures to keep up with new threats that we see?

COMEY:

First of all, I would expect security companies and technology companies to continue to try and improve their security. That's why it's important that all of us talk about this, because it's not the company's job to worry about public safety. It's the FBI's job, Congress' job and a lot of other folks' in the government.

So I -- I don't put that on the companies. But the other thing that concerns me a little bit is this sense that, if we have a world where people comply with government warrants, it must be insecure.

And I don't buy that, because there are lots of providers today of e-mail service, of text (ph) service, who have highly secure systems, who, because of their business models, visualize the -- the information in plain text on their servers so they comply with court orders.


COMEY:
I have not heard people say their systems are insecure. They simply have chosen a different business model. So I actually don't think it's, again, a lot of people may disagree with me, I actually don't think in the main it's a technological problem. It's a business model problem. That doesn't solve it, but that gets us away from this "it's impossible" nonsense.


DELBENE:
But we know more and more, in fact we're seeing -- we're talking about phones today, but we're talking about the growth on the Internet of things of more and more personal devices where security will be even more critical. And so it's hard to say. You're talking about a world where it's combined to the way the world works today. I think that absolutely is not the situation that we're facing. We're seeing evolution every day. And these are devices that are connected to networks and information is flowing.

And that information might be someone's financial information or personal information that if it is exploited would create a security issue itself.


COMEY:
I agree.

DELBENE:

So don't you believe that encryption has an important role to play in protecting security?

COMEY:

Vital.

DELBENE:

So now we've talked about what role Congress plays versus what role the courts would play. And you've kind of talked about both in different scenarios. You've talked about privacy versus security, and that Congress should play a role there. But the courts should decide whether or not there's a security breach, if there's a piece of technology that breaks into a device and whether or not there is a concern that that will be widely available.

Yet, the tension isn't really between just privacy and security. It's between security and security, and protecting people's information. And -- and so, how do you -- where do you think Congress plays a role versus the courts, when you've talked about both of them in your testimony today?

COMEY:

I think the courts have a job to, in particular cases, interpret the laws that Congress has passed throughout the history of this country, to try and decide the government is seeking this relief; does that fit within the statute. That's -- that's the court's job and they're very, very good at it.

The larger societal problem we have is this collision, that I think you've said well, between privacy and security -- very difficult to solve it case by case by case. We have to ask ourselves: How do we want to govern ourselves? If you are a manufacturer of devices in the United States, or you provide communication services in the United States, what are our, as a country, what are our expectations of you and demands of you?

It's hard to me to see that being worked out on a common law basis, honestly. But it's going to be because the issue is joined every single day in our law enforcement work. If nobody else gets involved, the courts will have to figure it out.

078

DELBENE:

This -- this -- this isn't just an issue of U.S. companies alone, because clearly there's access to technology that could be developed in other countries that we'll not have access to, and that's widely available today and people can use.

But also, then, it is important we have laws that are centuries and decades old that have not kept up with the way the world works today. And so it is very important that Congress plays a role because the courts are going to be interpreting those laws, and those laws were written with no awareness of what's happening today. Then Congress needs to play a role of making sure we have laws that are up to date and setting standards that courts can then follow.

Thank you. I yield back, Mr. Chair.

GOODLATTE:

The chair thanks the gentlewoman.

And recognizes the gentleman from New York, Mr. Jeffries.

JEFFRIES:

Thank you, Mr. Chairman.

And thank you, Mr. Comey, for your presence here today. And as one of my colleagues mentioned, your candor and open dialogue and communication is much, much appreciated. It is not always the case with high-level government witnesses and others.

You testified today that you don't question Apple's motives in connection with the San Bernardino case. Is that correct?

COMEY:

Correct.

JEFFRIES:

And you also testified that there are no demons in this conversation. True?

COMEY:
Correct. I hope not.


JEFFRIES:
But the Department of Justice has questioned the company's motives in defending the privacy of the American people. Isn't that right?


COMEY:
I don't think they question their motives, in the sense that attributed sort of that they're acting with evil intent or something. I think they -- I remember a filing the department said where they think a lot of Apple's position has to do with its market power, which I frankly think is not an illegitimate motive.


JEFFRIES:
In fact, in the motion to compel that you refer to, I believe the prosecutor said that Apple's current refusal to comply with the court's order, despite the technical feasibility of doing so, appears to be based on its concern for its business model and public brand marketing strategy. Is that the statement that you're referring to, sir?


COMEY:
Yes. And I think that's -- that's fair. I bet that's accurate. Apple has a legal obligation, because I used to be the general counsel of a public company, to maximize shareholder value. They're a business. And so I would hope that's part of their motivation and it's not a bad thing if it's entirely their motivation. Their job is not to worry about public safety. That's our job, and all of us in this room who work for the government.


JEFFRIES:
William Bratton is the police commissioner of the New York City Police Department. Is that right?


COMEY:
Yes.

JEFFRIES:

It's the largest department in the country?


COMEY:

Yes.


JEFFRIES:

And he's one of the most respected law enforcement professionals in the country. Would you agree with that?


COMEY:

I agree with that very, very much.


JEFFRIES:

Now, at a February 18th press conference in New York City, he publicly accused Apple of corporate irresponsibility. Are you familiar with that remark, sir?


COMEY:

I'm not.


JEFFRIES:

OK. Do you agree with that strident statement, that Apple is engaging in corporate irresponsibility by vindicating its (inaudible)?


COMEY:

I don't know that Bill said that, but I'm not going to characterize it that way. I don't think they're acting irresponsibly. I think they're acting as a corporation in their self-interest, which is the way -- which is the engine of innovation and enterprise in this country.


JEFFRIES:

Fundamentally, as it relates to the position of those of us who are on the Judiciary Committee, as well as members in the House and in the Senate, guardians of the Constitution, this is not about marketing or corporate irresponsibility. Correct? This debate?

COMEY:

I hope not. I mean, I hope part of it is, and that's a voice to listen to. But they sell phones. They don't sell civil liberties. They don't sell public safety. That's our business to worry about.

JEFFRIES:

Right, but in terms of our perspective, this is really about fundamental issues of importance as it relates to who we are as a country, the Fourth Amendment of the United States Constitution, the reasonableness of government intrusion, the rule of law, the legitimate centuries-old concern as it relates to government overreach and the damage that that can do. This is fundamentally a big-picture debate about some things that are very important to who we are as a country. Correct?

COMEY:

I agree completely.

JEFFRIES:

OK. Now, in terms of the technology that's available today, Americans seem to have the opportunity to choose between privacy or unfettered access to data which can reveal the far reaches of their life to a third party, to a government, to a bad actor. Would you agree that there's an opportunity that the technology is providing for Americans to choose privacy?

COMEY:

I don't agree with that framing because it sounds like you're framing as we either have privacy or we have unfettered access by bad actors. I don't accept that premise.

JEFFRIES:

OK. So let me ask a few questions. One of the obstacles to unfettered

access is the pass code. Correct? The pass code?


COMEY:
Yes.


JEFFRIES:
A (inaudible) or six-number pass code.


COMEY:
I naturally quibble because I'm a lawyer, but I'm just stuck on
"unfettered."


JEFFRIES:
OK.


COMEY:
One of the obstacles to access to a device is the password.


JEFFRIES:
Let me drop "unfettered."


COMEY:
OK.


JEFFRIES:
The pass code is an obstacle. Correct?


COMEY:
Correct, correct.


JEFFRIES:
Now, you can choose a pass code or choose not to activate pass code.
Correct?

COMEY:
I think that's right.


JEFFRIES:
OK. Now, whether you back up your system or not is an issue as it relates to access. Correct? In other words, if you don't back up your system, you don't have access. Correct? To the cloud?


COMEY:
Yes. I think if you don't back up your system to the cloud, there's nothing in the cloud that could be obtained by a warrant.


JEFFRIES:
Right. Now, with respect to auto-erase, that is a choice that's being made. In other words, you have to actually affirmatively choose auto-erase. If you didn't choose it, in this particular case or any other case, eventually your computer is powerful enough to get access to the data. Correct?


COMEY:
I think that's right for the 5-C. I think that's -- and folks from Apple could tell you better. I think for the later models, it's not a choice, but I think it's a choice -- I'm reasonable confident it's a choice for the 5-C.


JEFFRIES:
My time is expired, but I think it's important as we frame this debate to understand that it is actually the American citizen that is choosing on at least three different occasions in three different ways, the value of privacy. And that's something that we should respect as Congress attempt to craft a solution.


COMEY:
OK.


GOODLATTE:
The chair thanks the gentleman.

And recognizes the gentleman from Rhode Island, Mr. Cicilline, for five minutes.


CICILLINE:
Thank you, Mr. Chairman.

Thank you, Director Comey, for your service to our country. Thank you for being here today and for the outstanding work of the men and women at the FBI.

We all, of course, acknowledge that incredible horrors of the San Bernardino attack. But I think in many ways what we're struggling is, as Ms. Delbene said, not necessarily security versus privacy, but security versus security. And the real argument that the danger that exists for the misuse of this new technology by foreign agents, by terrorists, by bad actors, by criminals will actually make us less safe in the long term.

And while it may achieve your objective in the short term in this particular case, the implications in terms of our own national security and personal security are -- pose greater dangers. And I think that's what, at least I'm struggling with.


CICILLINE:
I appreciate you said this is the hardest question you've confronted because I think it is a hard one.

But the first thing I want to ask is this is different, would you agree, than all the examples that have been used about producing items in your custody. This is a different kind of warrant because it's actually compelling a third party to produce and create intellectual property which doesn't exist today.


COMEY:
I understand that to be Apple's argument. I don't know enough about the other possible comparisons to give you a thoughtful response. But yes, I understand that.


CICILLINE:

But I mean -- but it's hard to even imagine how a court ultimately enforces that because you have to sort of get into the head of the engineers to figure out did they actually comply with what the government order is directing them to create.

I mean, I'm not saying it's not something you're not allowed to ask for, but it is different, it seems to me, than simply asking people to produce that which they are in possession of, custodians of.

COMEY:
Yeah, I see that. I mean, I heard someone earlier say there's a difference between a landlord that has a key in his pocket, you say you've got to give us the key, and you don't have one. Go make one for that door. And the question for the judge is...

CICILLINE:
Well, this is more than...

COMEY:
...what's the significance of this.

CICILLINE:
...not just go make one, because knowing how to make keys exists, but to develop a whole new technology and intellectual property. So I just want -- I raise that because I think we have to acknowledge it's different and then decide what to do with it.

But in addition to that, you've said repeatedly that the government doesn't have the ability to do this already. And as you know, there was a decision yesterday, Magistrate Judge Orenstein -- I'd ask unanimous consent that that memorandum and order be made part of the record -- in which he actually...

GOODLATTE:
It is already part of the record.

CICILLINE:

OK -- which he goes through and says the All Writs Act doesn't apply; CALEA (ph) prohibits this by omission and, I think, in a very clear way. But in addition to that, he goes on to say that the government argued in an unrelated case that the government actually has the ability to do this, that the Department of Homeland Security investigations, that they are in possession of technology that would allow its forensic technicians to override the pass code security feature on the subject iphone and obtain the data.

So I think this is a very important question for me. If, in fact -- is it, in fact, the case that the government doesn't have the ability, including the Department of Homeland Security investigations, and all of the other intelligence agencies, to do what it is that you claim is necessary to access this information?

COMEY:
Yes.

CICILLINE:
It is very -- the answer is yes?

COMEY:
That is correct. And I don't know, I think -- I could be wrong, but I think the phone in the case from Brooklyn is different. Maybe both the model and the IOS, the operating system is different. But for this -- I'm here to tell you -- and again, people know the sound of my voice. If you've got an idea, let us know. But 5C, IOS 9, we do not have that capability.

CICILLINE:
OK.

COMEY:
Again, to disable -- the problem is we can get into that phone with our computing power if they take off the auto erase and the delay between guesses function, we will get into that phone.

CICILLINE:

So do you agree, Director Comey, that if there is authority to be given to do what you are asking, that that authority has to come from Congress?

COMEY:
No, I don't agree with that.

CICILLINE:
So where do you think the authority comes from?

COMEY:
Well, the government has already asked the court and made the argument under the court that the All Writs Act vests in the judiciary the ability to order this relief. That's what -- that's what the court case is going to be about.

CICILLINE:
OK. So if the ruling made yesterday remains, which rejects the notion that the All Writs Act applies and that CALEA (ph) in fact is Congressional intention on this and the fact that we didn't act on it means you have authorization has not been provided, then would you agree that Congress is the only place that can authorize this? And if so, what would you recommend we do? What would that look like as we grapple with this question?

Because I can tell you, from me having read that, I think CALEA (ph) is clear it doesn't authorize it, it's clear the All Writs Act doesn't. So if there is to be authority, assuming we decide that there should be, it seems it must come from Congress. As director of the FBI, what do you think that would -- what would your recommendation be that would respond to what you see as your needs but also the national security interests of our country?

COMEY:
I'm not prepared to make a recommendation, but I think I get your question now. If the judges are right that you can't use the All Writs Act for this relief, what should Congress do to grant relief? And I'm not prepared to tell you specifically what to do. I do think it's something that Congress is going to have to wrestle with.

088

CICILLINE:
Thank you. I yield back. Thank you, Mr. Chairman. Thank you, Director.


GOODLATTE:
The chair would ask unanimous consent that letters from the Computer
Communications Industry Association dated February 29, a statement
for the record from Raynold Tariche, president of the FBI Agents
Association and a letter dated February 29 from the American Civil
Liberties Union all be made a part of the record.

Director Comey, you've given us three hours -- oh, I'm sorry. I'm
jumping the gun here. The gentleman from California, Mr. Peters, is
recognized for five minutes.


PETERS:
Director Comey, I want to -- first of all, thank you, Mr. Chairman. I want
to thank you for being here.

I wanted to just conclude by saying that I did hear very -- did listen
carefully to your opening statement. I thought it was very constructive. I
think you appreciate the two objectives we have here, which is to both
preserve privacy and to deal with San Bernardino. You've heard the
comment hard cases make bad law. They're still hard cases, and the
problem we see in terrorism now is the onesies and the twosies, and the
notion that we would have invulnerable communications I think is
something that we should all be concerned about.

I hope that you and the panel to follow you will all be part of a
constructive discussion to figure out a way to serve both objectives and
that the lines won't be too hard drawn on either side so that we can do
that. And I appreciate, Mr. Chairman, the chance to thank Director
Comey for being here, and look forward to the next panel.


COMEY:
Thank you.


PETERS:
Yield back.

Case 5:16-cm-00010-SP   Document 177-2   Filed 03/15/16   Page 91 of 93   Page ID #:2791

GOODLATTE:

Chair thanks the gentleman. Director, you've donated three hours of your time to our efforts today -- or more, I'm sure, in getting ready. So we thank you very much for your participation and for answering a multitude of question. And we are looking for answers, so if you have more to add to the record later, we would welcome that later as well. Thank you very much.

COMEY:

Thank you, sir.

CQ Transcriptions, March 1, 2016

**List of Panel Members and Witnesses**

PANEL MEMBERS:
REP. ROBERT W. GOODLATTE, R-VA. CHAIRMAN

REP. LAMAR SMITH, R-TEXAS

REP. JIM SENSENBRENNER, R-WIS.

REP. DARRELL ISSA, R-CALIF.

REP. J. RANDY FORBES, R-VA.

REP. STEVE KING, R-IOWA

REP. TRENT FRANKS, R-ARIZ.

REP. LOUIE GOHMERT, R-TEXAS

REP. JIM JORDAN, R-OHIO

REP. TED POE, R-TEXAS

REP. JASON CHAFFETZ, R-UTAH

REP. STEVE CHABOT, R-OHIO

REP. TOM MARINO, R-PA.

REP. TREY GOWDY, R-S.C.

090

REP. RAUL R. LABRADOR, R-IDAHO

REP. BLAKE FARENTHOLD, R-TEXAS

REP. DOUG COLLINS, R-GA.

REP. RON DESANTIS, R-FLA.

REP. MIKE BISHOP, R-MICH.

REP. KEN BUCK, R-COLO.

REP. JOHN RATCLIFFE, R-TEXAS

REP. DAVE TROTT, R-MICH.

REP. MIMI WALTERS, R-CALIF.

REP. JOHN CONYERS JR., D-MICH. RANKING MEMBER

REP. JERROLD NADLER, D-N.Y.

REP. ZOE LOFGREN, D-CALIF.

REP. SHEILA JACKSON LEE, D-TEXAS

REP. STEVE COHEN, D-TENN.

REP. HANK JOHNSON, D-GA.

RES. CMMSR. PEDRO R. PIERLUISI, D-P.R.

REP. JUDY CHU, D-CALIF.

REP. TED DEUTCH, D-FLA.

REP. LUIS V. GUTIERREZ, D-ILL.

REP. KAREN BASS, D-CALIF.

REP. CEDRIC L. RICHMOND, D-LA.

REP. SUZAN DELBENE, D-WASH.

REP. HAKEEM JEFFRIES, D-N.Y.

REP. DAVID CICILLINE, D-R.I.

Case 5:16-cm-00010-SP   Document 177-2   Filed 03/15/16   Page 93 of 93   Page ID #:2793

REP. SCOTT PETERS, D-CALIF.

WITNESSES:
FBI DIRECTOR JAMES COMEY

Source: **CQ Transcriptions**
© 2016 CQ Roll Call All Rights Reserved.