# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF DOCUMENT DISCREPANCIES

FILED
CLERK, U.S. DISTRICT COURT

MAR 1 6 2016

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION   BY DEPUTY

To: ☐ U.S. District Judge / ☑ U.S. Magistrate Judge  SHERI PYM

From: K. Carter , Deputy Clerk   Date Received: 03/09/15

Case No.: EDCM16-10(SP)   Case Title: In the Matter of the Search of an Apple iphone Seized...

Document Entitled: Brief of Amicus Curiae submitted by P. Stephen Lamont

---

Upon the submission of the attached document(s), it was noted that the following discrepancies exist:

| | | |
|---|---|---|
| ☐ | Local Rule 5-4.1 | Documents must be filed electronically |
| ☐ | Local Rule 6-1 | Written notice of motion lacking or timeliness of notice incorrect |
| ☐ | Local Rule 7-19.1 | Notice to other parties of ex parte application lacking |
| ☐ | Local Rule 7.1-1 | No Certification of Interested Parties and/or no copies |
| ☐ | Local Rule 11-3.1 | Document not legible |
| ☐ | Local Rule 11-3.8 | Lacking name, address, phone, facsimile numbers, and e-mail address |
| ☐ | Local Rule 11-4.1 | No copy provided for judge |
| ☐ | Local Rule 11-6 | Memorandum/brief exceeds 25 pages |
| ☐ | Local Rule 11-8 | Memorandum/brief exceeding 10 pages shall contain table of contents |
| ☐ | Local Rule 15-1 | Proposed amended pleading not under separate cover |
| ☐ | Local Rule 16-7 | Pretrial conference order not signed by all counsel |
| ☐ | Local Rule 19-1 | Complaint/Petition includes more than 10 Does or fictitiously named parties |
| ☐ | Local Rule 56-1 | Statement of uncontroverted facts and/or proposed judgment lacking |
| ☐ | Local Rule 56-2 | Statement of genuine disputes of material fact lacking |
| ☐ | Local Rule 83-2.5 | No letters to the judge |
| ☐ | Fed. R. Civ. P. 5 | No proof of service attached to document(s) |
| ☑ | Other: | Brief is untimely due no later than March 3, 2016. |
| | | No request seeking leave of Court to file such brief submitted. |

**Please refer to the Court's website at www.cacd.uscourts.gov for Local Rules, General Orders, and applicable forms.**

---

### ORDER OF THE JUDGE/MAGISTRATE JUDGE

IT IS HEREBY ORDERED:

☐   The document is to be filed and processed.  The filing date is ORDERED to be the date the document was stamped "received but not filed" with the Clerk.  Counsel* is advised that any further failure to comply with the Local Rules may lead to penalties pursuant to Local Rule 83-7.

_____   _____
Date   U.S. District Judge / U.S. Magistrate Judge

☒   The document is **NOT** to be filed, but instead **REJECTED**, and is ORDERED returned to counsel.*  Counsel* shall immediately notify, in writing, all parties previously served with the attached documents that said documents have **not** been filed with the Court.

3-16-16
_____   _____
Date   ~~U.S. District Judge~~ / U.S. Magistrate Judge

* The term "counsel" as used herein also includes any pro se party.  See Local Rule 1-3.

COPY 1 -ORIGINAL-OFFICE   COPY 2 -JUDGE   COPY 3 -SIGNED & RETURNED TO FILER   COPY 4 -FILER RECEIPT

CV-104A  (06/13)   NOTICE OF DOCUMENT DISCREPANCIES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

P. Stephen Lamont *(pro hac vice* application forthcoming)
ARUMAI TECHNOLOGIES, INC.
175 King Street
Armonk, N.Y. 10504
Telephone: (914) 217-0038
Facsimile: (914) 967-2489
psl@arumaitechnologies.com

Counsel for *Amicus Curiae*

*Returned 3-16-16 xcata*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF AN APPLE IPHONE SEIZED DURING THE EXECUTION OF A SEARCH WARRANT ON A BLACK LEXUS IS300, CALIFORNIA LICENSE PLATE 35KGD20 | ED No. CM 16-10 (SP)<br><br>BRIEF OF AMICUS CURIAE ARUMAI TECHNOLOGIES, INC. IN SUPPORT OF APPLE, INC.<br><br>Hearing:<br>Date: March 22, 2016<br>Time: 1:00 p.m.<br>Place: Courtroom 3 or 4<br>Judge: Hon. Sheri Pym |

# TABLE OF CONTENTS

STATEMENT OF AMICUS CURIAE ................................................................................................ 6

ARGUMENT ................................................................................................................................... 8

I.      THE GOVERNMENT'S REQUEST IS CONFOUNDED BY ITS OWN DESIGN AND BY THE MORE STRINGENT REQUIREMENTS OF 18 U.S.C. § 2510 ET SEQ. ................................................................. 8

    A.      Stored Communications Act ................................................................................................ 8

    B.      Wiretap Act .......................................................................................................................... 9

    C.      The Electronic Communications Privacy Act ..................................................................... 10

    D.      Summary ............................................................................................................................ 11

II.     THE GOVERNMENT'S INTERPRETATION OF THE ALL WRITS ACT IS UNPRECEDENTED AND UNNECESSARY. ......................................................................................................................... 12

    A.      The All Writs Act Is A Limited, "Residual" Source Of Federal Court Authority. .................. 12

    B.      The Government Seeks A Dramatic Extension Of *New York Telephone* To Cover Ever-Evolving Technologies. ....... 14

    C.      The Government's Interpretation Of The All Writs Act Ignores Congress's Comprehensive Regulation Of Investigative Methods. ......................................................................................................................... 19

III.    THE LAW DOES NOT ALLOW FEDERAL AGENTS TO CONSCRIPT COMPANIES INTO DEFEATING THEIR OWN SECURITY SAFEGUARDS AND PRODUCT DESIGNS. ...................................................... 26

    A.      The Government Seeks Here Far More Than The Nonburdensome Technical Assistance Allowed By The All Writs Act.  26

    B.      The Government's Position, If It Prevails, Will Undermine The Security Of Americans' Most Sensitive Data. ............ 30

IV.     THE CANON OF CONSTITUTIONAL AVOIDANCE COUNSELS AGAINST THE GOVERNMENT'S EXPANSIVE INTERPRETATION OF THE ALL WRITS ACT ................................................................................. 34

CONCLUSION ............................................................................................................................. 39

# TABLE OF AUTHORITIES

## Cases

*Adams v. United States ex rei. McCann, 317* U.S. 269, 273 (1942) ............................................................. 9

*Bernstein v. Dep't of Justice,* 176 F.3d 1132, 1141 (9th Cir. 1999) ............................................................ 32

*FTC* v. *Wyndham Worldwide Corp.,* 799 F.3d 236, 240-242 (3d Cir. 2015) ................................................ 27

*Harris v. Nelson,* 394 U.S. 286, 300 (1969) ............................................................................................... 9

*In re Application of United States for an Order Authorizing an In-Progress Trace of Wire Commc'ns Over Tel.Facilities,,* 616 F.2d 1122, 1129, 1132 (9th Cir. 1980) ............................................................................................... 12

*In re Application of United States for an Order Directing X to Provide Access to Videotapes,* No. 03-89, 2003 WL 22053105, at *3 (D. Md. Aug. 22, 8 2003) .......................................................................................... 13

*In re Application of US. for an Order Directing a Provider of Cammlllllication Services to Provide Technical Assistance to Agents of the Us. Drug Enforcement Administration,* No. 15-1242,2015 WL 5233551, at 27 *2, *5 (D.P.R. Aug. 27, 2015) .............. 23

*In re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by This Court,* No. 15-MC-1902 (slip op.) (E.D.N.Y. Feb. 29,2016) ..................................................................................... 10

*In re Order,* No. 15-MC-1902, at 20 ........................................................................................................... 16

*INS* v. *St. Cyr,* 533 U.S. 289, 299-300 (2001) ........................................................................................... 31

*Junger v. Daley,* 209 F.3d 481, 485 (6th Cir. 2000) .................................................................................. 32

*NAACP v. Button,* 371 U.S. 415, 433 (1963) ............................................................................................. 34

*NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 502,506 (1979) ...................................................... 34

*Pennsylvania Bureau Corrections v. United States Marshals Serv.,* 474 U.S. 34,43 (1985) ................... 9

*Riley v. California,* 134 S. Ct. 2473 (2014) ................................................................................................ 13

*Riley v. Nat 'l Fed 'n oj the Blind* II *ojN.c., Inc.,* 487 U.S. 781,796 (1988) ............................................ 33

*United States v. Hall,* 583 F. Supp. 717, 722 (E.D. 5 Va. 1984) .............................................................. 12

*United States* v. *Jones,* 132 S. Ct. 945 (2012) ............................................................................................ 14

*United States* v. *New York Telephone Co.,* 434 U.S. 159 .......................................................................... 10

*Universal City Studios, Inc. v. Corley,* 273 F.3d 429, 448 n.22 (2d Cir. 5 2001); *id.* at 449 ................32

## Statutes

18 U.S.C. § 2703 ........................................................................................................................16

18 U.S.C. §§ 2511-2522 ............................................................................................................16

28 U.S.C. § 1651(a) ....................................................................................................................34

28 U.S.C.12 § 1651(a) ..................................................................................................................9

47 U.S.C. §§ 1001-1010 .............................................................................................................17

50 U.S.C. § 1805 ........................................................................................................................16

50 U.S.C. § 1874 ........................................................................................................................20

Pub. L. No. 114-23,129 Stat. 268 .............................................................................................16

## Other Authorities

Amy Hess, Exec. Assistant Dir., Sci. & Tech. Branch, FBI, *Statement Before the House Oversight and Government Reform Committee, Subcommittee on Information Technology* (Apr. 29, 2015) ................................28

Arumai Technologies, Legal Information *http://www.arumaitechnologies.com/legal-information-4* .......................8

Charlie Savage, *U.S. Tries to Make It Easier to Wiretap21 the Internet,* N.Y. Times, Sept. 27, 2010 .......................17

Cory Bennett & Katie Bo Williams, *Week Ahead: Encryption Fight Heats Up,* The Hill, Feb. 22, 2016 .....................18

Devlin Barrett et al., *Apple and Others Encrypt Phones, Fueling Government Standoff,* Wall St. J. (Nov. 18,2014) ...................26

Dropbox, *2015 Transparency Report,* https:llgoo.gl/HhEUQm; .......................7

Dustin Volz et al., *Key u.s. Lawmaker Suggests Openness to Encryption Legislation After Apple Order,* Reuters, Feb. 19,2016 ... 18

Dustin Volz, *U.S. Lawmakers Seek to Bar States from Mandating Encryption Weaknesses,* Reuters, Feb. 10, 2016 ....................18

Ellen Nakashima, *Google, Facebook all  Other Poweful Tech Firms Filing Briefs to Support Apple,* Wash. Post, Feb. 28, 2016 ...30

Erin Kelly, *Bill Would Stop Feds from Mandating 'Backdoor' to Data,* USA Today, Apr. 2, 2015 ...........................29

Evernote, *Transparency Reportfor 2015,* https:llgoo.gl/MIpwJW; .......................7

Facebook, *Information for Law Eliforcement Authorities,*https:llgoo.glISdfH4r; .......................8

Facebook, *United StatesLaw Enforcement Requestsfor Data, https:llgoo.gllYwTyOQ;* .......................8

Google, *Transparency Report,* https:llgoo.gl/RkS5f8; .......................8

Harold Abelson et al., *Keys Under Doormats: Mandating Insecurity by Requiring Government Access to All Data and Communications* 2 (July 6, 2015) .......................................................................................... 29

James B. Corney, Dir., FBI, *Joint Statement with Deputy Attorney General Sally Quillian Yates Before the Senate Judiciary Committee* (July 8, 2015).......................................................................................... 28

Katie Benner & Matt Apuzzo, *Narrow Focus May Aid F.B.I. in Apple Case,* N.Y. Times, Feb. 22, 2016 .................................... 19

Mike Masnick, Techdirt, *FBI Claims It Has No Record of Why It Deleted Its Recommendation to Encrypt Phones* (Feb. 29, 2016) .......................................................................................... 28

Nicole Perlroth & David E. Sanger, *Obama Won't Seek Access to Enclypted User Data,* N.Y. Times, Oct. 10, 2015 .................. 17

President's Review Grp. on Intelligence & Commc'ns Techs., *Report and Recommendations: Liberty and Security in a Changing World* 22 (Dec. 12, 2013) .......................................................................................... 29

Snapchat, *Law Eliforcement Guide, https:llgoo.gl/H2jSGQ.* .......................................................................................... 8

Snapchat, *Transparency Report,*https:llgoo.gllpZbxnC; .......................................................................................... 8

The Chertoff Group, *The Ground Truth About Encryption and the Consequences of Extraordinary Access* .......................... 29

The White House, *Administration Strategy on Mitigating the Theft of U.S. Trade Secrets* 1 (Feb. 16 2013) ...................... 27

The White House, Office of the Press Sec'y, *Fact Sheet: Cybersecurity National Action Plan* (Feb. 9, 2016) .......................... 27

Yahoo, *Government Data Requests, https:llgoo.glldnwcFv.* .......................................................................................... 8

## Constitutional Provisions

Fourth Amendment .......................................................................................... 13

# STATEMENT OF AMICUS CURIAE

Arumai Technologies, Inc. respectfully submits this brief as *amicus curiae* in support of Apple, Inc.

Arumai Technologies, Inc. ("Arumai"), one of the only pure play OTT products and services companies drives the evolution of digital television forward, as a market leader in pre-processing, streaming, and SoC solutions for video delivery systems that provide a premium viewing experience across all networks, to all devices – and a supplier of an OTT Video Suite of Video Products – proprietary streaming video protocol, a Cloud-Based Transcoding & Streaming System for Media Companies, a Multiscreen OTT Video Stack for Operators, and a differentiated OTT Platform with Social Media Layers for OEM's.

*Amicus* often compete with Apple. But *amicus* here speaks because of the singular importance of this case to them and their customers who trust *amicus* to safeguard their content, data and most sensitive communications from attackers. *Amicus* share the government's and the public's grief and outrage at the heinous act of terrorism that took place in San Bernardino, California, in December 2015, and they fully support the lawful investigation of that crime. But *amicus* are also united with other *amici* in their view that the government's order to Apple exceeds the bounds of existing law and, when applied more broadly, will harm Americans' security in the long run.

To be clear: *Amicus* feels no sympathy for terrorists. Technology companies like *amicus* have obligations under the Stored Communications Act, 18 U.S.C. §§ 2701-2712, and other laws to produce customer data to law enforcement with proper legal process, and *amicus* take their obligations seriously. Many *amicus* have full-time teams of employees - with someone on duty or on call around-the-clock dedicated to responding to law enforcement requests for customer data. Indeed, in just the first six months of 2015, *amici* collectively responded to tens of thousands of U.S. government data requests in criminal cases. Many *amicus* also publish law enforcement guidelines that explain their products, what customer data can be requested through legal process, and how to best serve process on the company. *Amicus,* in short, have no interest in shielding those who break the law. But *amicus* reject the government's unsupported assertion that the law allows it to commandeer a company's own engineers to undermine their products' data security features. The Court should vacate its order compelling Apple to engineer security flaws into its own software and deny the government's motion to compel. See:

Dropbox, *2015 Transparency Report,* https:llgoo.gI/HhEUQm;

Evernote, *Transparency Reportfor 2015,* https:llgoo.gl/MIpwJW;

Facebook, *United StatesLaw Enforcement Requestsfor Data, ttps:llgoo.gllYwTyOQ;*

Google, *Transparency Report,* https:llgoo.gI/RkS5f8;

Microsoft, *Law Eliforcement RequestsReport, https:llgoo.gI/3KHQUB;*

Pinterest, *Quarterly Transparency ReportArchive, https:llgoo.gl/S89TmN;*

Snapchat, *Transparency Report,*https:llgoo.gllpZbxnC;

Yahoo, *Government Data Requests,* https:llgoo.glldnwcFv.

Facebook, *Information for Law Eliforcement Authorities,*https:llgoo.gIISdfH4r;

Snapchat, *Law Eliforcement Guide, https:llgoo.gl/H2jSGQ.*

Arumai Technologies, *Legal Information http://www.arumaitechnologies.com/legal-information-4*

## ARGUMENT

## I.   THE GOVERNMENT'S REQUEST IS CONFOUNDED BY ITS OWN DESIGN AND BY THE MORE STRINGENT REQUIREMENTS OF 18 U.S.C. § 2510 ET SEQ.

### A. Stored Communications Act.

The Stored Communications Act (SCA), codified at 18 U.S.C. Chapter 121 §§ 2701–2712) is a law that addresses voluntary and compelled disclosure of "stored wire and electronic communications and transactional records" held by third-party internet service providers (ISPs) (the "server side"). It was enacted as Title II of the Electronic Communications Privacy Act of 1986 (ECPA).  However, in the government's Dkt. No.1, at 10 (Feb. 19, 2016) (Mot. to Compel), it requests this

Court to compel Apple to assists in invading the device (the "client side") – a big difference. In this case, SCA does not aid the government in its quest.

**B. Wiretap Act.**

As SCA does not apply, neither does Title III of the Omnibus Crime Control and Safe Streets Act of 1968, (Pub. L. 90-351; 6/19/68), also known as the "Wiretap Act" that:

> prohibits the unauthorized, nonconsensual interception of "wire, oral, or electronic communications" by government agencies as well as private parties, establishes procedures for obtaining warrants to authorize wiretapping by government officials, and regulates the disclosure and use of authorized intercepted communications by investigative and law enforcement officers.

Even if the Wiretap Act did aide the government's Motion, more problems arise for the government as:

> General Provisions. Title III prohibits the intentional actual or attempted: interception, use, disclosure, or "procure[ment] [of] any other person to intercept or endeavor to intercept" any wire, oral, or electronic communication. Exceptions: The Act provides exceptions for operators and service providers for uses "in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service" and for "persons authorized by law to intercept wire, oral, or electronic communications or to conduct electronic surveillance, as defined in section 101 of the Foreign Intelligence Surveillance Act of 1978." 18 U.S.C. § 2511. The Act also prohibits the use of illegally obtained communications as evidence. 18 U.S.C. § 2515.

However, in the government's Dkt. No.1, at 10 (Feb. 19, 2016) (Mot. to Compel), it requests this Court to compel Apple to assists in invading the device (the "client side") temporary storage, not communications "in transit"– a big difference.  In this case, the Wiretap Act does not aid the government in its quest.

Were that not enough, Title II (SCA) and Title III (Wiretap Act) are superceded, without limitation, by Title I of 18 U.S.C. § 2510.

**C. The Electronic Communications Privacy Act**

The Electronic Communications Privacy Act and the Stored Wire and Electronic Communications Act, commonly lumped together as the Electronic Communications Privacy Act 18 U.S.C. §2510-22. ("ECPA") are federal laws that prohibit certain types of electronic interception.

Title I of the ECPA created penalties for any person who intentionally:

    a.  intercepts, <u>uses or discloses</u> any wire or oral communication by using any electronic, mechanical, or <u>other device</u>, or

    b.  <u>without authority</u> <u>accesses a wire or electronic communication while in storage</u>

(emphasis supplied).

The statute defines "interception" as the "aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical, or other device" (such as an iPhone App).

The statute defines "electronic storage" as "any temporary, immediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and any storage of such communication by an electronic communication service for purposes of backup protection of such communication." Any storage in an email inbox is temporary storage (the client side") where storage on the server of any domain or ISP is permanent (the "server side").

The ECPA applies to traditional telephone wiretaps, cordless telephone interceptions, electronic messages, voicemail systems, pagers, chat logs, web-streaming video, voice over IP, and recording or videotaping private face-to-face conversations.

The ECPA, as amended, protects wire, oral, and electronic communications while those communications are being made, are in transit, and when they are stored on computers. The ECPA applies to email, telephone conversations, and data stored electronically.

**D. Summary**

As Title II, the SCA, pertains to the "server side" and Title III, the Wiretap Act, pertains to electronic communications "in transit," and Title I, the ECPA, prohibits the use of intercepted electronic communications on the "client side" or "the server

side," the governments Motion is meaningless as it pertains to San Bernadino or anywhere else, *res ipsa loquitur.*

## II.   THE GOVERNMENT'S INTERPRETATION OF THE ALL WRITS ACT IS UNPRECEDENTED AND UNNECESSARY.

### A. The All Writs Act Is A Limited, "Residual" Source Of Federal Court Authority.

The All Writs Act, 28 U.S.C. § 1651, was originally enacted as part of the Judiciary Act of 1789, ch. 20, 1 Stat. 73. That was fifty years before the telegraph was invented and almost a century before Alexander Graham Bell made the first telephone call. Amended just twice, in non-substantive ways, the All Writs Act currently provides:

> The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C.12 § 1651(a).

As its terms indicate, the All Writs Act was not designed to confer sweeping new powers. Rather, it gave federal courts a "residual source of authority to issue writs that are not otherwise covered by statute." *Pennsylvania Bureau Corrections v. United States Marshals Serv.,* 474 U.S. 34,43 (1985). The first Congress recognized that "historic aids" might be necessary for federal courts to exercise and protect their newfound jurisdiction. *Adams v. United States ex rel. McCann, 317* U.S. 269, 273 (1942). The Act supplies those aids, but they are not unfettered; they must be

employed according to established "usages and principles of law." See *Harris v. Nelson,* 394 U.S. 286, 300 (1969) (explaining that "the purpose and function of the All Writs Act [is] to supply the courts with the instruments needed to perform their duty, ... provided only that such instruments are 'agreeable' to the usages and principles of law").

Now, 200 years later, the government endeavors to reinterpret the All Writs Act as an open-ended source of new powers. It asks this Court to endorse an unprecedented expansion of the Act that would allow law enforcement to force private technology companies to circumvent security features that protect their customers' most sensitive information from hackers, criminals, and violators of valid copyrights. Such conscription looks nothing like the "historic aids" that the 1789 Judiciary Act contemplated. Moreover, where the new authority the government seeks would not "fill[] the interstices of federal judicial power," *Pennsylvania Bureau of Corr., 474* U.S. at 41, but would confer on the judiciary a power that the legislature has withheld, it contradicts "the usages and principles of law." For that very reason, another court recently rejected an even less sweeping request under the All Writs Act. *See* Mem. & Order, *In re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by This Court,* No. 15-MC-1902 (slip op.) (E.D.N.Y. Feb. 29, 2016). The court held that the "usages and principles" clause prohibits the government from using the All Writs Act "to achieve a legislative goal that

Congress has considered and rejected." *Id.* at 26; *see infra* Part I.C. As a textual matter, then, the circumscribed authority provided in the All Writs Act cannot and does not support the government's broad reinterpretation.

B. The Government Seeks A Dramatic Extension Of *New York Telephone* To Cover Ever-Evolving Technologies.

Nor has the government justified its boundless reading of the statute under Supreme Court precedent. In keeping with its "residual" status, the All Writs Act has not been extensively analyzed by courts. In this case, both Apple and the government draw heavily from the Supreme Court's 1977 decision in *United States* v. *New York Telephone Co.,* 434 U.S. 159. They have extracted three (or so) factors from *New York Telephone* to guide their analysis. *See* Dkt. No.1, at 10 (Feb. 19, 2016) (Mot. to Compel); Dkt. No. 16, at 20 (Feb. 25,2016) (Mot. to Vacate). But the emphasis on a rigid multi factor test obscures the bigger point. Those factors were not ends unto themselves; they were markers to gauge whether the government had pushed a "residual" power too far.

In the decision on appeal in *New York Telephone,* the court of appeals was concerned that an order to the telephone company would "pose a severe threat to the autonomy of third parties who for whatever reason prefer not to render such assistance." 434 U.S. at 171. The Supreme Court concluded that the lower court had no reason to worry, because "the power of federal courts to impose duties upon third

parties is not without limits." *Id.* at 172. In particular, orders requested under the All Writs Act cannot impose an "unreasonable burden[]."*Id.* The key question in *New York Telephone* was whether a specific order was "appropriate" and not "unreasonable." *Id.* at 172, 174. And that question could not be divorced from the context in which it arose: *New York Telephone* involved the installation of a pen register, "a mechanical device that records the numbers dialed on a telephone." *Id.*at 161 n.1. The Supreme Court thought it "clear that Congress did not view pen registers as posing a threat to privacy of the same dimension as the interception of oral communications," which was governed by statutory procedures. *Id.* at 168. It was equally clear to the Supreme Court that "the use of pen registers [wa]s by no means offensive" to the public utility subject to the order. *Id.* at 174.

It is dangerous to extend that limited endorsement of judicial power over third parties to situations the Supreme Court never could have envisioned and all the more troubling where the Court itself declined to opine on "the diverse contexts in which [third party duties] may arise." *Id.* at 176 n.24. As the Ninth Circuit has explained, *New York Telephone's* only "gloss" on the All Writs Act was its conclusion that a third party could be ordered "to provide non burdensome technical assistance to law enforcement officers." *Plum Creek Lumber Co. v. Hutton, 608* F.2d 1283, 1289 (9th Cir. 1979). But the Supreme Court stopped there. It did not give courts "plenary power" or "a roving commission" to order third parties to assist

law enforcement wherever law enforcement deems it expedient. *Id.* Other applications of the Act have thus hewed carefully to the "nonburdensome technical assistance" required in *New York Telephone. See, e.g., In re Application of United States for an Order Authorizing an In-Progress Trace of Wire Commc'ns Over Tel. Facilities,,* 616 F.2d 1122, 1129, 1132 (9th Cir. 1980) *(Wire Commc'ns)* (ordering telephone company to install devices "virtually identical" to a pen register, which required no "active monitoring by company personnel"); *United States v. X,* 601 F. Supp. 1039,1043 (D. Md. 1984) (ordering telephone company to provide existing toll records for two subscribers); *United States v. Hall,* 583 F. Supp. 717, 722 (E.D. Va. 1984) (ordering bank to produce existing credit card records for a particular account); *In re Application of United States for an Order Directing X to Provide Access to Videotapes,* No. 03-89, 2003 WL 22053105, at *3 (D. Md. Aug. 22, 2003) *(Videotapes)* (ordering apartment complex "to provide access to surveillance tapes already in existence").

The request here is far different. This Court should therefore exercise caution in how it applies a decision from an era in which concepts like "cell phones" and "the Internet" were unheard of. Extending *New York Telephone's* holding as the government requests here would unmoor it from its motivating rationale. And the Supreme Court has cautioned lower courts against woodenly applying prior decisions without assessing

intervening technological change, in the comparable context of the Fourth Amendment[1].

In *Riley v. California,* 134 S. Ct. 2473 (2014), the Supreme Court explained that cell phones had altered the reasonableness of a full search incident to arrest. The Court observed that modem cell phones "are based on technology nearly inconceivable just a few decades ago," when the only relevant search-incident-to-arrest precedents had been decided. *Id.* at 2484. In part because of the quantitative and qualitative differences in available information, it concluded that the reasoning in those precedents did not have "much force with respect to digital content on cell phones." *Id.* Americans live their lives on their phones now. They store their emails, their conversations, their appointments, their photos, sometimes even their medical information, all in a device they carry in their pockets. Cell phones are the way we organize and remember the things that are important to us; they are, in a very real way, an extension of our memories. And as a result, to access someone's cell phone is to access their innermost thoughts and their most private affairs. Those concerns are why the Supreme Court in *Riley* found the difference between searches of cell phones and other searches incident to arrest so stark that "any extension of [the Court's prior] reasoning to digital data has to rest on its own bottom." *Id.* at 2489.

---

[1] Although this case does not formally involve the Fourth Amendment (because the government has a warrant), the principles that inform the Fourth Amendment analysis are instructive here. Both doctrines, after all, assess the reasonableness of government intrusions onto private property, and Congress passed the Fourth Amendment and the 1789 Judiciary Act just four days apart.

A majority of the Supreme Court in *United States v. Jones,* 132 S. Ct. 945 (2012), made a similar point. Writing for four Justices, Justice Alito remarked that "technology can change" an individual's expectations of privacy and thus alter the calculus that courts must perform. *Id.* at 962 (Alito, J., concurring in the judgment). And Justice Sotomayor, writing for herself, emphasized that technology can disrupt the calculus so much that "it may be necessary to reconsider" basic Fourth Amendment premises. *Id.* at 957 (Sotomayor, J., concurring). Again, the critical lesson was that, when transplanting dated precedents into modern technological scenarios, courts should never lose sight of the overarching reasonableness inquiry that underlies all government access to private information.

The same concerns apply here. Whatever principles this Court extracts from the 1977 *New York Telephone* decision about the 1789 All Writs Act, one thing is clear: Applying the All Writs Act here would extend the Act in unprecedented ways, not routinely apply it. The stakes are much higher now-the security interests greater, the government's request broader, the companies' objections sharper, the technological and social problems thornier-than when the Supreme Court assessed the installation of a pen register. As the Supreme Court has cautioned, any extension of the All Writs Act to such complex modern scenarios must "rest on its own bottom." *Riley,* 134 S. Ct. at 2489. The government's proposed extension, which would move beyond companies' existing products to subvert security features millions of

Americans rely on to keep their digital information secure, *see infra* Part II, fails that test. A 200-year-old source of residual power that must be exercised consistently with "the usages and principles of law," 28 U.S.C. § 1651(a), cannot be transformed into a perpetual invitation to reshape private parties' behavior in policy-laden ways.

### C. The Government's Interpretation Of The All Writs Act Ignores Congress's Comprehensive Regulation Of Investigative Methods.

It is well established that the All Writs Act is unavailable "[w]here a statute specifically addresses the particular issue at hand." *Pennsylvania Bureau of Corr.,* 474 U.S. at 43; *see* Mot. to Vacate 15-19. That doctrinal preference for legislative action is also good policy: In light of rapidly evolving technology and its tremendous social benefits, Congress is better suited to confront the issues here. And indeed, Congress has already grappled with these issues on many occasions leading to a comprehensive legislative scheme for regulating investigative methods. "The absence from that comprehensive scheme of any requirement that Apple provide the assistance sought here implies a legislative decision to prohibit the imposition of such a duty." *In re Order,* No. 15-MC-1902, at 20.

In 1968, when Congress turned its attention to surveillance techniques, it initially focused on law enforcement methods. It enacted the Wiretap Act, which lays out specific procedures by which law enforcement can request, and courts can supervise, the interception of communications (originally wire and oral, and later

electronic as well). *See* 18 U.S.C. §§ 2511-2522. In the Foreign Intelligence Surveillance Act of 1978 (FISA), Congress then prescribed specific procedures for the surveillance of foreign intelligence information, and required that certain persons furnish technical assistance to law enforcement. *See* 50 U.S.C. § 1805. It continues to update and amend FISA, including just last year in the USA Freedom Act of 2015. *See* Pub. L. No. 114-23,129 Stat. 268. In 1986, in the Stored Communications Act, Congress also outlined the conditions under which law enforcement can compel an internet service provider to disclose certain subscriber content. *See* 18 U.S.C. § 2703.

Particularly relevant here, Congress next decided to regulate telecommunications carriers and manufacturers of telecommunications equipment.  In 1994, it enacted the Communications Assistance for Law Enforcement Act, commonly known as CALEA, to enhance law enforcement's ability to conduct surveillance. CALEA requires telecommunications carriers and manufacturers to design their services and equipment in a manner that ensures law enforcement can execute court-ordered wiretaps. *See* 47 U.S.C. §§ 1001-1010. It specifically exempts information service providers from that command. *Id.* § 1002(b)(2).  Moreover, it specifies that in most instances telecommunications carriers "shall not be responsible for decrypting, or ensuring the government's ability to decrypt, "communications. *Id.* § 1002(b)(3).

Since CALEA was enacted, there have been a number of proposals to extend it to electronic communication service providers like Apple. Yet Congress has never seen fit to give law enforcement the power it now seeks from this Court. In 2010, for example, the Obama administration prepared a legislative proposal to extend CALEA to all services that enable communications, but never submitted the proposal to Congress. *See* Charlie Savage, *U.S. Tries to Make It Easier to Wiretap the Internet,* N.Y. Times, Sept. 27, 2010. In 2013, it advocated a modified plan that would have imposed fines rather than mandates; that proposal was never formally submitted, either. *See* Charlie Savage, *U.S. Weighs Wide Overhaul of Wiretap Laws,* N.Y. Times, May 7, 2013. In fact, the Obama administration has since dropped the call for new legislation altogether. *See* Nicole Perlroth & David E. Sanger, *Obama Won't Seek Access to Encrypted User Data,* N.Y. Times, Oct. 10, 2015.

Even absent formal proposals from the Executive Branch, Congress has given these issues considerable attention. Legislation aimed at expanding law enforcement's investigative capabilities has been discussed in reaction to this very case. *See* Dustin Volz et al., *Key U.S. Lawmaker Suggests Openness to Encryption Legislation After Apple Order,* Reuters, Feb. 19,2016; Cory Bennett & Katie Bo Williams, *Week Ahead: Encryption Fight Heats Up,* The Hill, Feb. 22, 2016. And legislation has been proposed to block state governments from requiring companies to create encryption backdoors. *See* Dustin Volz, *U.S. Lawmakers Seek to Bar States from*

*Mandating Encryption Weaknesses,* Reuters, Feb. 10, 2016. That debate illustrates exactly how the democratic process should work.

The government ignores that process here and instead seeks powers from the judiciary that the legislature has repeatedly withheld. That is not the function of the courts, or of the gap-filling All Writs Act. *See Pennsylvania Bureau of Corr., 474* U.S. at 41. The government's reading of the Act would "thoroughly undermine both the legislature's own prerogative to reject a legislative proposal effectively and efficiently (without the need to affirmatively ban the proposed authority) and the more general protection against tyranny that the Founders believed required the careful separation of governmental powers." *In re Order,* No. 15-MC-1902, at 27. Those separation-of-powers concerns are especially acute where, as here, the issues at hand are "a matter of high policy for resolution within the legislative process after the kind of investigation, examination, and study that legislative bodies can provide." *Diamond v. Chakrabarty,* 447 U.S. 303, 317 (1980). "That process involves the balancing of competing values and interests, which in our democratic system is the business of elected representatives." *Id.* It should not be truncated by ad hoc judicial decisions.

Make no mistake: If the government prevails in this case, it will seek many such decisions. The government's motion reassures this Court and the public that the request here is a one-time-only hack. *See* Mot. to Compel 14-15. But there are

already strong indications that law enforcement will ask for broad authority, and it is a dangerous precedent, under the All Writs Act on facts far different from the terrorism investigation at hand. For example, FBI Director James Corney just days ago told the House Judiciary Committee that this Court's decision will be "potentially precedential" in other cases involving similar technology. *See* Julia Harte & Julia Edwards, *Apple Lawyer, FBI Director Face Off in Congress on iPhone Encryption,* Reuters, Mar. 2, 2016. Manhattan District Attorney Cyrus Vance, Jr., likewise told journalists that he "[absolutely]" would seek access to all locked phones linked to criminal proceedings if the government's theory were to prevail here. *See* Katie Benner & Matt Apuzzo, *Narrow Focus May Aid F.B.I. in Apple Case,* N.Y. Times, Feb. 22, 2016. That is exactly why this Court should reject any case-specific arguments the government makes here. Investigative tools meant for extraordinary cases may become standard in ordinary ones. *See New York Tel.,* 434 U.S. at 179 (Stevens, J., dissenting in part) (warning that the "accretion [of arbitrary police powers] is no less dangerous and unprecedented because the first step appears to be only minimally intrusive"). As one court has already observed, "[n]othing in the government's arguments suggest any principled limit on how far a court may go." *In re Order,* No. 15-MC-1902, at 44.

For technology companies like *amicus,* the difference between judicial action and legislative action is not merely philosophical and constitutional. It is critical from a

practical standpoint that regulatory changes come, if at all, through the legislative process - and not through decisions from individual judges across the country applying the All Writs Act. *Amicus* pride itself on transparency with the public, particularly with respect to sensitive issues such as disclosing customers content and users' data. They publish privacy reports or privacy policies online, and take revisions to those policies very seriously. And many of them publicly report information about (*See* Google, *Privacy* & *Terms,* https://goo.glINICNc; Snapchat, *Privacy Policy,* http://goo.gl/EvITe2; Facebook, *Data Policy,* http://goo.gllVxoRFQ); the government requests they receive, to the extent permitted by law. *See* 50 U.S.C. § 1874 (regulating public reporting by persons subject to FISA orders). Some of *amici* even fought in court to secure that right.

A boundless All Writs Act could cripple these efforts. Under the ad hoc approach the government advocates, the assistance it can request is limited only by its imagination and the case-by-case reasonableness calls made by magistrate judges across the country. By contrast, when operating within the framework of existing statutes, *amicus* can apply the law openly and evenhandedly. Under current law, companies can describe the types of process they receive - warrants, subpoenas, national security letters, and so on-and explain how they respond. And *amicus's* experiences with law enforcement under existing statutes confirm the wisdom of a statutorily circumscribed approach. Not only can they better account for users'

privacy and security interests (and better communicate with users about those interests), but they can also better assist law enforcement through efficient, consistent, established procedures. After all, technology companies like *amici* respond to tens of thousands of law enforcement requests in criminal cases each year. Indeed, even this case was cooperative at the outset. *See* Dkt. No. 16-32, at 2-3 (Feb. 25, 2016) (Decl. of Lisa Olle) (reciting Apple's immediate compliance with several FBI requests).

All the virtues of statutory predictability fall away if the government can invoke the All Writs Act as expansively as it seeks to do here. The American people as *voters* are cut out of this important debate, because their elected representatives have no opportunity to weigh complex policy choices. And the American people as *consumers* are cut out of the debate, because they cannot select (see Microsoft, *Privacy Statement,* http://goo.gl/mGf4qs;Yahoo,*Privacy Center,*http://goo.gl/Ng6xjn; Box, *Privacy Policy,* http://goo.gl/G5JXDT; Mozilla, *Privacy Policy,* http://goo.gl/LX4rRi; Dropbox, *Privacy Policy,* http://goo.gl/QQrlul; WhatsApp, *Privacy Notice,* http://goo.gl/OGQ7Ll;Evemote,Privacy Policy,https://goo.gl/yKbzbq) products based on company policies or security features if the government may override those policies and features without notice. These repercussions underscore why the

Court should decline to extend *New York Telephone* from the installation of pen registers in the 1970s to the creation of security-defeating technology in 2016.

## III. THE LAW DOES NOT ALLOW FEDERAL AGENTS TO CONSCRIPT COMPANIES INTO DEFEATING THEIR OWN SECURITY SAFEGUARDS AND PRODUCT DESIGNS.

### A. The Government Seeks Here Far More Than The Nonburdensome Technical Assistance Allowed By The All Writs Act.

The government argues that the All Writs Act grants the Court the power to compel any technical assistance from a company that does not require "inordinate effort." Mot. to Compel  But most of the government's cited cases actually stand for a much narrower proposition: that a court can require companies to assist the government with nonburdensome technical assistance - -that is, with tools companies already have available. That is an altogether different power from the one the government seeks here, a power to commandeer private engineers working for private companies to write computer code that would disable the security protections their employers have designed into their products.

In *New York Telephone,* for instance, the phone company already used pen registers for billing purposes and to trace harassing telephone calls to customers. 434 U.S. at 174-175. The telephone company in *Wire Communications* similarly admitted that it used trap-and-trace devices like the one the government had requested "in response to obscene or annoying calls, or following telephone threats." 616 F.2d at 1126. And

in *In re Application of US. for an Order Directing a Provider of Communication Services to Provide Technical Assistance to Agents of the US. Drug Enforcement Administration,* No. 15-1242,2015 WL 5233551, at 27 *2, *5 (D.P.R. Aug. 27, 2015), the court merely required the phone company to use the tools it employed for court-ordered wiretaps to assist with consensual monitoring of a particular phone. In each of the phone cases, the companies could comply with the court's order by employing pre-existing procedures.

That pattern repeats itself outside of the telephone cases. In *United States v. Hall,* the credit card company "routinely" compiled the billing records the government had requested. 583 F. Supp. at 721. And the federal agents in *Videotapes,* would review the tapes the court compelled "by using apartment complex equipment that is currently in operation and routinely used by complex employees." 2003 WL 22053105, at *1. In each case, law enforcement worked within companies' existing capabilities.

The assistance that the government seeks here is thus different not just in degree, but also in kind. The government is not asking companies to do what they do in the normal course of business; the government is asking companies to change how they do business. To honor an order like the Court issued here, companies must divert engineering talent to fundamentally alter their products. *See* Mot. To Compel 13. Their engineers will have to design, create, test, validate, and deploy entirely new

software to undermine security features they previously designed, created, tested, validated, and deployed. *See* Mot. to Vacate 13. The government seeks the power to conscript technology companies' engineers to develop products that they do not want to create, and which they would not create absent government compulsion. That is a far cry from the "nonburdensome technical assistance" that the All Writs Act authorizes. *Plum Creek,* 608 F.2d at 1289.

Against this, the government emphasizes that it is technically feasible for companies like Apple to comply with its requests. It references, for example, Apple's capability or ability to comply with the government's demands no fewer than six times in its motion to compel. *See* Mot. to Compel I, 3 n.2, 6,10, II, 14. The apartment complex in *Videotapes* also "di[d] not contest the government's application," further reducing the case's precedential value. *Videotapes,* 2003 WL 22053105, at * 1. But technical feasibility cannot, and should not, be the standard for reasonableness under the All Writs Act. *Amicus,* like Apple, employ top engineering talent. With enough time and resources, *amicus's* engineers could possibly come up with any number of new versions of their companies' products that circumvent or undermine their pre-existing data-security features. But those new versions would not be the same product anymore. Box would not be Box; Gmail would not be Gmail; WhatsApp would not be WhatsApp; and so on.

That is the key point. How apps and programs store data is not just-as the government claims-a "public brand marketing strategy." Mot. to Compel 3. It is at the core of the products' identities. Some companies pride themselves on promptly deleting users' data when it is no longer needed. *See, e.g.,* Snapchat, *When are Snaps and Chats Deleted?, https:llgoo.gl/adHPnO* ("Delete is our default."); David Rowan, *WhatsApp: The Inside Story,* Wired UK, Feb. 19,2014 (Whats App does not store users' messages on its servers). Others have designed their services so that users can store and easily search large volumes of data spanning a long stretch of time. Indeed, how companies store and manage customers' data is one way companies tailor their chat, e-mail, social-media, and data-storage solutions to customers' needs. Change those features and the government has changed the product in a fundamental way. The government therefore does not seek unobjectionable technical assistance; it seeks the ability to compel technology companies to modify their products, on spec, for the FBI in ways that are contrary to their core values.

The distinction between the use of existing tools and the creation of new ones against companies' wishes is borne out in the Ninth Circuit's All Writs Act case law. *Plum Creek* emphasized that although the Act allows a court to compel a third party "to provide nonburdensome technical assistance," it does not permit "forcing an employer to rescind a company policy so that [a government agency] can more

efficiently conduct an investigation." 608 F.2d at 1289-1290. *Amicus* have policies against undermining their own security features. The government seeks the power to force *amicus* and other technology companies to rescind those policies, and, worse, the power to impose a new, contrary policy. That is precisely what *Plum Creek* forbids. *See id.*

### B. The Government's Position, If It Prevails, Will Undermine The Security Of Americans' Most Sensitive Data.

*Amicus* do not create security-protecting features just to satisfy their own ideological predilections. They also do so in response to "consumer demands to protect private data." Devlin Barrett et al., *Apple and Others Encrypt Phones, Fueling Government Standoff,* Wall St. J. (Nov. 18, 2014). As storing sensitive personal and commercial data electronically becomes less of a luxury and more of a necessity, protecting that data has also become a necessity. That is why in 2013 the White House rolled out a comprehensive strategy to combat trade-secret theft, with a particular focus on enhanced cyber security. *See* The White House, *Administration Strategy on Mitigating the Theft of U.S. Trade Secrets* 1 (Feb. 16 2013), *https:llgoo.gl/S7pXaD.* Strong privacy protections from companies like *amicus* are an important component of that strategy. *See* Office of the Nat'l Counterintelligence Exec., *Foreign Spies Stealing US Economic Secrets in Cyberspace,* A-4 to A-5 (Oct. 2011),

http://goo.gllQidbfG (identifying data encryption and multi-factor authentication measures as "[Best Practices" for data protection).

The government's bid to have technology companies undermine their own security measures is all the more puzzling because the Executive has been *encouraging* companies to increase cyber security in consumer products. The Federal Trade Commission, for instance, has claimed the power to sanction companies that do not adequately secure their customers' data. *See FTC* v. *Wyndham Worldwide Corp.,* 799 F.3d 236, 240-242 (3d Cir. 2015). The White House has touted its work with technology companies, including many of the *amici,* to enhance security on consumer accounts. *See* The White House, Office of the Press Sec'y, *Fact Sheet: Cybersecurity National Action Plan* (Feb. 9, 2016), https://goo.g1l2hWPWV ("By judiciously combining a strong password with additional factors, such as a fingerprint or a single use code delivered in a text message, Americans can make their accounts even more secure."). And Director Comey has told the Senate Judiciary Committee that "[t]he development and robust adoption of strong encryption is a key tool to secure commerce and trade, safeguard private information, promote free expression and association, and strengthen cyber security." James B. Corney, Dir., FBI, *Joint Statement with Deputy Attorney General Sally Quillian Yates Before the Senate Judiciary Committee* (July 8, 2015), https://goo.gllPdhtOw; *see also* Amy Hess, Exec. Assistant Dir., Sci. & Tech.

Branch, FBI, *Statement Before the House Oversight and Government Reform Committee, Subcommittee on Information Technology* (Apr. 29, 2015), https://goo.glljzxaLi ("To be clear, we in the FBI support and encourage the use of secure networks and sophisticated encryption to prevent cyber threats to our critical national infrastructure, our intellectual property, and our data.").

These are not one-off statements. Until recently, the FBI's webpage listed tips for protecting consumers' mobile devices like "[p]asscode protect your mobile device" and "[d]epending on the type of phone, the operating system may have encryption available." Mike Masnick, Techdirt, *FBI Claims It Has No Record of Why It Deleted Its Recommendation to Encrypt Phones* (Feb. 29, 2016), https://goo.gllP8ewUL. Similarly, the President's Review Group on Intelligence and Communications Technologies recommended in December 2013 that the government "take additional steps to promote security" by "(1) fully supporting and not undermining efforts to create encryption standards; (2) making clear that it will not in any way subvert, undermine, weaken, or make vulnerable generally available commercial encryption; and (3) supporting efforts to encourage the greater use of encryption technology." President's Review Grp. on Intelligence & Commc'ns Techs., *Report and Recommendations: Liberty and Security in a Changing World* 22 (Dec. 12, 2013), https:llgoo.gIIHXghaV. *Amicus's* security features in their products comport with these past recommendations.

The government reconciles its conflicting positions by arguing that security is all well and good, just so long as it does not interfere with the execution of a lawful warrant. *See* Mot. to Compel 21. But once a company builds a security - defeating tool, it cannot guarantee that it will be used by law enforcement only and always. *See* Harold Abelson et al., *Keys Under Doormats: Mandating Insecurity by Requiring Government Access to All Data and Communications* 2 (July 6, 2015), https:llgoo.gJlJv5tCK (observing that "exceptional access would create concentrated targets that could attract bad actors"); The Chertoff Group, *The Ground Truth About Encryption and the Consequences of Extraordinary Access,* http://goo.gl/Z9xPpj (concluding that "an extraordinary access requirement is likely to have a negative impact on technological development, the United States' international standing, and the competitiveness of the U.S. economy").

As one legislator has explained, "if we put in backdoors for the convenience of the government, those backdoors can be exploited by hackers and violators of copright as well." Erin Kelly, *Bill Would Stop Feds from Mandating 'Backdoor' to Data,* USA Today, Apr. 2, 2015 (quoting Representative Thomas Massie). Not just hackers: Other countries, including countries with less-robust due-process guarantees, would demand similar access. *See* Ellen Nakashima, *Google, Facebook all Other Powerful Tech Firms Filing Briefs to Support Apple,* Wash. Post, Feb. 28, 2016.   And if companies' security-defeating tools were to fall into the wrong hands,

the companies-not the U.S. government-would be the ones left to deal with the fallout of lawsuits, lost customers, and damaged reputations. That very real risk is not merely a "marketing or general policy concern[]." Mot. to Compel 20. It is a danger that any technology company would be blind to ignore.

The government may believe that the risk to technology companies is so minimal or that the benefit to its investigations so great that the risks are ones that the companies should bear. But the Ninth Circuit held in *Plum Creek* that the All Writs Act "does not give the district court a roving commission to order a party subject to an investigation to accept additional risks at the bidding of' government agents. 608 F.2d at 1289. The All Writs Act, the Court explained, "does not authorize a court to order a party to bear risks not otherwise demanded by law, or to aid the government in conducting a more efficient investigation." *Id.* at 1289-1290. Yet that is what the government asks technology companies to do--to use their own personnel to defeat their own products' security and to assume all the risks that the tool the government commanded them to make will fall into the wrong hands. That is simply too great a risk to impose on third parties under the limited, residual authority furnished by the All Writs Act.

**IV.   THE CANON OF CONSTITUTIONAL AVOIDANCE COUNSELS AGAINST THE GOVERNMENT'S EXPANSIVE INTERPRETATION OF THE ALL WRITS ACT.**

The canon of constitutional avoidance provides yet another reason to reject the government's expansive interpretation of the All Writs Act. Under that canon, where "an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' [a court is] obligated to construe the statute to avoid such problems." *INS* v. *St. Cyr*, 533 U.S. 289, 299-300 (2001) (citation omitted). The government's interpretation of the All Writs Act presents grave constitutional problems under the First Amendment: Computer code is protected speech, and the government asks this Court, under the authority of the All Writs Act, to compel Apple to write code. It also raises serious due process and separation-of-powers questions. *See In re Order*, No. 15-MC-1902, at 27-30; Mot. to Vacate 18-19,34. This Court should reject the government's constitutionally problematic reading of the vague terms of the All Writs Act.

Writing computer code can be a creative, complex, and expressive task, and it is a form of protected speech under the First Amendment. In the Second Circuit's unequivocal words, "software programs qualify as 'speech' for First Amendment purposes." *Universal City Studios, Inc. v. Corley,* 273 F.3d 429, 448 n.22 (2d Cir. 2001); *id.* at 449 ("[W]e join the other courts that have concluded that computer code, and computer programs constructed from code can merit First Amendment protection."). The Sixth Circuit has similarly determined that "computer source

code" is "protected by the First Amendment," because it "is an expressive means for the exchange of information and ideas about computer programming." *Junger v. Daley,* 209 F.3d 481, 485 (6th Cir. 2000). A panel of the Ninth Circuit has likewise held that "encryption software, in its source code form and as employed by those in the field of cryptography, must be viewed as expressive for First Amendment purposes." *Bernstein v. Dep't of Justice,* 176 F.3d 1132, 1141 (9th Cir. 1999) (footnote omitted)[2].

Recent Supreme Court case law strengthens those holdings. In *Sorrell v. IMS Health Inc.,* 131 S. Ct. 2653, 2667 (2011), the Supreme Court reaffirmed the broad principle that "information is speech," and computer code is, at a minimum, a type of information. In *Brown v. Entertainment Merchants Ass 'n,* 131 S. Ct. 2729 (2011), the Court held that digital video games are entitled to First Amendment protection. It explained: "whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary when a new and different medium for communication appears." *Id.* at 2733 (citation and internal quotation marks omitted). Computer code may be a "new and different medium for communication," but it is not, as a consequence, any less deserving of protection.

---

[2] The Ninth Circuit granted rehearing en banc in Bernstein, and withdrew the panel opinion, 192 F.3d 1308 (9th Cir. 1999), but never actually decided the issue en banc because the regulations at issue were changed.

The government seeks to force Apple and its engineers to write software - that is, to engage in protected speech-against their will. In the government's own words, the order would require Apple to "writ[e] software code." Mot. to Compel 13. This Court's order would also require Apple to cryptographically "sign[]" code as authentic when it is clearly nothing more than government compulsion. Order Compelling Apple, Inc. to Assist Agents in Search at 2, No. 15-MJ-451, Dkt. No. 19 (C.D. Cal. Feb. 16,2016). That is classic compelled speech. And as the Supreme Court has explained, "[t]here is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance." *Riley v. Nat 'l Fed 'n of the Blind of N.C., Inc.,* 487 U.S. 781,796 (1988). That is because "the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say." I*d.* at 796-797. Computer code is "protected speech," and technology companies therefore have the right to determine for themselves "what *not* to say." *Id.* The government's interpretation of the All Writs Act would invest courts with a "roving commission" to invade that right. *Plum Creek,* 608 F.2d at 1289.

The All Writs Act certainly does not confer that power explicitly; it is not a blank check to the federal courts. Rather, it only authorizes "writs" that are, among other things, "agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). It is

certainly not *clear* that an order compelling a third-party to write source code is the sort of "writ[]" authorized by the Act, or that it is "agreeable to the usages and principles of law" - because it is historically unprecedented, because it encroaches on an area fully regulated by Congress, and because it is in tension with constitutional values. *Id.*

In the absence of a clearer statement from Congress, the avoidance canon compels a court to construe the vague All Writs Act in a way that does *not* raise serious First Amendment concerns. As the Supreme Court has explained, when one interpretation of a statute "presents a significant risk that the First Amendment will be infringed," a court should adopt it only if it is the "affirmative intention of the Congress clearly expressed." *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 502,506 (1979) (citations omitted); *see also NAACP v. Button,* 371 U.S. 415, 433 (1963) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."). Congress certainly did not express the clear and affirmative intention to authorize orders compelling speech.

In short, the government's reading of the All Writs Act raises serious First Amendment problems, because it would allow a court to compel protected speech. And because the All Writs Act does not clearly and specifically authorize such an order, this Court should decline to grant it.

## CONCLUSION

For the foregoing reasons, the Court should vacate its order compelling Apple to assist the government and deny the government's motion to compel assistance.

Dated: March 3, 2016

Respectfully submitted,

For Amicus Curiae:

By: _____

P. Stephen Lamont
175 King Street
Armonk,, New York, 10504
Tel.: (914)-217-0038
Email: psl@arumaitechnologies.com



UPS

ing the world of commerce

Express Envelope

1 OF 1

0.5 LBS   LTR

P.S. LAMONT
95 BOSTON POST RD
YE NY 10580

SHIP TO:
KIRY GRAY CLERK OF COURT
3470 TWELFTH STREET
RIVERSIDE CA 92501

CA 925 0-02

UPS 2ND DAY AIR   2

TRACKING #: 1Z 3E3 487 02 4817 3466

BILLING: P/P

RECEIVED

2016 MAR -9   PM 2

U.S. DISTRICT
CENTRAL DIST. OF
RIVERSIDE

BY

RECEIVED

2016 MAR -9   PM 2:45

U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

BY